

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-11-2002

# Marshall v. Hendricks

Precedential or Non-Precedential: Precedential

Docket No. 00-9004

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Marshall v. Hendricks" (2002). *2002 Decisions.* Paper 561.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/561

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 1 of 3

PRECEDENTIAL

       Filed September 11, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-9004

ROBERT O. MARSHALL,
       Appellant

v.

ROY L. HENDRICKS*,
Administrator, New Jersey State Prison;
JOHN J. FARMER*, Attorney General,
State of New Jersey

*Caption amended per Court's Order of 8/8/00

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 97-cv-05618)
District Judge: Honorable Joseph E. Irenas

Argued March 21, 2002

Before: BECKER, Chief Judge, ROTH and
RENDELL, Circuit Judges

(Filed: September 11, 2002)


       Stephen W. Kirsch, Esq. [ARGUED]
       Office of Public Defender
       P.O. Box 850
       Richard J. Hughes Justice Complex
       25 Market Street
       Trenton, NJ 08625
        Counsel for Appellant

       Robert E. Bonpietro, Esq. [ARGUED]
       Office of Attorney General of
        New Jersey
       Department of Law & Public Safety
       Division of Criminal Justice
       Richard J. Hughes Justice Complex
       P.O. Box 086
       Trenton, NJ 08625
        Counsel for Appellees

OPINION OF THE COURT

RENDELL, Circuit Judge.

Robert O. Marshall unsuccessfully appealed his sentence of death in the New Jersey courts. He then sought habeas corpus relief in the United States District Court for the District of New Jersey, and having been denied relief there, he has appealed to our court. For the reasons set forth below, we will affirm the District Court's orders as to all claims regarding the guilt phase of Marshall's trial, but we will remand for further evidentiary development as to his claim that his attorney was ineffective in the penalty phase.

I. Facts

Robert O. Marshall, a successful insurance salesman and active member of the community in Toms River, New Jersey, was convicted and sentenced to death in 1986 for having hired someone to murder his wife, Maria, in order that he might gain approximately $1.5 million in insurance proceeds. During the months prior to his wife's death, Marshall had been involved in an affair with Sarann Kraushaar, who, with her husband, belonged to the same

2

country club as the Marshalls. Their affair had advanced to the point that they had made plans to leave their respective spouses, establishing a safe deposit box for joint assets and preparing to lease a cottage together.

Marshall frequented the casinos in Atlantic City and found himself burdened by debt. Within a year of Maria's death, Marshall purchased increasing amounts of insurance on Maria's life. On September 6, 1984, Maria and her husband both were examined by a physician to qualify for an additional insurance policy. That night, while driving home from dinner and gambling in Atlantic City, Marshall allegedly experienced trouble with a tire while on the Garden State Parkway. He pulled into a darkened rest stop area, and, after he had exited the car to examine the tire, Marshall was hit on the head and Maria was fatally shot. We will reprise the facts at some length as they provide a necessary background for understanding much of our analysis.

As police investigated, they uncovered numerous telephone calls from Marshall to Louisiana, primarily to a hardware store in Caddo's Parish. An employee at the hardware store, Robert Cumber, had attended a party in Toms River where he met Marshall. As Marshall told the story, during the course of the evening, he and Cumber discussed insurance and financial instruments, and, at some point, Marshall mentioned that he was seeking an out-of-town investigator to track missing casino winnings that he had given to his wife. He expressed his reluctance to hire a local investigator, since Toms River was a small community where news traveled quickly. After Cumber's return to Louisiana, Marshall mailed information on financial products to him. Cumber also put Marshall in contact with Billy Wayne McKinnon -- although McKinnon did not use his real name in his dealings with Marshall,

using the name James (or Jimmy) Davis instead -- who agreed to conduct Marshall's investigation. Initially, Marshall's only contact with McKinnon was through telephoning Cumber -- both at home and at the hardware store. Even after Marshall and McKinnon met in person, Cumber remained Marshall's primary contact in Louisiana. Marshall wired money to McKinnon -- again as Jimmy

Davis -- on two occasions; McKinnon had a person whose name really was Jimmy Davis sign for the money each time. McKinnon traveled to Atlantic City to meet with Marshall three separate times. The numerous telephone conversations were, according to Marshall, following up on the financial information sent to Cumber. According to McKinnon, they were attempts to find out why it was taking so long for McKinnon to murder Maria Marshall.

On September 21, 1984, investigators met with Marshall in his home, and asked him whether he knew either James Davis or Billy Wayne McKinnon from Shrevesport, Louisiana. Marshall's sister, Oakleigh DeCarlo and Marshall's son, Robert were present during this meeting, which Marshall cut short by refusing to answer questions on the advice of his attorney. On September 25, 1984, Marshall admitted to Sarann Kraushaar that he had lied to her about his Louisiana contacts -- he had previously told her they were related to payments he had made on bets on an NBA playoff game. Kraushaar then decided to end the affair. Shortly thereafter, on September 27, 1984, Marshall checked into a Best Western hotel, into the room that he and Kraushaar had frequented. He telephoned each of his sons, and he also prepared separate tapes for each son, his secretary, and his brother-in-law, Joseph Dougherty, who happened to be an attorney.[1] He took the tapes addressed

_____

1. Marshall played the tapes to his sons and his secretary during his testimony; they contained no incriminating statements. The State played the tape to his brother-in-law to the jury as part of its case, and, when Marshall testified, he was cross-examined about the statements on the tape.

In a rambling narrative, the Dougherty tape discussed Marshall's relationship with Kraushaar, including his plans to leave Maria, his escalating debt that had spiraled to almost $200,000, and his concerns that the police suspected his involvement in Maria's murder because he had hired McKinnon to find five or six thousand dollars that was missing. Marshall also explained that Maria had hired an investigator who had disclosed his affair to others. At one point in the tape, Marshall stated, "The . . . thought that comes to mind is that if . . . anybody, who knew about it . . . the attorney who he told who is a friend of mine, or any of the people who the attorney told . . . if they had said something to me, this entire thing would not have happened . .. because we

to his secretary and his brother-in-law to the front desk,
where he placed them in a container for outgoing mail. He
then added a large quantity of prescription sleeping pills to

---

wouldn't have been in Atlantic City that night . . . .. Worse than that, if
Maria had confronted me when she either wanted to or. . . sooner,
again, none of this would have happened." PCR Appeal, State Appendix,
Vol. 4 at PA573. Marshall stated that he was convinced that he would be
indicted, found guilty, and sentenced to death. Id. at PA574. Marshall
asked his brother-in-law to communicate his love for Maria and tell the
authorities that Sarann "was not involved in any way." Id. He also
instructed Dougherty as to how he wished certain items distributed.
Marshall discussed his desire that the two older boys continue at their
colleges, and be given spending money, and he expressed a hope that
the youngest would be able to finish out the year at the same high
school, and that he not live with Marshall's in-laws, unless the in-laws
moved to Toms River. He also expressed a desire that his oldest son have
a new Mustang convertible to replace the current one, and that a used
Porsche be purchased for the youngest son when he turned 17. He
discussed his desire that he be buried with Maria, preferably at Saint
Joseph's. He asked Dougherty to convey his love to several people. If
possible, he wanted the boys to retain the house.

Marshall also said that his sons were not aware of the "latest
developments." Id. at PA585. He then discussed details of hiring
McKinnon through Cumber as an investigator. He stated that he met
Cumber at his neighbor's party in May. He admitted paying him $6300,
including $800 the night of Maria's murder. He also admitted to calling
Cumber several times attempting to contact McKinnon. Marshall had
learned that Cumber and McKinnon had been indicted, and was
convinced that the third sealed indictment was for him. He characterized
the evidence against him as circumstantial, and asked Dougherty to
communicate to his older sons as much as he felt comfortable telling.
Marshall said, "I just feel that . . . that, plus the . . . life insurance, the
debt and Siran [sic], that, uh . . . it just .. . looks so bleak." Id. at
PA587. He closed with "I hate doing what I ha-- . . .what I'm going to do
. . . because of the boys. I know . . . how it's gonna hurt them. So please
help them . . . . I know I don't have to ask, I know you will . . . . And
help them, Joe . . . they're good boys . . . . They don't deserve this . . .
just like Maria didn't deserve what happened, either. . . . But Joe, I
want to be with her . . . and I pray that God will allow me to be . . .
'cause I can't go on like this. I love you all, .. . especially Robbie, Chris,
and John . . . . Please pray for me . . . and thanks, Joe. . . . Thanks for
everything . . . . I love you. . . ." Id. (Ellipses in original transcript of
tape; actual tape not submitted on appeal).

5

a soda, explaining later that he had intended to drink the
soda and commit suicide that night, but had fallen asleep
prior to consuming the drink.

Hotel personnel alerted the police that Marshall had
checked into the hotel. When Marshall did not respond to
a telephone call to his room, they forced entry and
transported him to a hospital. His counsel, Glenn Zeitz,
arranged for him to be transferred to a Philadelphia
psychiatric hospital for observation. Police also seized the

tapes, but did not play them until after they had secured a search warrant.

The prosecutor entered into a plea bargain favorable to McKinnon, offering him an extremely light sentence and assistance with entry into the witness protection program in return for testimony against Marshall and for naming and implicating the person who actually shot Maria Marshall. McKinnon named Larry Thompson as the shooter. Larry Thompson was a person whom Marshall had never met, who lived in Louisiana near McKinnon.

Marshall and Thompson were tried together. Opening statements were made on January 27, 1986. McKinnon testified at length, as did Kraushaar. Prior to and between McKinnon and Kraushaar, and at the close of the State's case, the prosecutor interspersed the testimony of persons who independently corroborated pieces of McKinnon's testimony with the testimony of the officers who responded the night of the murder and those who investigated the crime, including forensics experts. The State also elicited testimony from Maria Marshall's attorney and an investigator she had hired prior to her death, so the jury knew that Maria Marshall had been aware of Marshall's affair prior to her death. Other witnesses testified as to the existence, timing, and amounts of the insurance policies taken out against Maria's life. The contents of the"suicide" tape to Marshall's brother-in-law were also played for the jury.

McKinnon testified that on his first visit to New Jersey, he had made reservations at the Islander Motel in Atlantic City because Harrah's was booked. Since the taxi driver could not find the Islander, he had dropped him off at

6

Harrah's, where McKinnon was able to get a room. McKinnon further testified that Marshall had asked McKinnon to kill Maria that night in the parking lot of a local restaurant, the Ram's Head Inn, but that, though he did visit the parking lot that night, it was crowded, and he simply returned to the hotel. A taxi driver then independently testified that he had picked McKinnon up at the airport on the date in question, could not find the Islander, dropped him off at Harrah's, and then, an hour later, took him to the Ram's Head Inn, where they drove around the building and then returned to Harrah's. Direct Testimony of Tae Yeon, February 10, 1986, St. Ex. 18T at 22-25. Shortly before noon on February 20, 1986, the State rested.

Marshall's case began with the testimony of the letter carrier who collected the mail from the Best Western hotel, seeking to establish that the tapes -- which the trial court had refused to suppress -- had been taken from a closed depository rather than an open container as the officers who seized the tapes had contended. Other Best Western employees were also called to testify as to the mail

container. One, Zillah Hahn, also testified that she notified the authorities when Marshall checked in.

Marshall called an insurance salesman from Cranford, New Jersey, who testified briefly that Marshall was viewed as an "upstanding professional, insurance agent, businessman and family man," and that the community considered him to be "a law abiding citizen, that he has integrity, that he has truthfulness." Direct Testimony of Gerald Hughes, February 20, 1986, St. Ex. 26T at 144-46. On cross-examination, Hughes admitted that he was not a member of the Toms River community; rather his acquaintance with Marshall was through the insurance business and social occasions. Id. at 146-47. Other insurance and financial services salesmen testified about the company whose policies Marshall sold primarily, his success at selling, and described in general the insurance sales industry and its practices. Tamburin, the man who taught Marshall a system of "comps" that he practiced at the casinos, was, through confusion as to when he had been placed on the witness list, allowed to testify only as to

his personal opinion that Marshall's reputation for being a law-abiding citizen and truthful and honest was"good." Direct Testimony of Henry Tamburin, February 20, 1986, St. Ex. 26T at 250-51.

One of Marshall's sisters, Oakleigh DeCarlo, testified, but only as to the events of September 21st, when the police questioned Marshall at his home about the names they had traced in Louisiana. Marshall then took the stand. He gave a brief autobiographical sketch, recounted his version of the affair with Kraushaar and his relationship with McKinnon, and gave his account of the events leading up to Maria's death. Then, a couple who were acquaintances of Marshall testified that he had a good reputation for being a law-abiding citizen and truthful and honest man. Marshall's youngest son, John, testified briefly, recalling that his father called him from the Best Western sounding "depressed and kind of upset." Direct Testimony of John Marshall, February 26, 1986, St. Ex. 29T at 186. His middle son, Chris, testified that his father had called him that afternoon, and sounded "nervous." On cross-examination, Chris testified that his father had sounded as though he were saying good-bye. Cross-Examination of Chris Marshall, February 26, 1986, St. Ex. 29T at 190. Marshall's brother-in-law, Joseph Dougherty, an attorney, testified that he had drafted powers of attorney, which Marshall signed, appointing Dougherty guardian over John and authorizing him to handle Marshall's affairs. They were executed shortly after Maria's death, but before the episode at the Best Western hotel. Dougherty characterized his role in trial preparation as co-counsel in a limited capacity. The tapes to Marshall's sons and secretary were played as part of Marshall's testimony.

Dr. Elliot Atkins, a licensed clinical pyschologist, testified

that he drove with Glenn Zeitz, Marshall's counsel, to see Marshall the night of the Best Western episode, and that, upon his recommendation, Marshall was transferred to the Institute of Pennsylvania Hospital, a psychiatric hospital, where Marshall remained as an in-patient for approximately two weeks. Because Dr. Atkins was not qualified as an expert witness, he was not allowed to testify as to any opinion regarding Marshall's condition at the time.

Marshall's oldest son, Robert, testified that he, his mother, and his father had had lunch at the country club the day of his mother's murder. This information contradicted McKinnon's testimony; McKinnon had testified that he and Marshall were on the Garden State Parkway looking for an appropriate site to stage the murder at the time in question. Robert also discussed the events on September 21, when the police questioned Marshall at their house; he had let them in and sat with his father during the questioning. He testified that his father had"warned them before hand [sic] . . . that he was instructed not to answer them, and it didn't seem to matter to the two men, they just asked them anyway. They seemed to bounce off him." Direct Testimony of Robert Marshall, February 27, 1986, St. Ex. 31T at 163-64. When his father called him from the Best Western, "it wasn't the same dad that I'd been used to talking to. He sounded shaky, like he's been through a lot, that type of thing." Id. at 164. Robert also testified that the family wanted to bury his mother in Florida, and had planned to travel there in December, but his father's arrest had caused them to postpone the arrangements.

Marshall's counsel had retained an investigator, Russell Kolins, who testified as to his investigation in Louisiana and his interviews with Billy Wayne McKinnon. Some of the investigators originally called by the State were recalled.

McKinnon had testified that he and Thompson had driven to New Jersey, and that he had met with Marshall late in the morning of September 6. Thompson's son, Brian, testified that his father took him to the dentist on September 6, which both Thompson and his wife confirmed. One of the dentist's employees produced a receipt made out to Larry Thompson that day, although she could not positively identify him as the person who had accompanied Brian. A friend of Thompson's, Garland Giddings, testified that he called and talked with Thompson at home on the evening of September 6. The phone call was confirmed both by Thompson's wife, Wanda, and Giddings' wife. Both Brian and Wanda testified that Thompson was with them throughout the weekend in question. Thompson's brother testified that he had seen Thompson

and his wife on the morning of September 8. Mike Gentry

testified that he had come to Atlantic City with McKinnon in July, had signed the hotel register himself, and during that trip never saw nor met either Rob or Maria Marshall. He also testified that the trip had taken about 28 hours each way.

Closing arguments were held on March 3, 1986. On March 4, the jury was instructed, and spent most of the day in deliberations. It resumed its deliberations on March 5, reaching a verdict shortly before noon.

Larry Thompson was acquitted, and no one was ever convicted of actually shooting Maria. Marshall, however, was convicted of murder as an accomplice by promising or paying money, and of conspiracy to commit the murder of his wife. After rendering the guilty verdict, the jury was dismissed for lunch. Then both counsel met with the judge to discuss the logistics of the penalty phase. As Marshall was being led from the courtroom, he fainted. According to the dispatch records, an ambulance was summoned at 11:36 a.m. An emergency room physician examined Marshall at 12:30 p.m. He conducted an examination and laboratory tests, and discharged Marshall approximately 50 minutes later. According to the sheriffs who transported Marshall back to the courthouse, the drive took an additional 15-20 minutes. After Marshall's return, he and counsel conferred. The penalty phase convened at 1:45 p.m. that same day.

After penalty phase statements by counsel and instructions from the judge, the jury retired to deliberate. One and a half hours later, it sentenced Marshall to death. It unanimously found one statutory aggravating circumstance, that Marshall "procured the commission of the offense by payment or promise of payment of anything of pecuniary value." N.J. Stat. Ann. S 2C:11-3c(4)e. The parties had stipulated as to the existence of one mitigating factor, Marshall's lack of a prior criminal history, 2C:11-3c(5)f, and the jury found unanimously the existence of a second under the statutory "catchall" provision, 2C:11-3c(5)h, on the basis of his "business, charitable, and community activities." State v. Marshall, 586 A.2d 85, 114 (N.J. 1991) ("Marshall I").

10

The proceedings have been subject to extensive judicial review. On direct appeal, the New Jersey Supreme Court undertook a thorough and careful analysis of Marshall's claims. That analysis, and a more detailed recitation of the facts, are reported in Marshall I, 586 A.2d 85 (N.J. 1991). Justice Handler dissented from the Court's opinion, and Justice O'Hern concurred in part and dissented in part. Justice O'Hern opined that constitutional trial errors sufficiently undermined confidence in the sentencing and that the imposition of the death penalty could not be supported, even though he felt that the guilty verdict should stand. See id. at 196-99 (O'Hern, J., concurring in part and dissenting in part).

Approximately three years after trial, two documents were discussed in an article in the New York Times that had not been provided to defense counsel prior to trial. Upon learning of the documents, Marshall moved the New Jersey Supreme Court for a hearing to determine whether a Brady violation had occurred. The New Jersey Supreme Court ordered a limited remand hearing, discussed in detail in Marshall I, 586 A.2d at 175-78. It also conducted a proportionality review, reported at 613 A.2d 1059 (N.J. 1992). Marshall's petition for certiorari was denied on February 22, 1993. See 507 U.S. 929 (1993). Marshall's conviction became final as of the date of the denial of certiorari. See Kapral v. United States, 166 F.3d 565, 570 (3d Cir. 1999).

Marshall then petitioned for state post-conviction relief, which was denied. Marshall had requested a "complete evidentiary hearing to support the claims raised in the petition through the presentation of testimonial and documentary evidence" and had "planned to amend the petition based on the evidence adduced at the hearing." State v. Marshall, 690 A.2d 1, 26 (N.J. 1997) ("Marshall II"). However, the Court granted a full evidentiary hearing as to only five of Marshall's claims, all of which related to defense counsel's promising, as part of his opening statement, that Marshall would take the stand, and to whether Marshall was competent to participate in the penalty phase, given his collapse following the verdict. For the remainder of the issues, the parties were required to submit documentary

11

evidence only. Marshall's request for reconsideration of the denial was also denied. Marshall v. Hendricks , 103 F. Supp. 2d 749, 771 (D.N.J. 2000) ("Marshall III"). He appealed the denial to the New Jersey Supreme Court in his post-conviction relief appeal. Marshall also appealed the Court's denial of each of his "548 grounds for reversal." Marshall II, 690 A.2d at 26. The New Jersey Supreme Court affirmed the decision of the post-conviction relief ("PCR") court. Again, Justice Handler dissented, and Justice O'Hern concurred in part and dissented in part from the New Jersey Supreme Court's opinion, reported at Marshall II, 690 A.2d 1 (N.J. 1997).

Marshall then filed for habeas relief in federal court. The District of New Jersey denied Marshall's petition for a writ of habeas corpus in Marshall III, 103 F. Supp. 2d 749 (D.N.J. 2000), and he has appealed that denial to us. In the District Court, Marshall also moved for discovery, including depositions, pursuant to Rule 6 of the federal rules that govern cases arising under 28 U.S.C. S 2254, in order to develop his Brady and ineffectiveness claims. The District Court denied the requests. Marshall also sought evidentiary hearings regarding his claims under Brady and Strickland, as well as the search, seizure, and admission of the tape to his brother-in-law, a spectator outburst, and judicial bias. Id. at 767. Marshall alleged that the New Jersey Supreme

Court erroneously addressed the merits of his claims, despite the "lack" of a record, and that, as a consequence, the New Jersey Supreme Court's opinion "contains little by way of finding of fact, and much by way of conjecture and unwarranted assumption." Id. at 771. The District Court found that Marshall did not " 'fail' to develop the evidence supporting his claims in state court," but determined that "none of the Townsend factors requiring an evidentiary hearing" were applicable, and "all of petitioner's claims were fully and fairly developed during the state court proceedings;" accordingly, the District Court found that Marshall was not entitled to an evidentiary hearing. Id. at 771-72. Marshall is also appealing those denials.

II. Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. S 2241 and 28 U.S.C. S 2254. Our appellate jurisdiction

12

arises under 28 U.S.C. S 1291 and 28 U.S.C.S 2253. The Certificate of Appealability ("COA") was granted on March 28, 2001 as to all issues raised by Marshall. Where, as here, a district court dismisses a habeas petition based solely on a review of the state court record without holding its own evidentiary hearing, our standard of review of the district court's determination is plenary. Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001). Thus, we will review the state courts' decisions applying the same standard as the District Court. Because Marshall's petition for a writ of habeas corpus was filed on October 30, 1997, the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") apply, and our standard of review of the state courts is dictated by those provisions, codified at 28 U.S.C. S 2254. In pertinent part, those provisions are:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court elucidated in [Terry] Williams v. Taylor how AEDPA has modified habeas review. 529 U.S. 362 (2000). We are to review the state court's determinations on the merits only to ascertain whether the court reached a decision that was "contrary to" or an "unreasonable application" of clearly established Supreme

Court law, or whether it made an "unreasonable determination" of the facts. In order for a decision to be contrary to Supreme Court precedent, the court must have reached a "conclusion opposite to that reached by th[e] [Supreme] Court on a question of law or if the state court decides a case differently than th[e] [Supreme] Court has on

13

a set of materially indistinguishable facts." Id. at 413. An application is unreasonable "if the state court identifies the correct governing legal principle from th[e][Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."2  Id. While the United States Supreme Court's focus in [Terry] Williams was elucidating the provisions of S 2254(d)(1), a federal court can also grant habeas relief if a state court unreasonably determined the facts in light of the evidence presented to it. See 28 U.S.C. S 2254(d)(2).

III. Discussion

Before us, Marshall alleges that there were eleven categories of error that so impugned the trial as to meet the stringent standard imposed by AEDPA and that would compel a reversal of the District Court's orders, and instead require the issuance of the writ as well as the grant of discovery and an evidentiary hearing.

    I. Penalty Phase Ineffectiveness of Counsel

    II. Denial of the Evidentiary Hearing

    III. Brady Violations

    IV. Guilt Phase Ineffectiveness of Counsel

    V. Violation of the Right to Counsel

    VI. Prosecutorial Misconduct

    VII. The Aggravating Factor was the Same as an
    Element of the Conviction

    VIII. Search and Seizure Violations

---

2. The Court also noted that the Court of Appeals whose decision it was reviewing had determined that there was a second way in which an application could be unreasonable: if it either unreasonably extended -- or refused to extend -- a legal principle to a new context in which it should apply. Id. at 408. The Court specifically refused to endorse that interpretation, however, noting both that though it may be correct, it was not precise, and that "[t]oday's case does not require us to decide how such 'extension of legal principle' cases should be treated under S 2254(d)(1)." Id. at 408-09.

14

IX. Denial of Discovery

X. Willful Nondisclosure of Brady Material

XI. Cumulative Error

Although we will address each of Marshall's claims, several of the claims overlap in their issues of fact and law, and will be addressed together.[3] A roadmap is appropriate.

A. We will address all of Marshall's claims based on the State's alleged failures to disclose (III, IX, and X) together.

B. We will combine Marshall's claims regarding his right to counsel and prosecutorial misconduct (V and VI) together, as they are related.

C. We will discuss Marshall's claims of Fourth Amendment and related statutory violations together.

D. We will address separately the question raised by Marshall as to whether the aggravating factor upon which the jury relied in sentencing Marshall to death impermissibly duplicates elements of the crime of which he was convicted.

E. We will examine Marshall's complaints as to the ineffectiveness of his counsel in the guilt phase.

F. We will then consider Marshall's contention that the District Court erred in determining that the trial errors, taken together, were insufficient to constitute constitutional error.

G. Lastly, we will address Marshall's allegations that his counsel was ineffective at the penalty phase.

_____

3. Although Marshall raised generalized claims for discovery and an evidentiary hearing, the grant or denial of an evidentiary hearing or discovery is constitutional only to the extent it implicates specific constitutional claims; thus, we will address the denial of the evidentiary hearing and discovery only within the context of the specific claims sought to be developed.

A. Government Failures to Disclose

Approximately one year prior to trial, Marshall's counsel requested that the prosecutor provide him with all exculpatory materials, including records of all agreements entered into with any witnesses.[4] Of all the State's witnesses at trial, two were undeniably the most critical to establishing the State's case: Billy Wayne McKinnon and Sarann Kraushaar. After the trial, it came to light that the

State had entered into an immunity agreement with Sarann Kraushaar -- an agreement that first surfaced and came to Marshall's attention three years after trial by a report in a newspaper article. Marshall I, 586 A.2d at 175. In addition, although the prosecutor had disclosed the written plea agreement entered into with Billy Wayne McKinnon, he had not disclosed numerous additional favors that had been provided to McKinnon and his family, which had also come to light years after the trial. In the opinion issued on appeal from the denial of post-conviction relief, the New Jersey Supreme Court noted that these issues were "addressed and resolved" in the opinion issued on direct appeal. Marshall II, 690 A.2d at 57. Thus, we will limit our consideration of the Court's analysis to its reasoning on direct appeal.

The principles enunciated in Brady v. Maryland , 373 U.S. 83 (1963), protect a defendant's right to due process of law under the Fifth Amendment by requiring that a prosecutor disclose material exculpatory evidence to the defense. Where the prosecutor fails to do so, regardless of whether the omission was intentional or a product of bad faith, the defendant is entitled to a new trial -- or, if pertinent, a new penalty phase -- provided that the withheld materials were material to guilt or innocence or to punishment. These core teachings of Brady have been consistent throughout the United States Supreme Court's ensuing decisions; the Court has in its later decisions clarified that the "prosecutor's" obligation to disclose extends to "any favorable evidence known to the others acting on the government's behalf in the case, including the police,"5 and

---

4. The precise text is reproduced at Marshall I, 586 A.2d at 175.
5. Although Kyles v. Whitley, 514 U.S. 419, 438-39 (1995) (reasoning from Giglio v. United States, 405 U.S. 150, 154 (1972)), was not decided until after Marshall's conviction became final, we think it clear that here the prosecutor was responsible for disclosing the immunity agreement -- which his office negotiated -- and the authorization of payments on behalf of McKinnon's family.

16

that "exculpatory" materials include impeachment evidence.6 The standard for materiality is the same as that iterated in Strickland v. Washington, 466 U.S. 668, 694 (1984). As the United States Supreme Court summarized:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles, 514 U.S. at 434 (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)).

At trial, as noted before, Marshall did not dispute that he hired McKinnon, nor that he wired money to him. What was hotly disputed was the purpose of the contact and payments: Marshall claimed he hired McKinnon to investigate lost casino winnings, and McKinnon testified that Marshall hired him to kill Maria. McKinnon's elaborate narrative provided a detailed account of the progression of the plot from the time of the initial solicitation and meeting to the unfolding of events on the day and night of the murder.7 In contrast, Sarann Kraushaar did not testify at all about McKinnon's relationship with Marshall or the details of the murder. Instead, she narrated convincingly the story of her relationship with Marshall, testifying that Marshall had told her that he wanted to get rid of his wife and had also confessed that he was burdened by extensive debt but that the insurance on his wife would cover the debt. Thus,

_____

6. Giglio, 405 U.S. at 154.

7. McKinnon's narrative also detailed how Thompson allegedly agreed to and executed the murder, but Thompson was acquitted. Marshall's account differed from McKinnon's, not only as to the purpose of McKinnon's retention, but also as to the amount of money paid (and promised), whether Marshall and McKinnon met together on the day of the murder, or only that evening, and in numerous other details.

17

Kraushaar provided a tangible "why" to accompany McKinnon's "what" and "how."

Because Marshall is claiming that the New Jersey Supreme Court unreasonably applied Brady and its progeny in holding the withheld information immaterial, we must test the undisclosed materials "when viewed collectively" to see if the resultant verdict was "unworthy of confidence." United States v. Pelullo, 105 F.3d 117, 123 (3d Cir. 1997) (citing Kyles, 514 U.S. at 437). 8 Thus, we will examine in more detail what was withheld as to each witness, and ask then whether the New Jersey Supreme Court erred in deciding that the combined nondisclosure was immaterial.

1. Kraushaar

When Kraushaar's immunity agreement came to light through a newspaper article, the New Jersey Supreme Court issued an order remanding the matter to decide "whether correspondence in respect of a grant of immunity for Sarann Kraushaar was disclosed to the defense; if it was not, was the non-disclosure willful and was the information improperly withheld from the defense." Marshall I, 586 A.2d at 175. In a footnote, the Court explained that the limitation of the scope was at the request of the defense, and agreed to by the State. Id. at 175 n.3. The Court

acknowledged that the scope of the remand was not consistent with Brady in that, under Brady, the prosecution's motives are immaterial to ascertaining whether a violation occurred. Id. The Court concluded nonetheless that its analysis was consonant with the dictates of Brady in that it "reach[ed] and determine[d] the ultimate issue under Brady -- whether the withheld evidence is material either to guilt or to punishment." Id.9

---

8. Although Kyles was decided in 1995, after Marshall's conviction became final, the New Jersey Supreme Court stated in denying the appeal from post-conviction relief that the evidence should be viewed collectively, and cited to Kyles in support of that proposition. Marshall II, 690 A.2d at 33.

9. When the New Jersey Supreme Court considered Marshall's direct appeal, it applied the United States v. Agurs , 427 U.S. 97, 107 (1976),

18

Because we find that the New Jersey Supreme Court reasonably concluded that the immunity agreement was non-material, we will not disturb the Court's conclusion.

When the remand hearing began, the parties stipulated that the documents in question had not been disclosed prior to or during trial. Id. at 175. During the hearing, the State conceded that at least some of the documents should not have been withheld. Id. During the remand hearing, the Court limited discovery to "documents closely related to the scope of th[e] Court's remand order." Id. at 179. Before us, Marshall claims both that he should have been entitled to broader discovery and an evidentiary hearing and that the New Jersey Supreme Court improperly assessed the materiality of the information under Brady and its progeny. We are persuaded that the Court did not err in limiting discovery because Marshall himself was responsible for the limited scope of the remand. We also find no reason to disturb the discretion of the District Court in its determination that no further evidentiary development was necessary.10 Further, we conclude that the non-disclosure of the grant of immunity to Kraushaar was not material.

Kraushaar was first interviewed on September 7, 1984,

---

standard of materiality because Marshall had specifically requested the materials at issue. On the appeal from the denial of post-conviction relief, it instead applied the Bagley standard of materiality, basing its decision on its reading of subsequent case law and noting that since Agurs requires less of a showing of materiality, a finding of non-materiality under Agurs will lead to a finding of non-materiality under the less sympathetic standard. Marshall II, 690 A.2d at 33-34. We see no reason to fault the New Jersey Supreme Court in this regard.

10. As the New Jersey Supreme Court noted, the New Jersey Court Rules include a rule governing the ability of a criminal defendant to discover materials in a prosecutor's files. This Rule provides for "broad access"

and "operates independently of the prosecution's absolute obligation to reveal exculpatory material, documentary or otherwise, to the defense." Marshall I, 586 A.2d at 182. We are concerned here only with the narrower question of whether the New Jersey Supreme Court erred in determining that Brady did not mandate that the New Jersey Supreme Court upset the discretionary decision of the trial court to limit discovery to the scope of the remand order. See id. at 183-84.

the day after Maria Marshall was killed. Marshall I, 586 A.2d at 101. She was stopped while driving and escorted to the prosecutor's office. Id. Her attorney was present at the interview. Id. In that interview, she told prosecutors that she and Marshall had had an affair since June 1983, that Maria had suspected that they were having an affair, and that Kraushaar and Marshall had made plans to leave their spouses. Id. They shared a post office box, and he had given her silver ingots that she kept in a safe deposit box. Id. Additionally, she stated that Marshall had told her that the insurance on Maria would cover his debts, and that he had at one point said of Maria that he "wished she wasn't around." Id. He had asked Kraushaar if she knew of "anyone who could take care of it," and she had replied with the name of a person who had been in trouble with the law, but that she "never wanted to be involved with him if he could do anything like that to his wife." Id.

Marshall and Kraushaar continued to see each other until September 25, when she ended the relationship. Two days later, Kraushaar again met with investigators, on her initiative, and, at her counsel's insistence, the prosecutor's office drew up a letter agreeing "neither to charge nor to prosecute Kraushaar in connection with the death of Maria Marshall, in return for her 'truthful cooperation.' " Id. at 109. Marshall alleges that in this second interview, both the content and the tone of Kraushaar's statements were "progressively more damaging." App. Br. at 72. He lists specifically three differences between the testimony at the first interview and the second, after the grant of immunity: "Kraushaar told the authorities that the debt had doubled to $200,000 and that she assumed it was a gambling debt." Id. at 73. Instead of reporting Marshall's having said he wished Maria wasn't around, she described his statement as "I swear if I thought there was a way of getting rid of her I would," and added that she did not doubt Marshall was referring to murdering his wife. Id. As to the first comment, we note parenthetically that on the same evening Kraushaar provided her statement, Marshall checked into the Best Western and made preparations to commit suicide. On one of the tapes he recorded, he acknowledged that his debt had "accelerated to almost two hundred thousand dollars." Marshall I, 586 A.2d at 103. We question whether

her reporting of the same amount of debt as Marshall himself reported on the same date was attributable at all to

the existence of the immunity agreement or was mere repetition of what Marshall may have said to her.

At trial, Kraushaar recounted these events in arguably stronger terms, accentuating Marshall's "dire financial straits" and "constant" discussion of the debt, and replacing the idea of "getting rid" of Maria Marshall with "doing away with her." App. Br. at 73. Kraushaar also repeated that Marshall had indicated that the insurance on Maria would take care of his debts. Id. at 73-74. Marshall also raises several other areas as to which Kraushaar testified at trial, but had not included as part of her initial statement. Id. at 74-76.

Marshall contends that he was prejudiced at both the guilt and sentencing phases by the fact that the jury could not weigh Kraushaar's testimony against the immunity agreement. Id. at 77. He finds fault with the New Jersey Supreme Court's determination that the agreement was not material -- a conclusion with which the District Court agreed (see Marshall III, 103 F. Supp. 2d at 775) -- arguing that it underestimated Kraushaar's importance to the prosecution,11 and overgeneralized in its conclusion that her testimony at the two interviews and trial was consistent. App. Br. at 77, 79-80. We disagree with his characterizations of the New Jersey Supreme Court's reasoning.

The New Jersey Supreme Court did state that "none of [Kraushaar's] testimony directly implicated defendant in a homicide conspiracy" and that "[i]t is evident that the most damaging evidence against defendant came from McKinnon's testimony and defendant's tape to his brother-in-law, in which he admitted paying money to McKinnon the night of the murder." Marshall I, 586 A.2d at 194. We think those statements were not a sign of denigration of

_____

11. Even were we to agree with Marshall's characterization, the New Jersey Supreme Court would not have been at fault if it determined that her testimony "was by no means as important to the prosecution as was the more direct incriminating testimony of other witnesses." United States v. Pflaumer, 774 F.2d 1224, 1230 (3d Cir. 1985).

21

Kraushaar's significance to the case, but were, instead, recognition that she was not an informant or co-conspirator actually implicated in the crime, who received immunity.

Under these facts, we cannot attribute the point that Marshall stresses -- that the tenor of the remarks and their detail was heightened as the time toward trial progressed -- to the existence of the immunity agreement. Where, as here, a former lover has had to confront publicly her previously private relationship, and has broken off the relationship in the face of mounting doubts as to her lover's veracity, we see nothing remarkable in the tone and details post-separation differing from those offered while the

relationship was still extant. Further, the differences in tone and detail were available to the defense to use for impeachment purposes at trial. The existence of an immunity agreement would not alter the challenge counsel could raise as to the apparent or actual inconsistencies.

Further, the purpose of an immunity agreement is to put a person in the same position she would have been had she invoked her Fifth Amendment privilege against self-incrimination instead of testifying. Kastigar v. United States, 406 U.S. 441, 459 (1972) ("[A]n analysis of prior decisions and the purpose of the Fifth Amendment privilege indicates that use and derivative-use immunity is coextensive with the privilege."). Thus, the impeachment value of the immunity agreement is inextricably tied to the self-incriminating evidence that was provided after the immunity agreement was executed. Put another way, its value lies principally in absolving the recipient of her admitted involvement. Here, the New Jersey Supreme Court noted that following the execution of the immunity agreement, Kraushaar provided no "significant, incriminating evidence that she had not already given before the prosecutor's agreement not to prosecute." Marshall I, 586 A.2d at 194. Instead, as the Court also found, her testimony prior to and following the immunity agreement was consistent. Id. Hence, we conclude that the nondisclosure of Kraushaar's immunity agreement was immaterial.

As the State points out, there is no evidence in the record that on September 7, 1984, just hours after Maria

Marshall's death, when Kraushaar was stopped in her car and taken in for questioning, she was contemplating an immunity agreement and tailored her first statement-- or her retention of counsel -- accordingly. Appee. Br. at 58-59. No additional self-incriminating details emerged in the second statement. Indeed, as acknowledged by Marshall, McKinnon had the "essential knowledge of the details of the alleged deal" but Kraushaar "gave the State's case . . . credibility." App. Br. at 66. That credibility would be undermined only if the existence of the immunity agreement "if disclosed and used effectively,[ ] may make the difference between conviction and acquittal." United States v. Bagley, 473 U.S. 667, 676 (1985).

Here, where we can posit no self-incriminating evidence that could have been accorded additional credibility by the jury in light of the undisclosed immunity agreement, the concerns that normally animate the Bagley analysis are absent. Thus, it was reasonable for the New Jersey Supreme Court to conclude that the non-disclosure was not material.12 Further, it did not contradict or otherwise undermine any of her testimony. In fact, it is difficult to articulate or imagine exactly how a jury could use its existence as a reasonable basis to undermine the detailed version of events to which Kraushaar testified.

## 2. McKinnon

McKinnon received a very favorable plea agreement in
return for his testimony, an agreement which the defense
attacked vigorously at trial. After the trial, two additional --
but related -- pieces of information came to light. First,
during the remand hearing to investigate the failure to
produce the Kraushaar immunity agreement, documents
were produced that indicated that McKinnon's family had
been relocated and was being given monetary support by
the government prior to trial. Second, in a television
appearance, one of the investigators made a comment

---

12. At least one court would not even reach the question of materiality
under these facts; the Ninth Circuit Court of Appeals has stated that
where the undisclosed item in question does not have impeachment or
exculpatory value, "it is not Brady material." United States v. Marashi,
913 F.2d 724, 733 (9th Cir. 1990).

about the witness protection program that suggested
McKinnon's participation was the result of his cooperation
with federal authorities in other criminal investigations.

On December 15, 1984, McKinnon entered into a plea
agreement with the State after reviewing the evidence that
the State had compiled implicating him in the murder.
During cross-examination, Marshall's counsel meticulously
reviewed the extent to which the prosecutors had shown
McKinnon evidence of the crime gathered prior to his
formal statement, and, in some cases, prior to the plea
agreement. See generally Cross-Examination of Billy Wayne
McKinnon, February 4, 1986, St. Ex. 14T at 6-18, 20-25,
34-56, 211-13.

During McKinnon's direct testimony, the text of the plea
agreement was read into the record.

> Whereas Billy Wayne McKinnon is presently indicted
> by the Ocean County Grand Jury along with Robert
> Cumber and James Davis in indictment number I-62-
> 01084 and is charged in count one of said indictment
> with conspiracy to murder Maria Marshall, the co-
> conspirators being Robert Cumber, James Davis and
> others both known and unknown; and whereas Billy
> Wayne McKinnon is charged in count three of said
> indictment as a principal in the murder of Maria
> Marshall, but not as the actual perpetrator of the
> murder, that is not to shoot her [sic]; and whereas the
> State of New Jersey would like to obtain the truthful
> cooperation of Billy Wayne McKinnon in identifying all
> others involved in the murder of Maria Marshall and
> the truthful testimony of Billy Wayne McKinnon in the
> prosecution of all of said individuals and whereas Billy
> Wayne McKinnon has indicated through his attorney,
> Maurice Loridans, that he is willing to truthfully

cooperate with the State of New Jersey in exchange for certain concessions and assistance by the State of New Jersey. [sic] Now, therefore, it is hereby agreed by and between and among Billy Wayne McKinnon, Maurice Loridans and the State of New Jersey as follows:

(1) Billy Wayne McKinnon will give a complete and truthful statement to the State of New Jersey

24

identifying everyone involved in the conspiracy to murder and the murder of Maria Marshall and the role which they played thereon;

(2) Billy Wayne McKinnon will sign a waiver of immunity and testify truthfully before the Ocean County Grand Jury with regard to all of the facts of which he has knowledge concerning the crime;

(3) if the Grand Jury returns an indictment, Billy Wayne McKinnon will appear as a witness and testify truthfully in the prosecution of said indictment;

(4) Billy Wayne McKinnon will be permitted to plead guilty to the crime of conspiracy to murder Maria Marshall. And it is understood and agreed by and between the parties that this crime does not fall within the purview of the so-called Graves Act;

(5) the State of New Jersey will recommend that if the Court decides to impose a custodial sentence on Billy Wayne McKinnon, that said sentence not exceed five years and that there be no period of parole ineligibility;

(6) the Ocean County Prosecutor's office will recommend to the State Department of Corrections that any custodial sentence be served in the Clinton Institution for security purposes;

(7) the Ocean County Prosecutor's office will recommend in writing to the New Jersey State Parole Board that Billy Wayne McKinnon be granted parole at the earliest eligible date;

(8) the State of New Jersey will immediately re-locate the family of Billy Wayne McKinnon for their protection to a safe location; and the Ocean County Prosecutor's office and the New Jersey State Police will recommend and support their entry into the witness protection program.

Witnesses whereof the parties to this agreement have affixed their signatures hereon this 15th day of December, 1984.

Direct Testimony of Billy Wayne McKinnon, February 3, 1986, St. Ex. 13T at 100-03.

The agreement was signed by McKinnon, his attorneys, and the Ocean County Prosecutor. Id. at 103. During his cross-examination, Marshall's counsel asked McKinnon about the witness protection program. Id. at 203-05. McKinnon admitted to having general knowledge about the program, but denied having specific knowledge of it, or whether or how his participation would take place. Id. Thompson's counsel questioned McKinnon extensively about the plea agreement, eliciting from McKinnon that he had a "very substantial motive to lie." Cross-Examination of Billy Wayne McKinnon, February 4, 2002, St. Ex. 14T at 135-36, 180. He also brought out that McKinnon understood the potential sentence for the crimes for which he was indicted -- murder and conspiracy to commit murder -- and how minimal his sentence was. Id . at 138-40. In the course of the cross-examination, McKinnon admitted that if he had stated that he was the shooter, he would not have gotten the "wonderful deal" that he did, and that he had to say that he did not shoot Maria Marshall in order to reap the benefits of the acknowledged plea agreement. Id. at 144. McKinnon also acknowledged that in his testimony he had admitted to lying about "some things," including his identity and the purpose of the money he received from Marshall. Id. at 145, 184-86, 192-95. McKinnon further conceded that under the terms of the plea agreement he would be allowed, following the trial, to plead to the second degree crime, and would not be charged with the murder, and that by securing the statement that the crime committed did not fall within the purview of the Graves Act, McKinnon avoided the three year mandatory imprisonment that was supposed to result when a gun was used in the commission of certain crimes, including murder. Id. at 164-66. He also admitted that the judge might not send him to jail at all, but that in any event the maximum sentence would be five years, with no period of parole ineligibility. Id. at 169-70.

Thompson's counsel also brought out the fact that the Clinton Institution is primarily a women's prison, and that McKinnon would be assigned there to protect him from abuse by other inmates. Id. at 171-72. He also elicited McKinnon's acknowledgement that, although not stated in the plea agreement, McKinnon was told that he would get

credit for the time already served in jail, and, since that time was more than the standard period of parole ineligibility, McKinnon would be immediately eligible for parole, and the prosecutor's office would encourage the parole board to parole him immediately. Id. at 175-77. McKinnon also admitted that his family had been relocated pursuant to the terms of the agreement. Id. at 178. He denied having seen a recommendation supporting his entry into the witness protection program, but was questioned about some aspects of the program:

Q. Now, as part of relocating your family under the Witness Protection Act has their moving expenses been paid by the federal government?

A. No, sir.

Q. Have any moneys been paid to support your family by the federal government under the Witness Protection Act?

A. No, sir.

Q. Has any money been paid to you, even one dollar, in way of services, rent, electric, heat, telephone, or anything else, under the Witness Protection Act?

A. No.

Q. Do you know--strike that. Were you told by your attorneys that such benefits were available to persons under the Witness Protection Act?

A. No.

Q. Did you have an understanding on your own, regardless of what your attorneys told you, that you might be eligible for certain payments in money or in kind --

A. I didn't know --

Q. -- by reason of your admission to the Witness Protection Act?

A. I didn't know exactly what that entailed.

Q. Didn't you inquire, since you were getting that as one of your concessions or assistance from the State?

A. I haven't been able to meet with the marshall and he has not contacted me in reference to that.

Id. at 179-80.

Counsel did not inquire as to whether the State had borne expenses on McKinnon's behalf aside from the aegis of the federal witness protection program. During the remand hearing, the State produced a correspondence file that contained two letters from the Office of the County Prosecutor of Ocean County New Jersey to the Criminal Investigation Division of the New Jersey State Police. The first was dated February 4, 1985, a year to the day prior to McKinnon's testimony on cross-examination. It detailed expenses of the investigation, and included the following

paragraphs:

> In addition, we have been required to incur
> substantial expenses in transporting the family of Billy
> Wayne McKinnen [sic] to the State of New Jersey and
> providing security for them until such time as
> McKinnen [sic] is accepted in the federal witness
> protection program. Expenses incurred for
> transportation of the family to New Jersey, obtaining
> temporary housing, doctors bills, food, heat and
> utilities thus far are in the amount of $6921.10.

> We are requesting that the New Jersey State Police
> and/or the Garden State Parkway Authority reimburse
> this office for one-half of these expenses or $3,460.55.

> In addition to the already incurred expenses, we
> must anticipate further expenses prior to trial of this
> matter. These expenses consist of maintenance and
> housing for the family of the defendant/witness, Billy
> Wayne McKinnen [sic]. The expenses appear to be as
> follows: monthly rent $500; heat $75; telephone $50;
> food, clothing and miscellaneous $750; or a total of
> $1300 per month expenses. We are requesting a
> commitment from the New Jersey State Police and /or
> the Garden State Parkway Authority that they will pay

28

> 50% of these anticipated costs for the next several
> months.

PCR Appeal, Defendant-Appellant Appendix, Vol. 20,
Exhibit 36 at 2594a. The second letter was dated May 1,
1985, and stated in relevant part:

> The family of Billy Wayne McKinnon (a key state's
> witness) has been relocated to New Jersey to assure
> their safety, in view of the violent propensities of other
> associates of McKinnon and co-defendant, Larry
> Thompson.

> We have thus far expended $9,456.45 to maintain
> this family while awaiting trial of the matter and will be
> faced with continuing costs approximately $1,000 per
> month until trial of the matter, which is scheduled for
> September 1985.

Id. at 2596a.

    a. The Expense Letters

Marshall claimed that the expense letters were evidence
of additional favors received by McKinnon, and, as such,
were Brady material that could have been used to impeach
McKinnon's credibility. The New Jersey Supreme Court
considered the merits of the claim, despite noting that the
letters were outside the scope of the remand hearing.
Marshall I, 586 A.2d at 195. The Court rejected Marshall's

argument that the non-disclosure was material, in part because of the extent of the cross-examination on the terms of the plea agreement, and in part because the Court deemed the evidence "merely cumulative." Id. at 195-96. The District Court agreed. See Marshall III, 103 F. Supp. 2d at 762.

Under the AEDPA standard, we ask only whether the New Jersey Supreme Court reasonably applied Brady and its progeny in concluding that the non-disclosure was immaterial as a matter of law. We conclude that it did. There is no question that McKinnon was a critical witness to the prosecution, and that the information as to the benefits received by his family was favorable to the defense and could have been used in cross-examination. But there

29

is also no dispute that counsel's cross-examination did disclose some special favors from the government, and did cause McKinnon to admit to lying on several occasions. In his testimony McKinnon portrayed himself as a man who was stringing Marshall along, intending to get from him as much money as possible to murder Maria Marshall, and then simply to walk away with the money. He testified that he had never intended to allow Maria Marshall to be killed, but that Thompson had confronted him, claiming that there was a contract on McKinnon's life because of an "unfinished job." According to McKinnon's testimony, he thought Marshall had taken out the contract; it was on the basis of that conversation that McKinnon "agreed" to let Thompson murder Maria Marshall for him.

McKinnon provided many details of the trips to Atlantic City that were independently corroborated by investigators, and that he could not have known had he not met with Marshall. Marshall complains that the information links Marshall to McKinnon, but not Marshall to the crime. We disagree. While Marshall admitted that he had hired McKinnon, he had offered only that he was trying to trace the missing winnings that he had given to Maria. Between McKinnon's testimony and the corroborating evidence, the State was able to demonstrate that McKinnon had received much more than the value of the purportedly missing funds. Further, McKinnon's testimony and the corroborating evidence established that McKinnon was in Atlantic City the day of Maria's death, and that he received money from Marshall on that day. Both of those pieces of information were critical -- albeit circumstantial-- elements in challenging Marshall's benign explanation for his association with McKinnon, and they provided a basis for inferring that Marshall's motive for hiring McKinnon, paying him large sums of money, and meeting with him and paying him on the day of Maria's death was, as McKinnon testified, to arrange for Maria's murder.

Marshall also claims that, since the evidence was not merely repetitive of what was before the jury, the New Jersey Supreme Court erred in concluding that it was

cumulative. He cites to Perdomo, where we stated:

> The district court did not apply the correct standard
> for measuring materiality at the sentencing hearing.
> The court reasoned that the undisclosed information
> was not material because the jury had ample
> opportunity to evaluate [the witness's] credibility due to
> other damaging testimony that had been elicited
> concerning the government payments to [the witness]
> and his prior drug usage. Whether or not the jury has
> had an opportunity to consider other impeachment
> evidence is not the correct standard for determining
> materiality of undisclosed information.

United States v. Perdomo, 929 F.2d 967, 972 (3d Cir. 1991).
In Perdomo, the impeachment evidence of former
convictions and a psychiatric examination was so
compelling that we concluded, "Seldom have appellate
judges seen such persuasive evidence that the availability
of information on a prior conviction could have made a
difference." Id. Here the evidence tends to indicate a
motivation for McKinnon to provide testimony, and to
provide testimony that the State finds satisfactory. But
those precise motivations were brought out graphically at
trial; it was clear after cross-examination that McKinnon's
change of plea would not occur until after he had testified
and that at his change of plea the State would withdraw the
murder charge. Further, the jury was made aware that,
pursuant to his plea agreement, McKinnon's sentence
would be no more than five years for this terrible murder;
in practical terms this meant that he either would serve no
more jail time, or would serve what little post-plea time he
did in a women's institution, a place that counsel implied
offered McKinnon very favorable residential conditions.
From the face of the plea agreement and the cross-
examination, it was also clear that the prosecutor would
assist McKinnon's entry into the federal witness protection
program. It could not help but be evident to the jury that
McKinnon's testifying to the satisfaction of the State was
critical in determining McKinnon's future. Indeed, the jury
apparently found McKinnon's testimony about Thompson
incredible, since it acquitted him. Unlike in Perdomo, the
ongoing support to McKinnon's family would not provide an
alternative or stronger incentive for his testimony. Marshall
also cites to two cases that he argues demonstrate that the

evidence could not have been cumulative because it was
not repetitive. We find those cases to be inapposite,
because they were discussing the admissibility of evidence,
not its materiality. See Elwood v. Pina, 815 F.2d 173, 178
(1st Cir. 1987); United States v. Ives, 609 F.2d 930, 933
(9th Cir. 1979).

b. The Witness Protection Program

Marshall further complains that it was unreasonable for the New Jersey Supreme Court, on appeal from the denial of post-conviction relief, to conclude that the prosecutor's failure to disclose information about McKinnon's possible cooperation with federal law enforcement agents was immaterial. App. Br. at 90. We note first that the New Jersey Supreme Court was skeptical about whether such information existed, and particularly whether it existed within the control of the prosecutorial team, reasoning only that if the information existed, it would have been immaterial. Marshall II, 690 A.2d at 38. The District Court characterized Marshall's request to develop the limited information he has about the connection further as a "fishing expedition." Marshall III, 103 F. Supp. 2d at 762.

In order to agree with Marshall, we would need to hold the State accountable for knowledge possibly possessed by the F.B.I. or other federal agents. There is no indication in the record that the federal agents who might have possessed such information were working together with state agents investigating Maria Marshall's death. Thus, such a holding would require a further expansion of Brady, possibly beyond what we would consider "clearly established law" even now, and certainly beyond "clearly established law" as of the time Marshall's conviction became final.13 Thus, we decline to hold that there was

---

13. The controlling case in this area, Kyles , was not decided until 1995. In earlier cases, such as United States v. Antone, 603 F.2d 566 (5th Cir. 1979), federal and state authorities had pooled their efforts, such that the Fifth Circuit Court of Appeals deemed it appropriate to consider both part of a single prosecutorial team. Id . at 569-70. See also United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991) (following Antone). In contrast, where there was no pooling, even within a single jurisdictional

clearly established law requiring Brady disclosures in this situation; consequently, we do not reach the question whether the New Jersey Supreme Court's determinations were reasonable.

3. Combined Impact

While the New Jersey Supreme Court evaluated the Brady claims individually on direct appeal, on appeal from the denial of post-conviction relief, the Court recognized that it was required to "consider the State's non-disclosures collectively, not item-by-item." Marshall II , 690 A.2d at 33. Further, the "best objective test derives from an assessment of the merits of the individual claims, combined with a part-subjective, part-objective effort to extrapolate those individualized assessments into an aggregate one." Id. at 90 (quoted in Appee. Br. at 65). The District Court also employed a collective approach. Marshall III, 103 F. Supp. 2d at 775. We agree with the New Jersey Supreme Court that a cumulative analysis begins at an analysis of the

individual claims, and then requires a court to view the violations in the aggregate. We further agree that under these facts, our confidence in the verdict is not shaken when we weigh the impact of the jury's properly considering both the existence of the Kraushaar immunity agreement and the payments to McKinnon's family. In so concluding, however, we do not in any way condone the actions of the prosecutor in failing to provide the information in a timely manner.

B. Prosecutorial Misconduct

Unlike cases in which a defendant alleges prosecutorial misconduct with regard to an opening or closing statement, or the questioning of one witness, on direct appeal Marshall

_____

umbrella courts at least as recently as 1997 have noted that the "extent to which knowledge may be imputed from one federal investigative agency to another for Brady purposes is as yet unclear." United States v. Zagari, 111 F.3d 307, 320 n.13 (2d Cir. 1997). While some courts do impute the responsibility to disclose state documents to federal prosecutors and vice versa, they do so in reliance on Kyles. E.g., United States v. Wilson, 237 F.3d 827, 832 (7th Cir. 2001); In re Sealed Case No. 99-3096 (Brady Obligations), 185 F.3d 887, 896 (D.C. Cir. 1999).

alleged "116 instances of prosecutorial misconduct in the course of his trial," Marshall I, 586 A.2d at 164, instances that Justice Handler, in his dissent, characterized as "clearly deliberate" and "incurable." Id. at 212 (Handler, J., dissenting). These incidents span the course of both the guilt and sentencing phases of Marshall's trial. Marshall has asked us to weigh both the number of instances of misconduct and the alleged deliberate nature of the misconduct, and to grant him a new trial on the basis of the prosecutor's actions.

It is beyond peradventure that all of the salient caselaw argued to us by Marshall existed in February 1993 when Marshall's conviction became final. Berger v. United States was decided in 1935, Griffin v. California in 1965, Donnelly v. DeChristoforo in 1974, Doyle v. Ohio in 1976, Smith v. Phillips in 1982, United States v. Young in 1985 and Darden v. Wainwright in 1986.

In our analysis, we recognize that the United States Supreme Court has drawn a distinction between misconduct that, because of its capacity to divert the trier of fact from the task before it, so undermines the reliability of a verdict that it constitutes a due process violation (such as the conduct at issue in Berger v. United States), and misconduct that implicates a specific right guaranteed by the constitution (such as that addressed by the Court in Doyle v. Ohio). Marshall alleges both types. We will accordingly discuss the alleged prosecutorial misconduct from three vantage points. First, we shall ask whether the alleged improprieties, other than those that implicated a

specific constitutional right, gave rise to a due process violation (1., below). Second, we shall examine the alleged violations of specific constitutional rights to determine whether habeas relief is warranted (2., below). Third, we will determine whether all of the foregoing, taken together, amount to cumulative error such that Marshall is entitled to habeas relief (3., below).

We note that, under AEDPA, our review is restricted. We are assessing not whether we independently would determine the misconduct to have been inappropriate, but whether the New Jersey Supreme Court's review applied the appropriate United States Supreme Court precedent

34

reasonably. In order to make that assessment, we must look at the conclusions and the analysis of the New Jersey Supreme Court, and compare them to established United States Supreme Court jurisprudence.

1. Misconduct Alleged to Violate Due Process but not Implicating a Specific Constitutional Right

a. The Improprieties

In assessing Marshall's charges that the prosecutor's actions rendered his trial unfair, we are guided by the United Supreme Court's instructions in Smith v. Phillips, 455 U.S. 209 (1982), where the Court reiterated the perspective initially set forth in Cupp v. Naughten, 414 U.S. 141, 146 (1973):

> Before a federal court may overturn a conviction resulting from a state trial . . . it must be established not merely that the [State's action] is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

Smith, 455 U.S. at 221. In Smith, the Court employed the principles set forth in Brady v. Maryland and United States v. Agurs, both of which involved a prosecutor's non-production of evidence, to elucidate the standard by which prosecutorial misconduct must be measured, stressing that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith, 455 U.S. at 219. The test is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). In examining what was done and its impact, we are to look at the entire proceeding. See id.

On direct appeal, the New Jersey Supreme Court evaluated the 116 alleged instances of misconduct, but found only nine to be of arguable merit, of which seven have been specifically raised before us on appeal. 14 We

14. Two instances of the prosecutor's conduct that the New Jersey Supreme Court found to be improper were not specifically raised and

agree with the New Jersey Supreme Court's assessment. The seven are:

i. Defense counsel questioned Marshall's sister, Oakleigh deCarlo, about the investigators' visit to Marshall's home on September 21, 1984. On cross-examination, the prosecutor repeatedly discussed with her the fact that Marshall had not answered the investigators because he had retained counsel. At one point, he went so far as to say, "Especially when your wife has been killed and you haven't -- you didn't have anything to do with it, you still run out and hire an attorney?" Marshall I, 586 A.2d at 148. The New Jersey Supreme Court characterized the prosecutor's questioning as "the offensive and impermissible suggestion that the retention of counsel is incompatible with innocence." Id. The trial court sustained counsel's objection to the question, but Marshall contends that the questioning required curative action by the court.15 This is argued in Marshall's brief at 123-127, 128, 131.

ii. The prosecutor began his cross-examination of Marshall by asking him whether he had heard the reference

_____

argued in Marshall's brief, and we decline to examine these on appeal. One of these instances occurred in the prosecutor's summation, when the prosecutor referred to September 21, when investigators came to Marshall's home to question him about Davis and McKinnon. The prosecutor's comments, according to the New Jersey Supreme Court, violated Marshall's privilege against self-incrimination, but were harmless beyond a reasonable doubt. Marshall I , 586 A.2d at 147. The other occurred when the prosecutor was cross-examining Marshall and intimated that his father-in-law was senile. The New Jersey Supreme Court found the "implication . . . unsupported by any evidence in the record . . . clearly improper," and that "[a] strong curative instruction by the trial court would have been appropriate." Id. at 166.

We note as well that some of Marshall's claims are stated only in general terms, and others are peppered with references to more extensive discussions in the Petition. See, e.g., App. Br. at 128, 130-31. Arguments in passing and "casual statements" of issues are insufficient to preserve them for consideration before us. See Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 133 (3d Cir. 1998) (listing cases).

15. This instance is also the subject of a separate attack as violative of Marshall's right to counsel.

in his opening statement to Marshall's owing over $300,000. When Marshall replied in the affirmative, the

prosecutor stated that he was "going to put some figures up here and, if you disagree, I'd appreciate it if you let me know so we can bring in the people from the banks who gave me the figures to testify." Id. at 165. The New Jersey Supreme Court found the remark improper, but harmless. "The prosecutor's statement that he would 'bring in people from the banks to testify' was clearly improper. It implied that the prosecutor's characterization of defendant's finances was accurate, and would be supported by other unidentified witnesses if contested by defendant." Id. at 165. This is raised in Marshall's brief at 131-32.

iii. Again in summation, the prosecutor vouched for McKinnon's testimony. As the New Jersey Supreme Court said, "The most critical issue at trial was the credibility of Billy Wayne McKinnon." Id. at 166. The prosecutor said:

> Ladies and gentlemen of the jury, in order to save himself, Billy Wayne McKinnon had to tell the truth. That was the deal. Because when he gave that statement, we checked it out up and down and sideways, and if we caught him in one lie -- and you heard the testimony. He waived immunity. Everything he said could be held against him. If we caught him in one lie, then he would be facing a murder charge.

Id. at 167. In reviewing this statement, the New Jersey Supreme Court noted: "Although the prosecutor was free to argue that McKinnon's testimony was credible, it was improper for the prosecutor personally to vouch for his credibility or to suggest that the truthfulness of his testimony had been 'checked out up and down and sideways,' obviously referring to matters outside the record." Id. at 167. This is mentioned in Marshall's brief at 131.

iv. Also during his summation, the prosecutor informed the jury,

> The bulk of that insurance was taken out in twelve-month period before Maria Marshall's death. I don't care if it's accidental; I don't care if it pertains to getting killed in a car on a Thursday only. That

37

> insurance was in effect, and he has the audacity to get up here and talk about contestability clauses, to give you the impression that he's not going to get any of that money. He's already received six hundred thousand dollars, and I can guarantee you, ladies and gentlemen, if you acquit this defendant, the checks will be in the mail within a week. Make no mistake about it.

Id. Counsel objected, and after the prosecutor finished, moved for a mistrial in part on the basis of the prosecutor's representation. The court denied the motion, but did issue a curative instruction. "[T]he prosecutor's assertions that

defendant had 'already received six hundred thousand
dollars' and that 'I can guarantee you if you acquit this
defendant, the checks will be in the mail within a week,'
were obviously mischaracterizations of the testimony, and,
as such, highly improper." Id. at 168. This is discussed in
Marshall's brief at 132.

v. The New Jersey Supreme Court characterized as
"among the most inflammatory portions of the prosecutor's
summation" the prosecutor's reference to the testimony of
Marshall's sons:

> And he has the audacity to bring in his three boys to
> testify. That's obscene. And I'm not being critical of
> them, because I would probably do the same thing. To
> put his boys on that witness stand is obscene, and for
> that there's a place in hell for him. He will use
> anybody, he will say anything and he will do anything,
> including his own family, to get out from under. And
> that's Robert Oakley Marshall. Make no mistake about
> it.

Id. at 169. The trial court refused to grant a mistrial in
response to these comments, but did give a curative
instruction, which the New Jersey Supreme Court noted
"could have been more forceful, but . . . was adequate to
ameliorate any significant prejudice to defendant." Id. "The
prosecutor's comments [about Marshall's having his sons
testify on his behalf] were not merely 'forceful and graphic,'
they were inflammatory and highly emotional, possessing
the capacity to anger and arouse the jury and thereby

38

divert them from their solemn responsibility to render a
verdict based on the evidence." Id. This is discussed in
Marshall's Brief at 128-29.

vi-vii. In reviewing both the guilt and penalty phase, the
New Jersey Supreme Court noted that "[w]here . . . the
victim's character has no bearing on the substantive issue
of guilt or the penalty to be imposed, the prosecution may
not comment on the evidence in a manner that serves only
to highlight the victim's virtues in order to inflame the
jury." Id. at 170 (quoting State v. Williams, 550 A.2d 1172,
1203 (N.J. 1988). Two of the prosecutor's statements-- one
in his guilt phase closing, and one in his penalty phase
statement -- crossed that line.

> I didn't know Maria Marshall, but I know and you
> know that she loved her boys. I know and you know
> that she loved her husband. For eight months that lady
> knew that his afternoons were spent in the arms of
> another woman. She continued to cook for him, she
> continued to clean his clothes, she continued to keep
> the house clean, she continued to make love with him,
> because she loved him. She wanted to start all over.
> She wanted to give him a second chance. She had a
> right to live her life in full, to watch her boys continue

to grow, to watch them graduate from school, to get
married and have families of their own, but he tossed
it all away because of his desperation and his greed.
And that is Robert Oakley Marshall.

Id. at 169-70.

I really cannot think of anything more heinous in our
society than to, you know, hire somebody to kill
somebody else, let alone a family member; in this case,
your wife.

. . . .

Maria Marshall had no prior criminal history. Maria
Marshall was civic-minded, and this defendant did not
give her the option of thirty years.

Id. at 171.

The New Jersey Supreme Court found the guilt phase
argument within the category of inappropriate argument

but "much more circumscribed and far less emotional" than
those it had found improperly diversionary. Id . It thus
concluded that the remarks were harmless. As to the
penalty phase comments, the Court concluded:

Although the prosecutor was free to depreciate the
significance of defendant's mitigating evidence, the
argument that the victim could claim the same
qualities relied on by the defendant is diversionary,
focusing attention away from the mitigating evidence
and emphasizing the lack of justification for the
homicide. We find the argument inappropriate, but
have no doubt that this isolated statement in the
prosecutor's brief closing argument did not have the
capacity to affect the jury's deliberative process.

Id. This is discussed in Marshall's brief at 133-34.

In reviewing the claims of prosecutorial misconduct on
appeal for post-conviction relief, the New Jersey Supreme
Court noted that Marshall had characterized two additional
comments in the prosecutor's opening statement as
misconduct. The Court concluded that, after review, all of
the claims were:

entirely without merit and do not warrant extended
discussion. Indeed, many of defendant's claims are
mere restatements of claims rejected by this Court on
defendant's direct appeal. In respect of most of the
claims in this category, defendant has failed to
demonstrate that the prosecutorial conduct in question
was improper. In the remaining instances, defendant
has not established that the State's misconduct was
"so egregious that it deprived defendant of a fair trial."

Marshall II, 690 A.2d at 73 (internal citations omitted). The District Court found that -- with regard to each of the claims of prosecutorial misconduct Marshall raised before it -- the conclusions of the New Jersey Supreme Court were neither contrary to nor an unreasonable application of United States Supreme Court precedent. See Marshall III, 103 F. Supp. 2d at 779-82.

b. Did the Misconduct Amount to a Due Process
   Violation?

Marshall urges that the New Jersey Supreme Court misapplied the United States Supreme Court's precedent in Berger v. United States, 295 U.S. 78 (1935), by determining either that "no error" occurred, or that any error that did occur was harmless. App. Br. at 134. In Berger , the United States Supreme Court condemned the prosecutor's argument as "undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury." Id. at 85. The Court then enunciated the often-cited standard by which prosecutors must abide:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Id. at 88. But improper conduct is not, in itself, sufficient to constitute constitutional error, even when -- as here -- that conduct is alleged to be both deliberate and pervasive. Improper conduct only becomes constitutional error when the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial.16

Under these facts, the two dissenting justices on the New Jersey Supreme Court would have held that the

_____

16. We note that we only conduct a harmless error inquiry once we decide that constitutional error did occur. Thus, we first examine whether the misconduct so infected the trial as to render it unfair. See, e.g., Darden v. Wainwright, 477 U.S. 168, 182 n.15 (1986).

prosecutor's actions were so deliberate and so pervasive, and that at least some of the actions were either not cured, inadequately cured, or incurable by subsequent instructions from the court, that the fairness of the proceeding was threatened. For Justice Handler, the trial itself was rendered suspect, while for Justice O'Hern, the misconduct at the trial threatened the integrity of the penalty proceeding. Marshall I, 586 A.2d at 212 (Handler, J., dissenting); id. at 198-99 (O'Hern, J., concurring in part and dissenting in part).17 Marshall relies heavily on the reasoning of these two justices in his argument that we, likewise, should deem the misconduct to have rendered his trial unfair. App. Br. at 134. We cannot condone the prosecutor's conduct here, which amounted to repeated, deliberate misconduct. But we believe that the majority of the New Jersey Supreme Court was reasonable in analyzing the impact that the conduct that amounted to constitutional error might have had upon the proceedings, thus looking at the "totality of the trial" in assessing whether his trial was rendered unfair. Indeed, we would be concerned if a court placed undue emphasis on the deliberateness of a prosecutor's actions, because the focus on the prosecutor might distract a reviewing court from its

_____

17. We note in addition that Justice O'Hern did not say that the misconduct alone constituted constitutional error, but rather that the misconduct, when weighed with the other errors at trial, was sufficient to undermine his confidence in the outcome.

> The dry curative instructions given by the trial court hardly sufficed to dispel the visual image of a place in hell for defendant that the prosecutor planted in the jurors' minds. Those remarks were neither accidental nor the result of the passion of a heated trial. They were planned. Contemporary statements by the prosecution to the press set forth in the record demonstrate that. I cannot conclude that those instances of prosecutorial misconduct, weighed cumulatively with the other instances of trial error and with the constitutional error of non-disclosure of the promise of immunity made to Sarann Kraushaar and the special expenses paid by the State for the support of the McKinnon family, could not present at least a "real possibility" that there would have been a sentence other than death.

Marshall I, 586 A.2d at 198-99 (O'Hern, J., concurring in part and dissenting in part).

rightful focus upon the fairness of the trial itself. The critical question in assessing constitutional error is to what extent a defendant's rights were violated, not the culpability of the prosecutor. Smith, 455 U.S. at 219. Such an inquiry requires a focus upon the reliability of the verdict and whether the trial as a whole was rendered unfair. A prosecutor's deliberate acts might have no effect at all upon the trier of fact, while acts that might be inadvertent could serve to distract the jury from its proper task and thus render a defendant's trial fundamentally unfair.

A similar concern informs our reluctance to be swayed by the "extensive" nature of the misconduct. In Berger, the case that Marshall relies on, the United States Supreme Court addressed the interaction of the evidence of guilt and the impact on the jury of persistent misconduct:

> In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt "overwhelming," a different conclusion might be reached. Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential.

Berger, 295 U.S. at 89 (internal citations omitted). Here, the New Jersey Supreme Court's opinions are replete with references to the overwhelming evidence of Marshall's guilt. In Moore v. Morton, 255 F.3d 95, 119 (3d Cir. 2001), we read United States Supreme Court precedent as establishing the principle that the stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair, whereas prosecutorial misconduct is more likely to violate due process when evidence is weaker.

When evaluating Marshall's claims, the New Jersey Supreme Court cited not to federal law, but to New Jersey precedent, State v. Ramseur, 524 A.2d 188, 290 (N.J. 1987), for its standard of constitutional error. Ramseur

itself cites to earlier New Jersey law, rather than the applicable United States Supreme Court jurisprudence. Rather than dwell on the New Jersey Supreme Court's error in applying its own precedent, however, we believe AEDPA review requires a more nuanced approach in this situation. Because we are examining to see whether the New Jersey Supreme Court's analysis "resulted in a decision" that was either "contrary to, or involved an unreasonable application of, clearly established Federal law," we believe that any error that we find in the approach or specific analysis of the Court must be tempered by our overall assessment as to whether the result it reached is in fact consistent with Supreme Court precedent.18 See 28 U.S.C. S 2254(d).

The New Jersey Supreme Court did inquire whether the misconduct was such that it deprived the defendant of a fair trial, which is consonant with the dictates of the United States Supreme Court enunciated above. It also consistently examined the statements to determine whether

_____

18. The District Court, applying Darden, concurred with the New Jersey

Supreme Court, concluding that "the few improper comments made by the prosecutor during his closing argument were not enough to have had a substantial or injurious affect [sic] on the jury's decision." Marshall III, 103 F. Supp. 2d at 781; see also id. at 776. It did not address the New Jersey Supreme Court's application of state law, but performed an independent examination using federal law that arrived at the same conclusion. We note that this situation is distinguishable from our recent case of Everett v. Beard, 290 F.3d 500, 507-08 (3d Cir. 2002), in which we held that the state court's ruling should not be analyzed under the AEDPA standard of review because it was not"clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." Id. (emphasis omitted). In Everett, the Pennsylvania courts did not address the petitioner's due process claim at all, and analyzed his ineffectiveness claim not under a Strickland analysis, but under standards set by its own precedent, different from those enunciated in Strickland . Rather than asking whether counsel's performance was objectively reasonable, the court inquired whether the underlying claim was meritorious, then whether "the course of action chosen by his counsel had no reasonable basis designed to effectuate the client's interests," and, finally, whether the defendant was prejudiced. Id. at 506-07. By contrast, here the New Jersey Supreme Court examined the merits of Marshall's claims and measured them against a standard that was consistent with federal law.

44

they challenged the core of Marshall's defense, and repeatedly evaluated the comments within the larger context of the trial as a whole, asking whether prior testimony, curative instructions, or the collateral nature of the comments served to mitigate their impropriety, particularly in the face of what it viewed as overwhelming evidence produced by the State. This also is in keeping with the teachings of the Supreme Court -- and our precedent -- recited above.

The majority of the New Jersey Supreme Court found that, for the most part, the misconduct either impacted a collateral issue in the case, Marshall I, 586 A.2d at 166, 169, 171,19 was sufficiently remedied by the court's curative instructions, id. at 168, 169,20  was "of limited significance" because it was adequately challenged by the defense, id. at 167, or was an isolated reference that did not "have the capacity to affect the jury's deliberative process," id. at 171.21 We agree that those conclusions are reasonable under Berger and its progeny.

_____

19. In one instance, the New Jersey Supreme Court appeared to collapse the constitutional error and harmless error analysis: "Based on our review of the prosecutor's entire guilt-phase summation, we are satisfied that those references to the victim that were unrelated to any substantive issues were neither extensive nor inflammatory, and we find them harmless beyond a reasonable doubt." Marshall I, 586 A.2d at 171.

20. "To the extent that we may discern, therefore, Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial,

assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant. There are 'some occurrences at trial [that] may be too clearly prejudicial for . . . a curative instruction to mitigate their effect.' In making this determination, Supreme Court precedent requires the reviewing court to weigh the prosecutor's conduct, the effect of the curative instructions and the strength of the evidence." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001) (internal citations omitted).

21. In other words, it is not enough for the"concerns underlying our reactions against improper prosecutorial arguments to the jury" to be implicated; they must be implicated to the extent that "we conclude that the jury's deliberations were compromised." United States v. Young, 470 U.S. 1, 18 (1985).

45

Thus, the majority of the misconduct that we have reviewed did not deprive Marshall of his right to a fair trial, and we agree with the New Jersey Supreme Court's conclusions that no constitutional right was implicated; accordingly, for those instances we do not reach the question of whether the error was harmless. Two instances of misconduct, however, implicated specific constitutional guarantees and require further examination.22

2. Violations of Specific Constitutional Rights

Marshall claims the prosecutor's misconduct violated two specific rights -- his right to counsel and his right to call witnesses -- both of which are rights that are specifically guaranteed by the Sixth Amendment. The United States Supreme Court has presumed that a due process violation has occurred when prosecutorial misconduct implicates specific rights guaranteed by the Bill of Rights. See Griffin v. California, 380 U.S. 609 (1965); Doyle v. Ohio, 426 U.S. 610 (1976); see also Hassine v. Zimmerman, 160 F.3d 941 (3d Cir. 1998).23

The Supreme Court has only evaluated a presumptive due process violation where a prosecutor misused a defendant's exercise of his Fifth Amendment right to remain silent as evidence of guilt. See Griffin v. California, 380 U.S. 609 (1965); Doyle v. Ohio, 426 U.S. 610 (1976). However, we think it clear that the same presumption applies when other enumerated rights are implicated. See United States v. Thame, 846 F.2d 200 (3d Cir. 1988); United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir.), cert. denied, 414 U.S. 855 (1973).24 We analyze whether the constitutional

_____

22. While the New Jersey Supreme Court found that one comment in the prosecutor's summation implicated Marshall's privilege against self-incrimination, Marshall has not specifically raised that ruling before us, and we will not address it here.

23. As discussed in more detail later, though such misconduct presumptively violates due process, there are exceptions. See Greer v. Miller, 483 U.S. 756 (1987).

24. Some circuit courts of appeals have restricted their review under AEDPA to United States Supreme Court decisions alone. See, e.g., Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (considering itself

right was violated, and if so, whether the error was harmless. Marshall alleges two such violations: the exchange by the prosecutor with DeCarlo about Marshall's retention of counsel and the prosecutor's remarks about Marshall's calling of his sons as witnesses. We will examine each in turn.

a. Right to Counsel

i. Did the New Jersey Supreme Court Properly Conclude that the Error was of the Type Condemned in Macon?

Oakleigh DeCarlo, Marshall's sister, was questioned on cross-examination about the visit police investigators made to the Marshall home on September 21, 1984, to inquire about the then newly discovered Louisiana contacts. Ms.

---

barred from examining "lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law"). We have concluded, however, that decisions of federal courts below the level of the United States Supreme Court may be helpful to us in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as "helpful amplifications" of that precedent. Moore v. Morton, 255 F.3d 95, 105 (3d Cir. 2001) (quoting Matteo v. Superintendent, SCI Albion, 171 F. 3d 877, 890 (3d Cir.) (en banc), cert. denied, 528 U.S. 824 (1999)). We view our reliance on Thame and Macon as such a "helpful amplification." And we think that other United States Supreme Court precedent implicitly recognized the principle we iterated in those cases.

In Donnelly, for example, the United States Supreme Court contrasted the alleged error before it with the denial of the"benefit of a specific provision of the Bill of Rights, such as the right to counsel" or the constructive denial of such a right, citing to Griffin. Donnelly, 416 U.S. at 643. Thus, while the United States Supreme Court has not had the opportunity specifically to extend Griffin's holding, it has recognized the basis for our holding in Macon. Further, the New Jersey Supreme Court itself stated that "we are fully in accord with the decisions of the federal Courts of Appeals holding that a prosecutor's statement suggesting that retention of counsel is inconsistent with innocence impermissibly infringes on a defendant's constitutional right to counsel." Marshall I, 586 A.2d at 148.

DeCarlo was present. At trial, there was conflicting testimony as to whether Marshall was asked whether he knew certain names or was also shown photographs of the

Louisiana contacts. Defense counsel had sought -- and
received -- a ruling that the prosecutor could inquire as to
Marshall's reaction to the photographs shown to him, but
not as to Marshall's refusal to answer based on counsel's
advice. App. Br. at 123-24. The prosecutor inquired of Ms.
DeCarlo whether the interview ended after Marshall was
shown the photographs.

> PROSECUTOR: You didn't hear him answer any
> questions, did you, when they said --
>
> DECARLO: Yes, I did.
>
> PROSECUTOR: You did?
>
> DECARLO: Yes.
>
> PROSECUTOR: Answer their questions?
>
> DECARLO: He answered a question.
>
> PROSECUTOR: A question?
>
> DECARLO: A question.
>
> PROSECUTOR: One question?
>
> DECARLO: One question.
>
> PROSECUTOR: Then the conversation ended: is that
> correct?
>
> DECARLO: No. They said they had other questions and
> he said, "I think I should have my lawyer here if you're
> going to ask any more questions."
>
> PROSECUTOR: Did you say to him, "Hey, Rob. Why get
> your lawyer. Your wife was murdered. Maybe these
> people --"

Marshall I, 586 A.2d at 147. The above were characterized
by the New Jersey Supreme Court as verging on
infringement of the right to counsel, but brief and "not
dwell[ed] on." Id. at 148.

After the prosecutor completed his cross-examination,
Thompson's counsel, Mr. Hartman, cross-examined
DeCarlo:

48

> HARTMAN: You wouldn't think it unreasonable that
> if a person retained an attorney and was possibly
> under suspicion that they should have their attorney
> present?
>
> DECARLO: Not at all. That's why you hire them for
> his advice.

Id. at 148. Hartman then asked Ms. DeCarlo if she thought it unreasonable that a person under suspicion would want their attorney present during questioning, and she responded that that is why attorneys were hired. Then the prosecutor resumed his cross-examination:

> PROSECUTOR: Especially when your wife has been killed and you haven't -- you didn't have anything to do with it, you still run out and hire an attorney?

Id.

Marshall's counsel objected to the question, and the objection was sustained, but no curative instruction was sought or given. The New Jersey Supreme Court noted that what could be "characterized as a question only by a most indulgent reading" required a "clear and forceful curative instruction" by the court. Id. The New Jersey Supreme Court characterized the prosecutor's cross-examination of DeCarlo as "a highly improper and inexcusable attempt . . . to suggest that defendant's retention of counsel was inconsistent with his claim that he was innocent." Marshall I, 586 A.2d at 147.

49

[This page intentionally left blank]

50

Volume 2 of 3

51

ii. Was the Error Nonetheless Harmless?

In analyzing whether the prosecutor's behavior impermissibly "suggest[ed] that retention of counsel is inconsistent with innocence," the New Jersey Supreme Court applied a harmless error analysis, reasoning that all courts of appeals to address the issue, except the Fifth Circuit Court of Appeals, had done so, and that the Fifth Circuit itself was inconsistent in whether it applied a per se or harmless error analysis. Id. at 148-49. In examining the prosecutor's conduct for harmless error, the New Jersey Supreme Court focused on our rationale in United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973), where we reversed the conviction in the face of a prosecutorial comment that impinged upon the defendant's right to counsel, because the "credibility of the petitioner as a witness was a central issue," given that "critical portions of the evidence were disputed." Id. at 616.

The prosecutor's conduct during Marshall's trial was distinguishable, according to the New Jersey Supreme Court, for two reasons: the jury had already been made aware that Marshall had retained counsel by the time the

episode in question had taken place, and had learned it from Marshall himself; and "the evidence of defendant's guilt was so persuasive that it is virtually impossible to conceive that this isolated comment by the prosecutor, however reprehensible it may have been, could have contributed significantly to the jury's determination of guilt." Marshall I, 586 A.2d at 149.

When the New Jersey Supreme Court considered the same facts in its post-conviction relief review, it reiterated that the remarks were harmless error, and it likewise dismissed the possibility that they were evidence either of the ineffectiveness of Marshall's counsel (in not requesting a curative instruction) or prosecutorial misconduct, because there was no prejudice. Marshall II, 690 A.2d at 67-69. When presented with the habeas petition, however, the District Court evaluated the claim as the New Jersey Supreme Court had on direct appeal, and found that the New Jersey Supreme Court's analysis and conclusions were neither unreasonable nor contrary to Supreme Court jurisprudence. Marshall III, 103 F. Supp. 2d at 777-79. Like

the District Court, we will evaluate the reasonableness of the New Jersey Supreme Court's evaluation on direct appeal.

Before us, Marshall contends that the prosecutor "deliberately led" DeCarlo to the improper disclosure, and that, indeed, "the prosecutor's entire cross of DeCarlo was aimed at these topics." App. Br. at 124. But the New Jersey Supreme Court found that DeCarlo's comment was volunteered. Marshall I, 586 A.2d at 148. Whether DeCarlo's disclosure was instigated or voluntary is, we believe, not clear. Thus we will not find the New Jersey Supreme Court's determination of the facts to be unreasonable.

Marshall also, however, challenges the prosecutor's follow-up comments implying that if Marshall were innocent, he would not have "run out and hire[d] an attorney." Marshall I, 586 A.2d at 148. As noted above, the New Jersey Supreme Court concluded that the comments were constitutional error, but that they were harmless under Chapman v. California, 386 U.S. 18 (1967).25 Under Chapman, an error is harmless if there is no"reasonable possibility that the evidence complained of might have contributed to the conviction." Id. at 23 (quoting Fahy v.

_____

25. In Hassine v. Zimmerman, 160 F.3d 941, 950-55 (3d Cir. 1998), we stated that -- in reviewing a claim on habeas that is not governed by AEDPA -- we would apply the harmless error standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), regardless of whether the state court applied the Chapman standard. Hassine, 160 F.3d at 952-53. In Penry v. Johnson, 532 U.S. 782 (2001), the United States Supreme Court did likewise under AEDPA, instructing us that, where courts find, using the AEDPA analysis, that the state court unreasonably applied clearly

established federal law, and thus that an error occurred in the trial that the state court did not evaluate as such, the habeas court is to apply Brecht to evaluate whether that error is harmless. Id. at 795. That is not the situation here, however. The New Jersey Supreme Court correctly found an error, and applied Chapman to evaluate whether that error was harmless. We need not determine whether, in such an instance, we should review their application of Chapman or apply Brecht independently, however, because here the error would be harmless regardless of which standard applied. The District Court also found that the error would be harmless under either standard. See Marshall III, 103 F. Supp. 2d at 778-79.

Connecticut, 375 U.S. 85, 86-87 (1963)). Further, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. Id. at 24. The New Jersey Supreme Court concluded that the impact of the prosecutor's line of questioning was ameliorated because Marshall testified before DeCarlo and had himself disclosed that he had retained counsel prior to the incident in question. Marshall I, 586 A.2d at 149. "We reach that conclusion in part because the jury knew from defendant's own testimony that he had retained counsel and did not consider that conduct to detract at all from his claim of innocence." Id. That reasoning, however, was secondary to the Court's conviction: "More important to our conclusion, however, is that the evidence of defendant's guilt was so persuasive that it is virtually impossible to conceive that this isolated comment by the prosecutor, however reprehensible it may have been, could have contributed significantly to the jury's determination of guilt." Id.

In Marshall's direct testimony at trial, he stated that his office was searched during the weekend prior to his wife's memorial service, and that as a result of that action, he consulted an attorney. Direct Testimony of Robert Marshall, February 26, 1986, St. Ex. 28T at 107-09. Immediately thereafter, Marshall discussed the visit paid him by the investigators on September 21, when his sister was present. Id. at 109-11. He denied being showed photographs at that time. Id. at 110.

DeCarlo's testimony occurred on February 24, 1986, two days prior to Marshall's testimony. Thus, Marshall had not in fact disclosed his retention of counsel before she testified. Rather, her testimony provided the initial impression to the jury as to Marshall's retention of counsel. Accordingly, we cannot discount the impact of the prosecutor's statements on the basis of the jury's knowledge via Marshall's testimony, as the New Jersey Supreme Court did. DeCarlo had testified that the investigators asked Marshall whether he knew "a couple of names." Direct Testimony of Oakleigh DeCarlo, February 24, 1986, St. Ex. 27T at 118. She further testified that Marshall was not shown any photographs at that time. Id.

From the beginning of the cross-examination, the prosecutor was combative with DeCarlo. She had testified that she had not heard one of the names asked by the investigators. The first question that the prosecutor asked was: "You didn't hear him answer any questions, did you, when they said --," to which DeCarlo responded that she had heard Marshall's response. Cross-Examination of Oakleigh DeCarlo, February 24, 1986, St. Ex. 27T at 119. Then the prosecutor asked whether the conversation ended, to which DeCarlo replied that Marshall had said he should have his attorney present if they were to ask more questions. Id. The prosecutor started to ask whether DeCarlo had said "Hey, Rob. Why get your lawyer. Your wife was murdered. Maybe these people --," but when DeCarlo attempted to answer, he cut her off. Id. Defense counsel objected, and the prosecutor reframed his question:"Did you say to your brother, 'Rob, wait a minute. Don't just answer one question. Take a good look at these photographs.'?" DeCarlo replied -- as Marshall would later confirm -- that he was not shown any photographs at that point. Id. at 120. The prosecutor then asked several questions attempting to elicit whether DeCarlo had ever stated that she could not tell whether Marshall was lying or telling the truth, and concluded his cross-examination. Thompson's counsel then asked DeCarlo whether she would think it unreasonable to want an attorney present if possibly under suspicion. She replied: "Not at all. That's why you hire them for his advice." Id. at 122. The prosecutor then asked again, "Especially when your wife has been killed and you haven't -- you didn't have anything to do with it, you still run out and hire an attorney?" Id. The "question" was objected to, and the objection sustained, and DeCarlo was permitted to step down.

The New Jersey Supreme Court properly considered the weight of other evidence against Marshall in determining that the error was harmless. See Brecht, 507 U.S. at 639. However, as we noted, the New Jersey Supreme Court stated that part of its determination was based on the fact -- which is not actually a fact -- that Marshall's testimony that he had retained counsel lessened the impact that the prosecutor's questioning of DeCarlo had upon the jury. We then must answer an additional question by looking at the

55

record: Considering the totality of DeCarlo's testimony, was it unreasonable for the New Jersey Supreme Court to conclude that the disclosure that Marshall had hired counsel -- absent the palliative ascribed by the Court of the jurors' having already heard from Marshall -- was harmless beyond a reasonable doubt?

To answer that question, it is important to look at what the United States Supreme Court reacted to in Griffin v. California, 380 U.S 609 (1965), and Doyle v. Ohio, 426 U.S. 610 (1976), and what we reacted to in Macon. In Griffin, the prosecutor used the defendant's silence -- and his own

powerful oratory -- to convey that the defendant knew the truth, but was wilfully withholding it from the jury.26 Further, the prosecutor's words were compounded by the court's instructions -- consistent with California law -- that the "jury could draw an inference unfavorable to the defendant as to facts within his knowledge about which he chose not to testify." United States v. Robinson, 485 U.S. 25, 30 (1988) (discussing Griffin, 380 U.S. at 610-15). In Doyle, the prosecutor, on cross-examination of the defendant, repeatedly denigrated Doyle's assertions of innocence.27 There, the trial court overruled objections and

---

26. As quoted by the Supreme Court, the prosecutor testified:

> The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment and went down the alley with her. What kind of a man is it that would want to have sex with a woman that beat up if she was beat up at the time he left? He would know that. He would know how she got down the alley. He would know how the blood got on the bottom of the concrete steps. He would know how long he was with her in that box. He would know how her wig got off. He would know whether he beat her or mistreated her. He would know whether he walked away from that place cool as a cucumber when he saw Mr. Villasenor because he was conscious of his own guilt and wanted to get away from that damaged or injured woman. These things he has not seen fit to take the stand and deny or explain. And in the whole world, if anybody would know, this defendant would know. Essie Mae is dead, she can't tell you her side of the story. The defendant won't.

Griffin, 380 U.S at 610-11.

27. The relevant prosecutorial questions are as follows:

56

allowed the prosecutor to argue the post-arrest silence in closing. Doyle, 426 U.S. at 614. In Macon, the prosecutor in his closing expressly tied the defendant's retention of counsel to the other circumstantial evidence of his guilt.28 There was no objection or requested instruction. We concluded there that the error was not harmless, because the verdict rested on a credibility determination, and the comments "would appear to have been directed to, and may have had the effect of, raising in the jurors' minds the inference that petitioner was, or at least believed himself to

---

> "Mr. Wood, if that is all you had to do with this and you are innocent, when Mr. Beamer arrived on the scene why didn't you tell him?"

> "But in any event, you didn't bother to tell Mr. Beamer anything about this?"

> "You are innocent? . . . . That's why you told the police department and Kenneth Beamer when they arrived -- . . . . about your innocence?"

"You said nothing at all about how you had been set up?"

"As a matter of fact, if I recall your testimony correctly, you said instead of protesting your innocence, as you do today, you said in response to a question of Mr. Beamer, -- 'I don't know what you are talking about.' "

Doyle, 426 U.S. at 614 & n.5.

28. As quoted in our opinion, the relevant portions of the prosecutor's summation are:

"Then what does he do? He drives along and can't tell us where. The gun goes out the window. An act of innocence?"

"The car is left somewhere and he doesn't remember where? An act of innocence?"

"He goes home and puts the shirt down in the chest, a torn shirt. Then he goes to bed. He says he had trouble sleeping. He gets up the next morning and lo and behold, what does he do? He calls his lawyer. These are acts of innocence?"

"I say, ladies and gentlemen, his story is implausible, impossible and you can judge by his own conduct, unbelievable."

Macon, 476 F.2d at 614 (emphasis in original).

57

be, guilty. Such an inference might certainly tend to cause the jury to disbelieve Macon's version of the story." Macon, 476 F. 2d at 616-17. We believe that there are important, though subtle, distinctions between the effect of the prosecutor's actions in these cases and in the one before us.

First, in Griffin, Doyle, and Macon, the prosecutor attacked the defendant directly. Here, the attack was indirect. Second, in each of the above cases, the prosecutor was allowed to wax eloquent without challenge or interruption, while here Marshall objected -- and the objection was sustained -- three times in the brief interchange between the prosecutor and DeCarlo. Finally, in part because both the direct and cross examination were brief, it was very obvious, even to us on a cold record, that the prosecutor was, for whatever reason, attempting to twist all of DeCarlo's testimony -- intimating that she did not hear Marshall's answer when she had testified that she did not hear one of the names asked by the investigator; asking her why she didn't ask Marshall to examine the photographs when she had already testified that he hadn't been shown any -- and we think that the way the prosecutor formulated the questions: "Didn't you ask him . . ." would have been perceived as yet further attempts to badger and twist the testimony of a minor witness.

When all three factors are considered in combination, we

cannot find the prosecutor's questions and comments, improper though they were, to support -- as they did in as in Griffin, Doyle, and Macon-- a clear inference that the exercise of the constitutional right was itself evidence of the defendant's guilt. Thus, we concur in the New Jersey Supreme Court's conclusion that the error was harmless.

b. Right to Call Witnesses

i. Did the New Jersey Supreme Court Properly Conclude that the Error was Not of the Type Condemned in Macon?

The remarks in question were quoted by the New Jersey Supreme Court:

58

And he has the audacity to bring in his three boys to testify. That's obscene. And I'm not being critical of them, because I would probably do the same thing. To put his boys on that witness stand is obscene, and for that there's a place in hell for him. He will use anybody, he will say anything and he will do anything, including his own family, to get out from under. And that's Robert Oakley Marshall. Make no mistake about it.

Marshall I, 586 A. 2d at 169.

Marshall raises these remarks before us twice, once by citing to the relevant portions of the dissent and including these remarks among those to be analyzed under Berger and Darden, App. Br. at 129-30, 132, and earlier, when Marshall discusses the infringement of the right to counsel discussed above. There, he states specifically that the right to counsel should be evaluated in conjunction with other misconduct "including the prosecutor's telling the jury in summation that there is a place in hell for Robert Marshall for exercising his 6th Amendment right to call his sons as witnesses." App. Br. at 127. The majority of the New Jersey Supreme Court did not directly address the contention that the prosecutor's comments were tantamount to a denial of Marshall's right to call witnesses, stating merely that:

Arguably, defendant's sons' testimony concerned only peripheral aspects of the case -- except for that of Robbie Marshall who stated that defendant was at home at noon on September 6, 1984, the time, according to McKinnon, that he and defendant met on the Garden State Parkway. Thus, it was not unreasonable for the prosecutor to have implied that defendant's sons had been called as witnesses not so much for the substance of their testimony but because their mere presence as witnesses would suggest support for their father, support that would have been unwarranted if defendant had participated in the murder of their mother. Thus, in emotional and inflammatory terms, the prosecutor expressed his

> revulsion at what he perceived as defendant's 'using'
> his sons in order to gain an acquittal . . . . Although
> the prosecutor's remarks went beyond the boundaries

> of permissibly forceful advocacy, we note that their
> focus was on a distinctly collateral aspect of the trial,
> not on a critical and contested issue of fact. We
> acknowledge that the trial court's curative instruction
> could have been more forceful, but we are satisfied that
> it was adequate to ameliorate any significant prejudice
> to defendant.

Marshall I, 586 A.2d at 169.

It is beyond dispute that the right to call witnesses is protected by the Sixth and Fourteenth Amendments."Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." Taylor v. Illinois, 484 U.S. 400, 408 (1988) (internal citations omitted). But even though the prosecutor's misconduct in this instance did touch on Marshall's exercise of a constitutional right, we conclude that the court's curative actions rightly kept the offending statements from the consideration of the jurors, and thus, that consonant with the United States Supreme Court's holding in Greer v. Miller, 483 U.S. 756 (1987), there was no violation of Marshall's right to call witnesses.

As the United States Supreme Court characterized Doyle, the harm lay in using the defendant's constitutionally guaranteed silence to impeach him at trial. Greer, 483 U.S. at 763. In Greer, a question was asked, counsel objected, and the court sustained the objection and instructed the jury to disregard questions that had been objected to if the objection had been sustained. Id. at 764. Thus, "[t]he fact of Miller's postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no Doyle violation occurred in this case." Id. at 764-65.

While the prosecutorial comments here are nowhere near as benign as the single prosecutorial question at issue in Greer, we think that Greer's holding is controlling. Here, as in Greer, the comments the prosecutor made regarding Marshall's sons were at a single point in a long trial. Though they were more inflammatory -- indeed,"[a]mong the most inflammatory portions of the prosecutor's

summation," "possessing the capacity to anger and arouse the jury and thereby divert them from their solemn responsibility to render a verdict based on the evidence," Marshall I, 586 A.2d at 168, 169 -- the trial court instructed the jury specifically to disregard the prosecutor's

comments: "A defendant in a criminal case has a right to bring in any witnesses or subpoena or bring in any other way any witnesses to testify on his behalf, and no adverse inferences should be drawn against the defendant merely because his sons testified as witnesses on his behalf." Id. at 169. The Court also instructed the jurors to disregard the reference to "a place in hell."[29]  Id. Indeed, the instructions here were specifically directed at the prosecutor's statement, unlike the general instructions that the Court upheld in Greer.

As Greer stressed, we are to "presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." Greer, 483 U.S. at 767 n.8. Thus, the fact that Marshall called his sons as witnesses was "not submitted to the jury as evidence from which it was allowed to draw any permissible inference." Id. at 764-65.

The New Jersey Supreme Court concluded that the prosecutor's statements were not directed at "a critical and contested issue of fact" and that the trial court's curative instructions were "adequate to ameliorate any significant prejudice to defendant." Marshall I, 586 A.2d at 169. Although the New Jersey Supreme Court should have evaluated this misconduct to determine if there was a violation under Doyle, its conclusions are essentially the same as those we reach independently applying the proper framework, and we find no constitutional error. Accordingly, we will not disturb its conclusions. [30]

_____

29. Also as in Greer, the trial court denied Marshall's motion for a mistrial on the basis of the prosecutor's actions. Id.

30. Because we find that there was no constitutional error, we do not need to reach the question of whether any error was harmless.

61

3. Accumulation of Error

The New Jersey Supreme Court also evaluated the right to counsel claim separately from the other claims of prosecutorial misconduct, and Marshall complains vociferously that, if the instances of prosecutorial conduct that were found to be improper by the New Jersey Supreme Court were considered together, there would be error that would render the trial unfair and not be harmless. App. Br. at 127. Further, he alleges that the nondisclosure of Kraushaar's immunity agreement should be factored in as well. Id. As stated above, Marshall is correct that error attributed to prosecutorial misconduct is accumulated for the purposes of the Chapman analysis. Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991). Indeed, in Chapman itself, the cumulative effect of the error was weighed

together.

> Thus, the state prosecutor's argument and the trial judge's instruction to the jury continuously and repeatedly impressed the jury that from the failure of petitioners to testify, to all intents and purposes, the inferences from the facts in evidence had to be drawn in favor of the State -- in short, that by their silence petitioners had served as irrefutable witnesses against themselves. And though the case in which this occurred presented a reasonably strong "circumstantial web of evidence" against petitioners, it was also a case in which, absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts. Under these circumstances, it is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt, that the prosecutor's comments and the trial judge's instruction did not contribute to petitioners' convictions. Such a machine-gun repetition of a denial of constitutional rights, designed and calculated to make petitioners' version of the evidence worthless, can no more be considered harmless than the introduction against a defendant of a coerced confession.

Chapman, 386 U.S. at 25-26 (internal citations omitted). It is also true, as noted above, that in Brecht v. Abrahamson, the United States Supreme Court did not preclude the

62

possibility that "in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." Brecht, 507 U.S. at 638 n.9.

But the essence of Chapman is that a prosecutor's misconduct is not harmless when it renders the defendant's "evidence worthless." Chapman, 386 U.S. at 26. Here, none of the misconduct properly before the jury undermined the integrity or fairness of the proceeding. While the United States Supreme Court has not clarified what might constitute an "unusual case," we do not think that the single instance of constitutional error -- the prosecutor's questioning of DeCarlo -- at Marshall's trial could suffice.31

C. Fourth Amendment and Statutory Violations

After Marshall recorded the tapes to his brother-in-law, who was also an attorney, and to his secretary and sons in his motel room at the Best Western, he put stamps on the envelopes and took two packages to the front desk and placed them in a container designated for outgoing mail.32

---

31. New Jersey law appears more willing than federal law to assess the accumulation of errors without first evaluating each separately:

> The accused, no matter how abhorrent the offense charged nor how
> seemingly evident the guilt, is entitled to a fair trial surrounded by
> the substantive and procedural safeguards which have stood for
> centuries as bulwarks of liberty in English-speaking countries. This,
> of course, does not mean that the incidental legal errors, which
> creep into the trial but do not prejudice the rights of the accused or
> make the proceedings unfair, may be invoked to upset an otherwise
> valid conviction; . . . . Where, however, the legal errors are of such
> magnitude to prejudice the defendant's rights or, in their aggregate
> have rendered the trial unfair, our fundamental constitutional
> concepts dictate the granting of a new trial before an impartial jury.

State v. Orecchio, 106 A.2d 541, 542 (N.J. 1954) (internal citations
omitted); see also State v. Rose, 548 A.2d 1058 (N.J. 1988) (finding
prosecutorial misconduct during the penalty phase, in sum, sufficient to
reverse a death sentence). But we are decidedly not in a position to
review the New Jersey Supreme Court's application of its own law.

32. In the record, there is much dispute as to whether the container in
question was an open tray or a closed box with a slotted lid. The New

63

Alerted by hotel personnel, police who were surveilling
Marshall awakened him, and he was taken to a hospital,
and later to a psychiatric hospital. The police, claiming that
the envelopes were in plain sight, with the topmost package
bearing the words "To be Opened Only in the Event of my
Death," retrieved the packages and later secured warrants
to examine their contents. The tapes that were found
pursuant to those warrants were played at trial, over
Marshall's protest that the search of the mail depository
and the seizure of the tapes violated his Fourth Amendment
rights. Before the District Court, and now before us,
Marshall also claims that the police actions violated federal
statutes. The District Court concluded that the federal
statutes and regulations Marshall cited were inapplicable
because the United States Postal Service never had custody
of the envelope. Marshall III, 103 F. Supp. 2d at 784. It
further concluded that Marshall had a full and fair
opportunity to litigate his Fourth Amendment claims before
the state courts, and that habeas review was barred by the
United States Supreme Court's holding in Stone v. Powell,
428 U.S. 465 (1976). Marshall III, 103 F. Supp. 2d at 785.

Before we can reach the merits of these claims, we must
determine whether we should address them at all. Two
issues are presented to us: Are we barred from considering
statutory, non-constitutional claims under AEDPA? And
does Stone v. Powell, which prohibits us from examining
Fourth Amendment claims that have been fully and fairly
litigated in state courts, bar our consideration of the Fourth
Amendment claims?

1. Statutory claims under AEDPA

In his brief on direct appeal to the New Jersey Supreme
Court, Marshall cited to the United States Postal Service's

Domestic Mail Manual in support of his argument that there
was a Fourth Amendment expectation of privacy in his
letters and that the search warrant must have been
executed by a federal (not a state) officer. The New Jersey

---

Jersey courts found that the container was an open tray. Later evidence
calls that conclusion into question, but for our purposes what depository
was used is immaterial.

Supreme Court rejected those contentions because the
envelope was not "within the custody of the postal
authorities at the time of the seizure" and "[t]he statute
does not limit search warrants to those issued by federal
judges or magistrates." Marshall I, 586 A.2d 118. The
District Court appeared to extend this reasoning to the
additional statutes cited by Marshall before it: 5 U.S.C.
S 301, 39 U.S.C. SS 201, 404(a)(1) and 3623(d). See Marshall
III, 103 F. Supp. 2d at 783-84.

We conclude that we do not have jurisdiction to entertain
Marshall's complaint as to the District Court's
determination of his statutory claims. In Slack v. McDaniel,
529 U.S. 473 (2000), the Supreme Court noted that 28
U.S.C. S 2253(c)), that section of AEDPA that governs our
ability to issue a COA to review a District Court's
adjudication of the claims of a habeas petition, states
explicitly that "a COA may not issue unless 'the applicant
has made a substantial showing of the denial of a
constitutional right.' " 529 U.S. at 483. In that section, as
Slack explains, Congress codified the standard of Barefoot
v. Estelle, 463 U.S. 880, 894 (1983), except  that Barefoot
only required the denial of a federal right, while AEDPA
requires the denial of a constitutional right. Slack, 529 U.S.
at 483.

While the Seventh Circuit Court of Appeals has extended
Slack -- and in our view, the explicit language of the
statute as well -- to allow "independently substantial
statutory issue[s]" to "come along for the ride" if there is a
"substantial constitutional question" within the case,
Ramunno v. United States, 264 F.3d 723, 725 (7th Cir.
2001), we refuse to deviate from Congress's express terms.
In United States v. Cepero, 224 F.3d 256, 262-63, 267 (3d
Cir. 2000), we construed Slack and the plain language of 28
U.S.C. S 2253(c)) to deprive us of jurisdiction to hear
statutory questions pursuant to habeas appeals. In
response to "the ad terrorem argument that the defendant
is thereby totally denied the opportunity to appeal
nonconstitutional issues, the short answer is that Congress
has indicated that these issues must be presented in the
direct appeal from the conviction." Id. at 265.33 Marshall did
not, and he cannot now raise them here.

---

33. The premise that nonconstitutional claims are waived if not raised on
direct appeal is, of course, unremarkable and well settled law. See, e.g.,

2. Stone v. Powell and the Fourth Amendment Bar

In Stone v. Powell, 428 U.S. 465 (1976), the Supreme
Court examined the nature of the exclusionary rule, which
it characterized as a "judicially created means of
effectuating the rights secured by the Fourth Amendment"
and balanced its utility as a deterrent against the risk of
excluding trustworthy evidence and thus "deflect[ing] the
truthfinding process." Id. at 482, 490. Finding that, as to
collateral review, the costs of the exclusionary rule
outweighed the benefits of its application, the Court
concluded that "where the State has provided an
opportunity for full and fair litigation of a Fourth
Amendment claim, a state prisoner may not be granted
federal habeas corpus relief on the ground that evidence
obtained in an unconstitutional search or seizure was
introduced at his trial." Id. at 494. While the federal courts
are not thus deprived of jurisdiction to hear the claim, they
are -- for prudential reasons -- restricted in their
application of the exclusionary rule. Id. at 494 n.37.

Seeking to avoid this restriction, Marshall seizes upon
the qualifying phrase in Stone, "where the State has
provided an opportunity for full and fair litigation," and
argues that he has not had an opportunity for full and fair
litigation, and thus, that the bar of Stone v. Powell should
not apply.34 Appellant's Memorandum of Law in Support of
Application for Certificate of Appealability 131-143.

---

Sunal v. Large, 332 U.S. 174, 178-79 (1947) (cited in Stone v. Powell,
428 U.S. 465, 478 n.10 (1976)).

34. Marshall also raises two additional arguments: that Stone v. Powell
should not be applied in a capital case, since the Supreme Court has
consistently recognized that "death is different," (App. Memorandum in
Law in Support of Application for Certificate of Appealability at 129-31)
and that the letter addressed to his brother-in-law, who was also an
attorney, implicated his Sixth Amendment right, and thus was protected
by attorney-client privilege and not governed by Stone by virtue of
Kimmelman v. Morrison, 477 U.S. 365, 382-83 (1986) (refusing to apply
Stone's bar when Sixth Amendment claims were tied to a Fourth
Amendment issue). But we find both of Marshall's arguments
unpersuasive here.

We have recognized that there may be instances in which
a full and fair opportunity to litigate was denied to a habeas
petitioner, but this is not one of them. This is not a case
where a structural defect in the system itself prevented
Marshall's claim from being heard. See, e.g., Boyd v. Mintz,
631 F.2d 247, 250-51 (3d Cir. 1980); see also Gilmore v.
Marks, 799 F.2d 51, 57 (3d Cir. 1986) (observing that a
state's "failure to give at least colorable application of the

correct Fourth Amendment constitutional standard" might
amount to a denial of the opportunity for full and fair
litigation). An erroneous or summary resolution by a state
court of a Fourth Amendment claim does not overcome the
bar. Id. And, as the District Court correctly assessed,
Marshall III, 103 F. Supp. 2d at 785-86, Marshall is at most

---

There is nothing within the language of Stone v. Powell itself upon
which to base a distinction between capital and non-capital collateral
review. We have applied Stone without hesitancy to capital cases. See,
e.g., Deputy v. Taylor, 19 F.3d 1485, 1491 (3d Cir.), cert. denied, 512
U.S. 1230 (1994). Indeed, the principles of comity that underlie Stone v.
Powell, as well as the cost-benefit analysis postulated in Stone -- i.e., the
deterrent value vis-a-vis those tempted to violate the proscriptions
against illegal search and seizure weighed against the risk that risk that
trustworthy evidence would be excluded -- militate against the
distinction Marshall would have us draw.

Here, the New Jersey Supreme Court found that the relationship
between Marshall and his brother-in-law was not primarily an attorney-
client relationship. Further, the legal relationship between the Sixth
Amendment and Fourth Amendment claim are distinguishable from the
situation in Kimmelman, on which Marshall relies. There, adjudication of
the Sixth Amendment claim would have been foreclosed if there could be
no determination whether the underlying Fourth Amendment claim was
meritorious. Kimmelman, 477 U.S. at 375. Here, in contrast, Marshall
seeks to demonstrate that the Fourth Amendment violation was more
egregious because it also implicated a Sixth Amendment right.
Additionally, the New Jersey Supreme Court found that the tape was
sent to his brother-in-law in a family capacity and that, although his
brother-in-law had on occasion provided advice, the police were on
notice that Marshall had retained counsel and that all legal
representations in the investigation had been made by that counsel, not
by Marshall's brother-in-law. Given our deferential review of the state
courts' findings of facts, we will not disturb this conclusion.

67

alleging that the Fourth Amendment claims were decided
incorrectly or incompletely by the New Jersey courts,
allegations which are insufficient to surmount the Stone
bar.

Marshall tries to argue that a full and fair litigation
would require consideration of the salient United States
Supreme Court precedent, and he raises a very old decision
that he argues should have controlled the New Jersey
Supreme Court's decision. App. Br. at 140-41. See Rosen v.
United States, 245 U.S. 467, 468 (1918). We do not need to
decide on these facts what would be sufficient to constitute
a "denial of opportunity for full and fair litigation," and
because the holding of Rosen is clearly not controlling here
we will not fault the New Jersey courts for failing to apply
it. We are satisfied that there was no structural defect that
prevented the full and fair litigation of Marshall's Fourth
Amendment claims in state court, and we are thus barred
from reconsidering them here. In retrospect, and in light of
our determination of the Fourth Amendment and related

statutory claims, we acknowledge that the COA was improvidently granted as to those issues and it will therefore be dismissed.

D. Murder for Hire: As both an element of the crime and an aggravating circumstance?

Marshall brings an as-applied challenge to New Jersey's death penalty statute, alleging that it violates the Eighth Amendment in its application to his crime. The aggravating factor relied on by the State -- that Marshall arranged the murder for pecuniary gain -- duplicated an element of the underlying offense. As Marshall correctly states, the United Supreme Court has held that the Constitution requires a capital sentencing scheme "genuinely [to] narrow the class of persons eligible for the death penalty and . . . reasonably [to] justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877 (1983). As the New Jersey Supreme Court correctly noted, the United States Supreme Court held in Lowenfield v. Phelps, 484 U.S. 231 (1988), that it may be permissible for an aggravating factor to duplicate an element of the underlying offense. See Marshall I, 586 A.2d at 155. Although Marshall criticizes

68

the New Jersey Supreme Court for failing to reference Zant,[35] we find no fault in the New Jersey Supreme Court's evaluating more recent United States Supreme Court precedent, and referring to its own caselaw which interpreted the earlier United States Supreme Court precedent, including Zant, instead. More recently, we had the opportunity to consider a similar challenge to Delaware's capital sentencing structure, and there we noted that, after Lowenfield, the "courts of appeals have consistently held that a sentencing jury can consider an element of the capital offense as an aggravating circumstance even if it is duplicitous [sic]." Deputy v. Taylor, 19 F.3d 1485, 1502 (3d Cir. 1994).

Marshall alleges that the homicide statute itself is broadly drafted, encompassing "virtually every murder committed either 'purposely' or 'knowingly.' " App. Br. at 135. Marshall contends that since his conviction was for hiring someone to murder his wife, and since the aggravating factor duplicated the elements of the underlying crime itself, there was no possibility for narrowing or for channeling the jury's discretion. The United States Supreme Court addressed a similar contention in Arave v. Creech, 507 U.S. 463 (1993).

---

35. In fact, Marshall urges us not to apply AEDPA to our examination of this question, since "the New Jersey Supreme Court did not engage in any meaningful analysis of this claim, failing even to cite to Zant." App. Br. at 138. Marshall misapprehends the duty of the state court. Its duty is to apply the "correct governing legal principle" reasonably. [Terry] Williams v. Taylor, 529 U.S. 362, 413 (2000). It does not have to recite

a specific case name in order to apply the principles enunciated within that case. By referring to its earlier analysis of the precise issues raised by Marshall in State v. Ramseur, 524 A.2d 188, 218-220 (N.J. 1987), an opinion that does discuss the requirements of Zant v. Stephens, 462 U.S. 862 (1983), in addition to other pertinent United States Supreme Court jurisprudence, including Furman v. Georgia, 408 U.S. 238 (1972), and Gregg v. Georgia, 428 U.S. 153 (1976), and by considering the impact of the United States Supreme Court opinion rendered in the interim between its decision in Ramseur and its consideration of Marshall's claims, Lowenfield v. Phelps, 484 U.S. 231 (1988), the New Jersey Supreme Court did all that it was required to do for us to apply AEDPA deference.

> When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm.

Id. at 474 (emphasis in original) (internal citations omitted).

Applying Arave's standard, however, it is clear that the New Jersey legislature had a right to establish a motive (for pecuniary gain) as more culpable than other motives, and to determine that a motive-specific factor would narrow the class of death-eligible murderers and would provide a principled consideration for jurors to weigh in making an individualized determination at the capital sentencing phase. That one of the means by which a person may commit murder with this motive is to hire someone else actually to execute the crime is immaterial to the limiting analysis.

The strictures of the United States Constitution do not require New Jersey to assign a constitutionally mandated function to aggravating circumstances, but to design a scheme that both narrows the class of death-eligible defendants and channels the jury's discretion to ensure that a death-eligible defendant is not sentenced to death arbitrarily or capriciously.36 Here there can be no question that the New Jersey legislature required sufficient culpability to withstand constitutional scrutiny. The New Jersey Supreme Court so held in Ramseur, and it was not unreasonable for the New Jersey Supreme Court to rely upon its detailed analysis in that opinion, and upon the more recent United States Supreme Court jurisprudence, in its consideration of Marshall's claim.

---

36. We note as well that Marshall did undergo a proportionality review, characterized in a Harvard Law Review article as "an additional fail-safe." Carol S. Steiker & Jordan M. Steiker, Sober Second Thoughts: Reflections on Two Decades of Constitutional Regulation of Capital Punishment, 109 HARV. L. REV. 355, 373 (1995).

E. Guilt Phase Ineffectiveness

Marshall cites before us nine separate ways in which he
contends his counsel was ineffective during the guilt phase
of the trial. The State counters that Marshall's"litany of
purported inadequacies is merely a lengthy series of
inconsequential minutiae." Appee. Br. at 76. As both
parties recognize, claims of ineffective assistance of counsel
are governed by Strickland v. Washington, 466 U.S. 668
(1984), and its progeny, although Marshall contends that,
while the New Jersey Supreme Court correctly identified
Strickland as controlling, it "both misconstrued and
unreasonably applied" it. Marshall contends that he "has
been afforded virtually no process on his ineffective-
assistance claim." App. Br. at 99. As the State notes,
Marshall originally raised claims of ineffectiveness in his
direct appeal brief, and then raised "more than 300 claims
in all" on appeal from the denial of post-conviction relief.
Appee. Br. at 77. The New Jersey Supreme Court found all
of Marshall's claims to be without merit. The District Court
did not find the New Jersey Supreme Court's conclusions
unreasonable under AEDPA, but Marshall contends that it
merely agreed, "in summary fashion," with the conclusions
of the New Jersey Supreme Court. App. Br. at 100-01.
Actually, as discussed below, most of the New Jersey
Supreme Court's conclusions were based on a finding that
Marshall could not demonstrate prejudice. The District
Court instead concluded that Marshall had not established
that the performance of his attorney was deficient:

> In hindsight, petitioner has compiled a long list of
> alleged errors and mistakes his counsel committed
> during his trial. The Court does not imply that defense
> counsel made no errors whatsoever, but that his
> performance was well within the required reasonable
> standard and his litigation strategy was based upon
> reasonable professional judgment.

Marshall III, 103 F. Supp. 2d at 790.

The nine areas of alleged ineffectiveness raised before us
by Marshall are:

1. Counsel did not develop or present any defense to
counter the State's contention that the murder was
financially motivated. App. Br. at 104-07.

2. Counsel did not develop or present evidence to refute
much of the State's circumstantial evidence about the
events the night of the murder. App. Br. at 107-11.

3. Counsel did not provide independent evidence to
refute McKinnon's testimony. App. Br. at 111.

4. Counsel did not present evidence to refute the State's allegations that Marshall's attempted suicide was staged. App. Br. at 111-13.

5. Counsel did not present evidence to counter the "prosecutor's theatrics [which] were sensational, shocking, and quite effective." App. Br. at 113-15.

6. Counsel did not present the evidence that his own testimony -- at a limited PCR hearing -- cited as his primary trial strategy: character evidence. App. Br. at 115-16.

7. Counsel had no coherent defense theory. App. Br. at 116-17.

8. Counsel did not present other evidence that was within his possession. App. Br. at 118-20.

9. Counsel did not object nor seek curative action when inadmissible testimony was admitted, or when the prosecutor engaged in misconduct. He also put "irrelevant, prejudicial facts before the jury." App. Br. at 120-23.

Under Strickland, courts are precluded from finding that counsel was ineffective unless they find both that counsel's performance fell below an objectively unreasonable standard, and that the defendant was prejudiced by that performance. Strickland, 466 U.S. at 687. In order to establish prejudice, a defendant need not demonstrate that the outcome of the proceeding would have been different, but only that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."37 Id. at 694. Where prejudice is lacking, the court

_____

37. As noted earlier, at A., supra, the Strickland prejudice standard is the same as the Brady materiality standard.

need not determine whether the performance was subpar. Id. at 697. Further, it is critical that courts be "highly deferential" to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight. Id. at 689-90. In part, this is because the purpose of the rule is not to improve the standard of professional conduct, but only to protect a defendant's right to counsel. Id. at 689. Thus, the court is not engaging in a prophylactic exercise to guarantee each defendant a perfect trial with optimally proficient counsel, but rather to guarantee each defendant a fair trial, with constitutionally competent counsel. In order to assess an ineffectiveness claim properly, the court "must consider the totality of the evidence before the judge or jury." Id. at 695.

The deference accorded to counsel's reasonable strategic decisions can be seen in numerous United States Supreme Court rulings following on the heels of Strickland. E.g., Burger v. Kemp, 483 U.S. 776, 794-95 (1987); Darden v. Wainwright, 477 U.S. 168, 185-86 (1986). Nonetheless, the Court has found the decisions of some attorneys to be objectively unreasonable. E.g., [Terry] Williams v. Taylor, 529 U.S. 362 (2000); Kimmelman v. Morrison, 477 U.S. 365, 385-87 (1986).

It is rare for a court to review claims of ineffective assistance of counsel on direct appeal, because the record is typically not adequately developed by that point to allow sufficient review. United States v. Cocivera, 104 F.3d 566, 570-71 (3d Cir. 1996); State v. Morton, 715 A.2d 228, 253 (N.J. 1998). The New Jersey Supreme Court recognized this in the appeal from the denial of post-conviction relief. The PCR court had determined that all of Marshall's ineffectiveness claims were procedurally barred, since some ineffectiveness claims had been raised on direct appeal, reasoning that ineffectiveness had been previously adjudicated, and that Marshall was thus barred from raising new instances of ineffectiveness before the court. The New Jersey Supreme Court specifically rejected the PCR court's conclusion, explaining that its analysis on direct appeal was limited to the specific instances and the contours of the record that were before it at that time, and thus were not dispositive of the other instances of

73

ineffectiveness raised in Marshall's application for post-conviction relief; nor could the treatment of the specific issues raised on direct appeal be viewed as dispositive of a broader claim of ineffectiveness on appeal from the denial of post-conviction relief. See Marshall II, 690 A.2d at 29-32. However, when specific issues were adjudicated on direct appeal and found to be without merit, the New Jersey Supreme Court relied on its resolution on direct appeal in finding that counsel could not be constitutionally ineffective in those areas. Marshall II, 690 A.2d at 87.

On direct appeal, the New Jersey Supreme Court read many of Marshall's contentions as suggesting trial strategies that, in hindsight, might have been more effective. Marshall I, 586 A.2d at 171-72. As the Court correctly concluded, the mere existence of alternative -- even preferable or more effective -- strategies does not satisfy the requirements of demonstrating ineffectiveness under Strickland.

On appeal from the denial of post-conviction relief, the New Jersey Supreme Court prefaced its analysis of Marshall's claims with the observation that this was the first appeal taken to it from a denial of post-conviction relief under the then-recently enacted Capital Punishment Act. Marshall II, 690 A.2d at 27. The New Jersey Supreme Court was clearly disturbed by the sheer magnitude of Marshall's presentation, stating both that it "question[ed] both the

wisdom and the necessity for so massive a presentation"
and that "[p]ost-conviction relief issues should be
categorized broadly but coherently, and to the extent
necessary illustrated by pertinent examples. No valid
purpose is served when every minute example of trial
counsel's alleged ineffectiveness is offered as a separate
ground for post-conviction relief." Id.

Thus, while allowing Marshall to raise his ineffectiveness
claims, the Court grouped them into more general
categories and declined to analyze claims that, even if
counsel had sought to proceed as Marshall suggested,
would have been foreclosed or completely lacking in merit.
In doing so, the Court reasoned from Strickland that if the
claims would not have been meritorious if pursued,

Marshall could not have been prejudiced. In Strickland, the
United States Supreme Court stated:

> Although we have discussed the performance
> component of an ineffectiveness claim prior to the
> prejudice component, there is no reason for a court
> deciding an ineffective assistance claim to approach the
> inquiry in the same order or even to address both
> components of the inquiry if the defendant makes an
> insufficient showing on one. In particular, a court need
> not determine whether counsel's performance was
> deficient before examining the prejudice suffered by the
> defendant as a result of the alleged deficiencies.

Strickland, 466 U.S. at 697. See Marshall II, 690 A.2d at
54, 87. Given the sheer volume of the claims, and the
related nature of many of them, we do not think that the
New Jersey Supreme Court was unreasonable in this
approach.38 We note, as we discuss more fully below, that
it is important here that we can focus on the prejudice
analysis, because we do not have a complete record on
which to assess some of the performance claims: while we
have Zeitz's trial preparation file, he has never been
questioned as to whether some of his actions were the
result of strategic decisions.

Marshall has asked us to hold that it was error for the
New Jersey Supreme Court not to "acknowledge or apply
the requirement that it look outside the trial record and
examine the circumstances underlying the claimed
deficiencies." App. Br. at 102. But the purpose of assessing
counsel's acts from an objective standpoint is to assess the
reasonableness of counsel's actions. We do not need to
reach the question of whether the attorney's actions fell
below an objectively unreasonable standard if we can
determine first that Marshall was not prejudiced.

But Marshall claims as well that the New Jersey Supreme

_____

38. In its opinion affirming the denial of post-conviction relief, the New

Jersey Supreme Court included a chart that grouped the "548 grounds" that Marshall had advanced for reversal into categories. On that chart, 267 issues related to ineffective assistance of counsel claims. Marshall II, 690 A.2d at 25.

Court failed equally in its determination of prejudice under Strickland (and the United States Supreme Court's more recent enunciation of how Strickland claims are to be evaluated under AEDPA, [Terry] Williams v. Taylor, 529 U.S. 362 (2000)). Marshall urges that the New Jersey Supreme Court misapprehended its task under Strickland , misreading the explicit instruction to consider the totality of the evidence as requiring it "only . . . to consider the strength of the State's case against petitioner at trial." App. Br. at 103. Such an analysis, according to Marshall, cannot comport with the teachings of the United States Supreme Court, because an assessment of the omitted evidence is required, and, since it was not in the trial record, it was not susceptible to analysis. Id. at 103-04. He cites in support two passages from [Terry] Williams, one penned by Justice Stevens in his majority opinion, and the other by Justice O'Connor in her concurrence.

In the passage quoted from Justice Stevens, the Court counters the Virginia Supreme Court's finding that there was no prejudice because the mitigation evidence not uncovered by counsel "barely would have altered the profile of this defendant that was presented to the jury" by noting that in so concluding the court "ignored or overlooked the evidence of Williams' difficult childhood and abuse and his limited mental capacity." [Terry] Williams, 529 U.S. at 374 n.5. Justice O'Connor then notes that when the original trial judge was shown the newly unearthed mitigation evidence, he concluded that Williams was prejudiced and, despite earlier having found Williams' death sentence "justified and warranted," recommended a new sentencing hearing. Id. at 416 (O'Connor, J., concurring). Justice O'Connor concluded that the Virginia Supreme Court's decision not to grant the sentencing hearing thus"reveals an obvious failure to consider the totality of the omitted mitigation evidence." Id. However, we conclude that counsel's conduct during the guilt phase of Marshall's trial does not reflect the same concerns that animated the United States Supreme Court in its consideration of the unpresented evidence in [Terry] Williams , as is evident upon closer examination of the specific claims Marshall raises before us.

1. Financial and Insurance Information

Marshall contends that his trial counsel was ineffective for failing to develop financial and insurance information to demonstrate that Marshall could reasonably expect to cover his expenses and satisfy his debts through future earnings,

and that insuring Maria Marshall was based on a rational analysis of the family's needs if she were no longer present. Further, he argues that proper psychiatric testimony would have revealed that his expressions of despair on the suicide tape were not probative of his actual financial situation.

The New Jersey Supreme Court found that the failure to develop those arguments was not prejudicial. As to the financial information, they found that it had been placed before the jury -- albeit pursuant to the questioning by co-defendant's, not Marshall's counsel -- and other witnesses had testified that Marshall was an outstanding insurance salesman. Marshall had explained at length why and how he assessed the amounts of insurance needed on Maria. In [Terry] Williams, the jurors had no opportunity to consider the mitigating evidence at all; as Justice O'Connor noted, if the trial judge himself felt a new sentencing was warranted on the basis of the information, the total absence of that evidence before the jury was prejudicial.

Further, it was not the fact of Marshall's financial situation, nor the rationality of accruing insurance on Maria that was in dispute: it was whether his perception of his increasing indebtedness led him to consider the magnitude of the assets available from the insurance policies as a solution to an overwhelming debt. Thus, Marshall is incorrect when he argues that his own acts and expressions of despair as to his finances could have been explained away by proper psychiatric testimony. His statements on the suicide tape that he was worried about his debt led the New Jersey Supreme Court to conclude that Marshall could not "demonstrate how trial counsel's more comprehensive preparation and different trial strategy could persuasively have overcome defendant's own perception that his debt was difficult to manage." Marshall II, 690 A.2d at 65. We note as well that Kraushaar's testimony also portrayed Marshall as a man who was worried about finances and how to resolve his debt. It was

not unreasonable for the New Jersey Supreme Court to find that the presentation of objective data justifying either the level of debt or the level of insurance maintained on Maria had no reasonable probability of impacting how the jurors perceived Marshall's response to his debt, nor to the insurance that indisputably would eliminate that debt.

2. Crime Scene Evidence

Marshall contends that he was prejudiced by his trial counsel's failure to test the tire and to bring out other evidence that would tend to demonstrate that Marshall pulled off the road where he did because he was afraid of being hit -- as a friend of his recently had been-- and had himself been seriously injured. He urges that if the car trouble were shown to be legitimate, and the circumstances surrounding the crime cast in a more accurate light, the jury could have found that Maria was killed to prevent her

from identifying thieves, rather than as the result of a carefully arranged plot between her husband and McKinnon. Here, the New Jersey Supreme Court did find that Zeitz's performance was below objective standards of proficiency, but that there was no constitutional violation because there was but "scant support" for the alternate theory of the crime. Marshall II, 690 A. 2d at 60-61, 63. Under Strickland, the burden is on the defendant to establish that counsel's performance prejudiced the defense. Strickland, 466 U.S. at 687. It was not unreasonable for the New Jersey Supreme Court to conclude that mere articulation of an alternate theory of the crime was not adequate to satisfy this burden.

3. McKinnon's Statement

Marshall's counsel hired an investigator to go to Louisiana. While there, the investigator secured a statement, authored by McKinnon, suggesting an alternate and exculpatory explanation for his relationship with Marshall. At trial, despite repeated requests by the State, Marshall's counsel claimed that he did not have the statement, averring that it was shown to him "a long time ago, over a year ago, and I've been asking him to locate the thing since then and I said it over and over again, and I don't think I have to continue defending myself about it."

78

Marshall II, 690 A.2d at 44. On cross-examination, the investigator read the statement into the record. Because neither McKinnon nor Marshall had been cross-examined on the statement, the trial court ruled that both could be recalled for cross-examination, although McKinnon could be recalled only by the co-defendant's counsel, since he was "faultless" in having been unable to cross-examine on the statement. Id. at 44. Neither witness was recalled. Id.

Marshall claims that his trial counsel was ineffective in not utilizing McKinnon's prior statement to impeach his testimony on the stand, claiming that the omission revealed either "incredible lack of preparation, or demonstrated highly questionable conduct on the part of the defense of which the jury was made aware." App. Br. at 111. In a conclusory fashion, Marshall claims that "evidence that would cast doubt on McKinnon's testimony would have been some of the most valuable impeachment evidence available and thereby cast doubt on the State's entire case." Id. Marshall refers us to the determination of the New Jersey Supreme Court that, since the statement was ultimately before the jury, "its late admission into evidence was immaterial. The jury had the benefit of the statement itself, and counsel had the opportunity to present arguments concerning McKinnon's statement to the jury in summation." Marshall II, 690 A.2d at 45. Reading Marshall's claim carefully, the prejudice that Marshall asserts would result from the jurors' being denied access to the contents of the statement and the fact that it contradicted McKinnon's testimony at trial. But, as

Marshall's counsel pointed out, since the jury had received both statements it could draw its own conclusions. Id. at 44-45. Thus, although counsel should have ensured that the document that was in the possession of his investigator was produced to the State and co-defendant's counsel in a timely manner, it was not unreasonable for the New Jersey Supreme Court to conclude that Marshall was not constitutionally prejudiced since the contents of the inconsistent statements were indeed available for consideration by the jury.

4. The Suicide Attempt

As noted above, after his wife's death, with the pressures of the investigation mounting and his relationship with

Kraushaar at an end, Marshall checked into the Best Western room where he and Kraushaar used to meet, and prepared tapes and a suicide drink, which he did not consume. At trial, the State intimated that the suicide attempt was staged, not genuine. Counsel did not present evidence to refute these allegations, except to elicit testimony from Marshall that the suicide attempt was genuine. App. Br. at 111-13. Although counsel had arranged for a psychologist, Dr. Atkins, to assess Marshall's condition, the report was not obtained until mid-trial, and was not used. Nor was Dr. Atkins called as an expert. Id. at 112.

Marshall contends that the psychological testimony is critical, because it would establish that the tape-- discussed above as reflecting Marshall's despair over his finances -- was the result of "a major depressive episode." Id. Marshall alleges that the New Jersey Supreme Court did not address these arguments in affirming the denial of post-conviction relief, even though he raised them, and that, as a consequence, we should not apply AEDPA deference.39 In response, the State contends that the court did address Marshall's contention, albeit generally, and thus argues that Appel v. Horn, 250 F.3d 203 (3d Cir. 2001), is inapplicable. See Marshall II, 690 A.2d at 73.

Given the posture of Marshall's claim, we do not need to address the level of deference owed, because Marshall has stated that the purpose for which the report would have been used is to demonstrate that Marshall was depressed when he produced the tape, which in turn would impact the reliability of the financial data. Those issues, as discussed above, were adjudicated on the merits by the New Jersey Supreme Court. We have already indicated that Marshall has misapprehended the New Jersey Supreme Court's view of the significance of the tape: it is not that it reflects Marshall's true financial status, but that it reflects Marshall's reaction to and perception of his financial

_____

39. As noted above, see supra note 18, where the state court does not

adjudicate a federal claim on its merits, we will apply pre-AEDPA deference. Here the parties both discuss Appel v. Horn, 250 F.3d 203, 210 (2001). Everett v. Beard, cited above, is equally apt here.

status, and, indeed, his state of mind. Thus, adducing testimony to demonstrate that the finances and other stressors in Marshall's life had caused him to enter a "major depressive episode" and attempt suicide could only bolster the image of Marshall's finances as sufficiently worrisome to provoke Marshall to commit desperate acts. The information therefore could not have a reasonable probability of affecting the outcome.

Further, courts are to be especially deferential to reasoned decisions by counsel. The fact that Marshall's counsel was the one who arranged for the psychological examination indicates that he was sensitive to the possibility that the information may be valuable for trial, and that he asked for it, received it, and did not use it places his decision squarely in the realm of the myriad tactical decisions counsel must make during a trial, and which courts, with the benefit of hindsight, should not second-guess.

5. Countering Prosecutorial Theatrics

During cross-examination, the prosecutor asked Marshall if he was wearing his wedding ring because he had been instructed to. Counsel objected, and the objection was sustained. Marshall volunteered the fact that he had had to surrender the ring when he was arrested, but, due to different policies in different locations, was now allowed to wear the ring. The prosecutor then asked whether the ring was a reflection of how much he loved and missed his wife, and, upon receiving an affirmative answer, asked why Maria's ashes were "still in a brown cardboard box at the funeral home in a desk -- ." Cross-Examination of Robert Marshall, February 26, 1986, St. Ex. 29T at 84. Counsel objected, and after a discussion at sidebar, the objection was overruled. Id. at 84-89. Marshall claims that counsel had avenues open to him to neutralize the effect of the prosecutor's questioning, and he suggests some options to us. But, as Strickland emphasizes, a trial does not have to be perfect to be constitutionally fair. Because reviewing courts are not seeking to enforce optimal attorney performance, they are not to question whether there was a "better" response possible -- only whether the attorney's response was constitutionally adequate. The New Jersey

Supreme Court recognized that counsel did attempt to neutralize the testimony, by eliciting from one of Marshall's sons the family's plans to travel to Florida together to bury Maria, plans that had to be postponed when Marshall was arrested. Marshall II, 690 A.2d at 74. It concluded that the

topic was "peripheral" and further testimony "would not have materially aided defendant's chances of being acquitted of the charged offenses." Id. Such a conclusion is reasonable, and our review is only as to reasonableness. Even were we to disagree with the New Jersey Supreme Court's conclusion, however, we would still hold that Marshall has not demonstrated performance that falls below the threshold set by Strickland.

6. Counsel's Non-Adherence to His Stated Strategy

Marshall claims -- without citation to the record-- that his trial counsel "testified that his trial strategy was to present character evidence" yet, for the witnesses that were called, he did not always interview them prior to their taking the stand, did not establish a proper foundation for their testimony, and did not elicit from them all of the information that should have been elicited. App. Br. at 115-16. The New Jersey Supreme Court considered Marshall's claims here in conjunction with other "miscellaneous claims" of ineffectiveness, and concluded that "[i]rrespective of whether those and analogous pretrial omissions by counsel constituted deviations that fell below an objective standard of reasonableness, we are convinced that defendant cannot demonstrate that counsel's alleged pretrial deficiencies either individually or collectively had the capacity to change the result of the proceeding." Marshall II, 690 A.2d at 87. The claim Marshall raises has two aspects to it: first, were the witnesses in question adequately prepared to testify; and second, were they adequately prepared if, indeed, the character testimony was critical to his trial strategy. If the witnesses were not critical to counsel's trial strategy, but were called merely to provide limited testimony, Marshall could not realistically satisfy either prong of Strickland. Thus, the critical question to assessing the reasonableness of the New Jersey Supreme Court's conclusion is: Were the witnesses in question vital to counsel's trial strategy?

82

The witnesses Marshall called who did provide -- or might have been expected to provide -- character testimony included his sons, his sister, and other members of the insurance industry and the Toms River community. As noted above, the character testimony elicited consisted primarily of brief affirmations that Marshall had a reputation for being law-abiding and a man of integrity, and that he was an excellent insurance salesman.

At the limited remand hearing, Marshall's trial counsel explained why he chose from the outset to have Marshall testify, distinguishing Marshall's situation from one in which the defendant had an extensive criminal history, or one where the State's case was particularly weak-- both of which were situations where a defense attorney would not want to commit the defendant to taking the stand from the outset. With Marshall, in contrast, the trial was expected to be lengthy, and counsel cited to jury studies that stated

that eighty percent of a panel make up their mind preliminarily after the opening statements. Direct Testimony of Glenn Zeitz, December 1, 1994, St. Ex. 6PCT at 11-13. He then stated:

> In this particular case, the way we defended this case, was to let the Jury know right from the beginning that there was going to be character testimony. I wanted to personalize my client. There's other references in the opening that deal with his background, the charitable things that he did, there were -- there was a reference to character testimony that they were going to hear from. And, in essence, what we were trying to accomplish in this case was to wait and have the Jury wait in their own minds until they heard his version, to give him an opportunity to tell them what happened here, rather than make up their minds preliminarily, notwithstanding the advice that we knew they'd be getting from the trial Court.

Id. at 13. It cannot reasonably be inferred from counsel's explanation as to why he felt it important to tell the jury from the outset that Marshall would testify what significance he accorded to any of the other witnesses' testimony. Because their testimony accounted for only a tiny portion of the trial testimony adduced, and because

83

Marshall has not demonstrated to us that any of the testimony that would have been provided would have any bearing at all on the jury's determination of guilt or innocence, it was not unreasonable for the New Jersey Supreme Court to conclude that ill preparation as to those witnesses, if it were found, would not be prejudicial to Marshall.

7. Counsel's Lack of a Coherent Defense Theory.

Although Marshall characterizes this claim as a failure to develop a coherent defense theory, his claim above would indicate that he thought that trial counsel had, indeed, formulated a coherent theory, one that focused on portraying Marshall as a good man, who would succeed by communicating directly with the jury. Further, the specific tactical decisions that Marshall cites in support of this contention40 amount to little more than a listing of things that, with the benefit of hindsight, counsel might have handled differently.

8. Counsel's Failure to Present Certain Evidence

All of the examples cited to us are tied to Marshall's understanding of other parts of his defense that have been rejected by the New Jersey Supreme Court. For example, Marshall criticizes counsel for not contradicting a trooper's statement at trial that Marshall had reported a flat tire, with the report the trooper prepared, indicating that the tire was half-flat. This is addressed by the reasoning in 2, above.41

40. In this category, Marshall considers the fact that his trial counsel allowed co-defendant's counsel to conduct "crucial examination" of witnesses, that he failed to object when co-defendant's counsel elicited testimony that benefitted his client but harmed Marshall, that he placed Marshall on the stand "abruptly in the middle of his case" and that he "fail[ed] to recognize that Kolins, his investigator, had engaged in such incriminating conduct that [counsel] needed to terminate their relationship or otherwise disassociate Kolins' conduct from his client" as evidence of trial counsel's lack of a coherent theory of defense. App. Br. at 116-17.

41. The State also points out that "most of what petitioner says should have been elicited was inadmissible hearsay under New Jersey law," Appee. Br. at 93, a point the New Jersey Supreme Court did not need to reach, since it evaluated this claim under the prejudice prong of Strickland.

84

Marshall also criticizes trial counsel for a witness's exclusion. Counsel had put Henry Tamburin's name on the witness list originally, then informed the court that his name was not on the list, and did not correct the error until he called Tamburin to the stand, at which point the court sustained the prosecutor's objection and limited the scope of the witness's testimony. Because Tamburin would have testified about the use of "comps" at casinos, and the gambling system he had taught to Marshall, Marshall now finds it "baffling in view of the voir dire he had requested on comp abusers" that he did not ensure that Tamburin was able to testify. Had he testified, however, all that would have become clear is what Marshall's gambling strategy was. As noted above, the issue before the jury was whether Marshall's perception of his financial circumstances was such that it could prompt a desperate act; explaining how he gambled would not address that issue, and thus the New Jersey Supreme Court reasonably concluded the omission of the testimony was not prejudicial.

Marshall also faults trial counsel for not having Marshall's secretary testify that Marshall had sent information on financial products to Robert Cumber. The jury knew that Marshall had met Cumber at a party in New Jersey,42 and that Marshall had sent him information on financial products. They also knew that Cumber introduced McKinnon and Marshall. But Marshall is asserting that the secretary's verification that Marshall did send the financial records "would have rebutted the inferences that the many calls Marshall placed to Cumber were to locate McKinnon to hasten his wife's murder." App. Br. at 120. Even assuming that trial counsel had adduced testimony verifying that Marshall sent documents to Cumber, that testimony would not serve to verify that the numerous phone conversations over the course of the summer concerned those documents; the jury would still be compelled to determine whether it believed Marshall's or McKinnon's testimony as to the purpose of the telephone calls. Thus, the New Jersey Supreme Court was not

42. The State points out that "at trial petitioner forgot 'exactly how' the conversation somehow led to the fact that I was looking for an investigator' to track down missing casino money." Appee. Br. at 95.

unreasonable in determining that Marshall could not have been prejudiced by the failure to call Marshall's secretary.

Marshall also faults the New Jersey Supreme Court for evaluating each of counsel's alleged failures individually, characterizing it as the "divide-and-conquer approach of ruling on each individual Strickland error rather than assessing the joint prejudice from all the ineffective-assistance claims." App. Br. at 120. Marshall cites to [Terry] Williams v. Taylor, 529 U.S. 362, 397-98 (2000), for this proposition. We think that Marshall misapprehends the guidance of the United States Supreme Court. In Williams, the United States Supreme Court found fault for "failing to evaluate the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- in reweighing it against the evidence in aggravation," thus erroneously concluding that Williams had not been prejudiced by his counsel's errors at the sentencing phase. Id. But here, Marshall has not placed before us anything that would singly, or in combination, have had a reasonable probability of affecting the outcome of his trial. The New Jersey Supreme Court reasonably concluded precisely that. "[F]ew of the allegations of ineffective assistance at trial involved significant deficiencies in the quality of counsel's representation, and those that did were not material to the trial result." Marshall II, 690 A.2d at 90.

9. Failure to Object or Seek Curative Action

Marshall alleges that trial counsel did not object nor seek curative action when inadmissible testimony was admitted, or when the prosecutor engaged in misconduct. He also put "irrelevant, prejudicial facts before the jury." App. Br. at 120. The New Jersey Supreme Court reasonably determined that Marshall could not demonstrate ineffectiveness under Strickland as to these alleged faults of counsel.

While we examine more fully the circumstances under which an evidentiary hearing is required below, we do conclude here that neither the New Jersey Supreme Court nor the District Court was required to hold an evidentiary hearing to develop the above claims of ineffectiveness at the guilt phase.

Volume 3 of 3

F. Cumulative Error

Marshall contends that even if we do not find the errors in his trial[43] individually so egregious that we would grant the writ of habeas corpus, the errors of all kinds that have been recounted are so invidious and numerous that we ought to aggregate them and find that, in sum, the constitutional error was sufficient to grant the writ.

We addressed this issue in the habeas context in United States ex rel. Sullivan v. Cuyler, 631 F.2d 14, 17 (3d Cir. 1980), recognizing that errors that individually do not warrant a new trial may do so when combined.[44] Here, even were we to cumulate all the claimed errors and superimpose them over the extensive trial proceedings, given the quantity and quality of the totality of the evidence presented to the jury, we could not conclude that the New Jersey Supreme Court unreasonably applied Supreme Court precedent or unreasonably determined the facts in making its ruling.

G. Penalty Phase Ineffectiveness

As we noted at the outset, counsel and the court discussed the procedures that would be followed in the penalty phase while Marshall was at the hospital, and the jury was at lunch. Within a few minutes of Marshall's return, at 1:45 p.m., the court convened the penalty phase.

─────────────────────────────────────────────

43. The errors Marshall asks us to aggregate are those he contends the New Jersey Supreme Court recognized as occurring "in the course of [his] trial." App. Memorandum of Law in Support of Application for Certificate of Appealability at 194. However, Marshall includes a penalty phase statement by the prosecutor in that list, id. at 195, as well as pretrial and penalty phase "additional problems." Id. We find persuasive the reasoning of the Western District of Pennsylvania that only errors occurring during trial should be considered in accumulation, a point made expressly in Pursell v. Horn, 187 F. Supp. 2d 260, 375-76 (W.D. Pa. 2002), and implicitly in the analysis of the other courts of appeals to have considered the issue.

44. "Moreover unified consideration of the claims in the petition well satisfies the interests of justice because the cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless." United States ex rel. Sullivan v. Cuyler, 631 F.2d 14, 17 (3d Cir. 1980).

THE COURT: Gentlemen, we're now prepared, I believe, to move on to the penalty phase of this matter. I did have a discussion with counsel in chambers regarding the procedure that we're going to follow, and before we place that on the record, are counsel in agreement that that is the procedure that will be

followed?

ZEITZ: Yes, sir.

KELLY: Yes, sir, your Honor.

THE COURT: As I understand it, what will now occur is that I will now make the usual opening statement to the jury that is made in this proceeding. I believe that the law now is -- I know that the law now is, expressly, that any evidence which was introduced in the trial can be considered as evidence for purposes of this proceeding. Given that, I understand that neither counsel intend to introduce any further evidence in this proceeding.

KELLY: That's correct, Judge.

ZEITZ: That's correct, Judge. I would like, at least, to have the record reflect that I've had an opportunity to speak with my client and discuss his right, if he desired, to call any witnesses with regard to the penalty phase of the proceedings, and it's his desire, and it is also my feeling, that we do not intend to call any witnesses at this stage of the proceedings. And we've had, I believe, an opportunity to discuss this, and this is his intention.

It's also based on the understanding that what we will do procedurally, is that Mr. Kelly and I will not make any opening statement to the jury at the penalty phase, but, in essence, what we will do is, I will make my summation arguments and then Mr. Kelly will make his to the jury.

I've also explained to my client, as part of this proceeding, which I think I should spread on the record, that the State, in its argument on the penalty phase, will be proceeding on one aggravating factor, and this is aggravating factor two as outlined in the

89

notice of aggravating factors that was filed in this case at or about the time of the return of the indictment, which states that the defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value.

I've also explained to my client that there are two mitigating factors which I will be arguing to the jury at the penalty phase, number one -- and I might add, Judge, that we did file, even though it was certainly premature, but we did file a notice of mitigating factors earlier in the case; specifically, that the defense will argue, number one, that defendant Robert O. Marshall has no history of prior criminal activity, and, I believe, I asked the Court in chambers to delete the word significant, because that seems to relate to a situation

that where someone may have something -- some blemish in their past, and the jury has to make some consideration as to whether or not that's significant or not, and I think the State is at least prepared to at least stipulate on the record that he has no history of prior criminal activity and, therefore, that, in essence, is a mitigating factor that they must find on his behalf.

Second, we will be arguing an additional mitigating factor which deals with anything that may relate to the character of the defendant, which I believe is the last mitigating factor that's referred to in the statute, and we are going to be arguing certain things with regard to his character which we'd asked the jury to consider as a mitigating factor.

I've explained to my client, in essence, that this is the procedure that I would like to adopt and follow at this stage, and it's my understanding that he is in agreement with this procedure.

THE COURT: Very well. And, Mr. Kelly, I suppose you're in agreement with the procedure that we're about to follow.

KELLY: Yes, your Honor, I am.

The Court brought in the jury and explained to them the procedure that would be followed, alerting them to the

90

aggravating and mitigating factors to be "argued" and that the jury would find. He concluded by saying:

You will now be asked to determine whether the defendant shall be sentenced to death or not.

As was true in the trial we just concluded, your decision in that regard must be based solely upon the evidence presented in this courtroom and my instructions regarding the law.

It is important to note that the penalty proceedings will not focus on whether or not the defendant is guilty. You have already returned a verdict in which you concluded beyond a reasonable doubt that the defendant is guilty of the murder. Rather, what is presented here will be concerned with whether or not there are factors which, on balance, lead you to conclude that the defendant should suffer the death penalty.

You will hear argument as to the alleged aggravating factor which the State contends, or may contend, warrants the imposition of the death penalty in this case, in addition to the evidence at the trial of which you can take cognizance.

The aggravating factor which is alleged is that the defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value. That is one of the aggravating factors listed in our statute. And that is the aggravating factor that the State may contend calls for the imposition of the death penalty.

On the other hand, you will hear argument as to mitigating factors which the defendant argues exist. As with the alleged aggravating factor, you should also consider the evidence at the trial as evidence pertaining to the mitigating factors.

The two mitigating factors which are alleged to exist are, first, that the defendant has no history of criminal activity. And I might state parenthetically at this point that the parties have stipulated, or agreed, that the defendant has no history of criminal activity. Therefore,

91

when you come to that place on the form that you'll get, you will have to answer that yes, the defendant has no history of criminal activity, because he does not.

The second mitigating factor alleged is any other factor which is relevant to the defendant's character or record or to the circumstances of the offense, which, I presume, there will be some statements made to you shortly.

Should you find beyond a reasonable doubt that the aggravating factor has been proven, then it will be your obligation to determine the mitigating factors also present.

While the State must prove aggravating factors beyond a reasonable doubt, the defense has a lesser burden. If any evidence has been presented with respect to a mitigating factor, then you are bound by law to consider it and weigh it against any aggravating factor you may have found present. The defendant does not have to establish the existence of mitigating factors, merely introduce evidence of them.

You will be asked to weigh the evidence of mitigating factors against the aggravating factor proven.

Under our law, the jury must return a special verdict on a form which will be provided to you, stating in writing the existence or nonexistence of the aggravating factor, and the evidence of the mitigating factors alleged.

If any aggravating factor is found to exist, the verdict must also state whether any such factor beyond a reasonable doubt outweighs all mitigating factors.

Should you find that any aggravating factor exists, and beyond a reasonable doubt that this aggravating factor outweighs all mitigating factors, then it's the responsibility of the Judge to impose the death penalty in this case.

If you're not satisfied beyond a reasonable doubt that the aggravating factor exists, or you're not satisfied beyond a reasonable doubt that the aggravating factor

92

outweighs all mitigating factors, then the defendant would be sentenced by the Court to a term of imprisonment from thirty years to life, and whatever term would be imposed, the defendant could not be considered for parole until he has served thirty years in prison.

So at this point, I believe Mr. Zeitz, on behalf of the defendant, will make a statement to you.

ZEITZ: Yes. Thank you, your Honor.

It would be an understatement for me to say that this is not a difficult moment for me, and I'm sure it's difficult for everyone in terms of the proceedings that we now have to deal with.

What, in essence, we are at right now at this stage is a situation where the State has agreed that there is one mitigating factor which you must find exists in the case, and that that is Rob Marshall has never had any type of criminal record of any kind.

The reason why I believe, when you look to the legislative history of the death penalty when it came into New Jersey that that clearly is a mitigating factor, is because, if you will, people feel, and I think quite rightly, that if you live a law-abiding life, that at some point in time you may be in a position where you may have to ask people to allow you to draw, if you will, maybe a credit because of the fact that you've led such a life. There are people obviously who have not led law-abiding lives and have been in situations where they've been in front of a jury and the jury has convicted them of a capital offense, and the jury will hear that this person has led a life, not law-abiding, but, in fact, has had a juvenile record, has had a record of other offenses and, for the most part, has lived a life that in all ways, shapes, and forms never conformed to what our society at least requires.

In this particular case it's been agreed that Rob Marshall has led a law-abiding life, and that you must consider that as a mitigating factor.

93

The State has one aggravating factor which they are going to ask you to consider, and that is the fact that, under the statute, this offense as you have found-- and at this point, as a lawyer, I have to accept that you have found that -- was procured by the payment or the thought of payment for some pecuniary gain.

The other mitigating factor that Judge Greenberg referred to deals with other circumstances and factors which a jury may consider in mitigation with regard to the death penalty. In this particular case, in addition to the fact that Rob Marshall has no prior criminal record, there's certain things, at least with regard to his life, that he has done, which he is entitled for you to consider.

He was involved in, among other things, with the Ocean County Businessmen's Association. You've heard that. He was campaign chairman for the United Way, and for a number of years worked with them in community affairs, raising money for United Way. In addition to that, he served with his family on various social activities, involving the swim leagues and certain other things of a community nature.

I don't want to stand here and go through the whole litany of things that he's done in forty-six years that -- either for other people or for his family or of a civic nature. Suffice it to say, the record is substantial in that area, and you have an absolute right to consider that as a mitigating factor.

As the Judge told you, now, in terms of a defense, we do not have to prove to you that the mitigating factors in some way outweigh the aggravating factor. The State has to prove to you, beyond a reasonable doubt, and you certainly know what that standard is, because you've been told that and you've been explained that by counsel, you have to use that standard when you determine whether or not you feel he deserves the death penalty.

One thing I have to tell you about this, which I think makes it an individual decision for each one of you, and that is that the only way that the death penalty

94

can be imposed is if all twelve of you agree to do it unanimously. So that you, in essence, have a power in your hands that, quite candidly, I would never have in my hands, because, as a lawyer, we generally don't serve as jurors. So I have no way of knowing what it must be like.

All I can say is this, that I hope when you individually consider the death penalty, that you're each able to reach whatever opinion you find in your

own heart, and that whatever you feel is the just thing to do, we can live with it.

Transcript of Proceedings, March 5, 1986, St. Ex. 34T at 5-28.

The jury began its deliberations at 2:20, and at 3:55, the jury unanimously sentenced Marshall to death.

As is obvious from the above replication, Zeitz did little more in the penalty phase than concede the existence of the aggravating factor and make vague references to evidence that was presented at trial only sparsely-- from Marshall's own autobiographical narration and the few "character" witnesses who had testified that Marshall was honest and law-abiding and an excellent salesman. Marshall characterizes the entire penalty phase as a "travesty." App. Br. at 19. He urges numerous ways in which Zeitz mishandled this important phase:

1. The penalty phase should not have commenced immediately upon Marshall's return from the hospital.

2. Zeitz presented no mitigation evidence (even though the judge instructed the jury to decide the existence of mitigating factors based on the evidence).

3. Zeitz failed to offer evidence to humanize Marshall, such as describing his childhood, his commitment to family, and his extensive community service.

4. Zeitz's statement to the jury was extremely brief and contained no request for mercy.

95

5. Zeitz never discussed the penalty phase with Marshall.

6. Zeitz never prepared for the penalty phase and conducted no investigation.

We view these claims as falling into two categories: (1) lack of consultation, preparation, and investigation by counsel, and (2) lack of content or substance in counsel's representation at the penalty phase. Marshall contends that these failures were the result of a "complete[ ] fail[ure] to investigate, prepare or present a case in mitigation, ultimately leaving petitioner in essence, without an advocate on his behalf." App. Br. at 20.

Anyone with an understanding of death penalty litigation, especially during the penalty phase, would be inclined to agree with Marshall's characterization.

The existence of a penalty phase in capital trials makes such trials radically different from ordinary criminal

trials. A full capital trial is in fact two separate but intimately related trials: a preliminary guilt trial focusing on issues pertaining to the commission of a capital offense, and a subsequent penalty trial about the convicted defendant's worthiness to live. The guilt trial establishes the elements of the capital crime. The penalty trial is a trial for life. It is a trial for life in the sense that the defendant's life is at stake, and it is a trial about life, because a central issue is the meaning and value of the defendant's life.

Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299, 303 (1983). The United States Supreme Court, in requiring full disclosure of presentence reports in capital proceedings, emphasized that a process that entrusted the interpretation of the report to a trial court's discretion without allowing for the advocacy of defense counsel was based on:

> the erroneous premise that the participation of counsel is superfluous to the process of evaluating the relevance and significance of aggravating and mitigating facts. Our belief that debate between adversaries is often essential to the truth-seeking

96

> function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases.

Gardner v. Florida, 430 U.S. 349, 360 (1977) (plurality opinion). The Court built upon this rationale in concluding in United States v. Cronic that "[t]he right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." 466 U.S. 648, 656 (1984).

Capital jurisprudence has long recognized that counsel's ability to advocate effectively during the sentencing phase is derived from adequate preparation directed specifically to the penalty phase. Thus, in his concurrence in Strickland, Justice Brennan stressed:

> Of course, "[the] right to present, and to have the sentencer consider, any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence or fails to present a case in mitigation at the capital sentencing hearing." Accordingly, counsel's general duty to investigate takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.

466 U.S. at 706 (Brennan, J., concurring in part and

dissenting in part) (internal citations omitted).

Marshall focuses understandably on what counsel did
not do, juxtaposing it against what counsel did do, which
appears from the record before us to have been very little.
Zeitz rambled his way through the mitigating factors. He
told the jury it had already found the aggravating factor.45

_____

45. Although Marshall does not press this claim on appeal, we note that
under New Jersey law, the jury should have been told to deliberate anew
as to whether the prosecutor had established the existence of the
aggravating factor beyond a reasonable doubt, as well as to what weight
to accord that factor in the face of the mitigating factors presented. The
New Jersey Supreme Court did not reference this, and, in fact, seemed
to find the instructions to the jury to be proper. See Marshall I, 586 A.2d
at 157.

He dwelt more on Marshall's lack of a criminal record --
which the State had stipulated, and the court had
instructed the jury must be found by them-- than on the
other factor that purportedly was the heart of the defense
in the guilt phase, namely, that Marshall was a good person
devoted to his family and community. Here Zeitz noted only
sparse facts, eschewing the notion of going "through a
whole litany" in favor of merely characterizing it as a
"substantial" record. In fact, the record at trial, as we cite
above, only included Marshall's own testimony as to his
community service or his devotion to his family, and that
was elicited in the course of introductory autobiographical
information; it was hardly "substantial."

Toward the beginning of Marshall's testimony, Zeitz
inquired as to the homes Marshall had owned in Toms
River, and whether he worked from home, and whether his
wife helped him. Zeitz then asked whether, while Marshall
was building his sales business, Marshall and his wife
"bec[a]me active in any types of groups or social
organizations or anything of that nature in [his]
community." Marshall responded:

> Well, in 1969, I believe, we joined the country club so
> that I could play tennis and the boys could swim,
> which was really the main purpose of our joining.
>
> I shortly thereafter became a member of the Toms
> River Rotary Club, was co-founder of the Toms River
> Business Association, which was a business-oriented
> group. My wife was a member of a hospital auxiliary
> group, which they referred to as a twig, laurel, pine
> and so forth, all names for trees, which was a group
> which was basically a fund-raising group of women
> who raised money for the hospital.

Direct Testimony of Robert Marshall, February 26, 1986,
St. Ex. 28T at 7-8. Zeitz then asked whether Marshall ever
had become active in United Way.

Yes. Because of my fund-raising activities in other areas for the YMCA and the Rotary and another organization that I belonged to, it seemed as though I always ended up as the fund-raising chairman for one reason or another. So the president of the United Way

asked me if I would join them, and I became the fund-raising chairman in 1982, '83.

Id. at 8. Zeitz then inquired as to Marshall's professional advancement, his certification as a charter life underwriter and earning of a real estate license, his expertise in financial products, and the companies for which he worked and the number of clients he had. Zeitz then moved on to inquiring about the party at which Marshall met Cumber, Marshall's affair with Sarann Kraushaar, and other details of the period of and subsequent to Maria's murder. Yet those bare references to social activities were presented to the jury in the mitigating phase as:

He was involved in, among other things, with the Ocean County Businessmen's Association. You've heard that. He was campaign chairman for the United Way, and for a number of years worked with them in community affairs, raising money for United Way. In addition to that, he served with his family on various social activities, involving the swim leagues and certain other things of a community nature.

I don't want to stand here and go through the whole litany of things that he's done in forty-six years that -- either for other people or for his family or of a civic nature. Suffice it to say, the record is substantial in that area, and you have an absolute right to consider that as a mitigating factor.

Transcript of Proceedings, March 5, 1986, St. Ex. 34T at 16.

Zeitz did not mention, let alone focus on, the intricacies of the weighing process the jury must go through in considering the various factors, telling the jurors instead that the death penalty can be imposed "if all twelve of you agree to do it unanimously." His last words were not a plea for mercy, but, rather, more akin to a verbal shrug of the shoulders: ". . . whatever you feel is the just thing to do, we can live with it." Id. at 17.

Recently, the United States Supreme Court was asked to declare counsel's performance in the penalty phase a  per se violation of the defendant's right to counsel where counsel

had failed to offer mitigating evidence and had waived

closing argument. Bell v. Cone, 535 U.S. ___, 122 S.Ct.
1843 (2002). The United States Supreme Court refused to
do so, making clear that the principles set forth in
Strickland must guide a court's analysis of ineffectiveness
even where a penalty phase presentation appears woefully
inadequate. The elements of the Strickland inquiry in the
penalty phase are no different from the elements in the trial
proceedings: did counsel's representation fall below an
objective standard of reasonableness, 466 U.S. at 688, and
is there "a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would
have been different." Id. at 694. In Bell, the Court noted:

> In Strickland we said that "judicial scrutiny of a
> counsel's performance must be highly deferential" and
> that "every effort [must] be made to eliminate the
> distorting effects of hindsight, to reconstruct the
> circumstances of counsel's challenged conduct, and to
> evaluate the conduct from counsel's perspective at the
> time." Thus, even when a court is presented with an
> ineffective-assistance claim not subject to S 2254(d)(1)
> deference, a defendant must overcome the
> "presumption that, under the circumstances, the
> challenged action 'might be considered sound trial
> strategy.' "

535 U.S. at ___, 122 S.Ct. at 1852 (internal citations
omitted).

Before examining the application of the Strickland
analysis by the New Jersey courts, we will consider the
nature of the types of substandard performance charged by
Marshall, the types of evidence he contends should have
been presented, and the things he alleges should have been
done differently, which Marshall urges would have made it
reasonably probable that the jury would have spared his
life.

The failing Marshall presses most forcefully is the failure
to present readily available witnesses to humanize Marshall
and render him a more sympathetic person who should not
be put to death. These witnesses include Dr. Atkins, who
had accompanied Zeitz the night of Marshall's suicide

100

attempt, and had facilitated Marshall's transfer to a
psychiatric hospital. During that evening, Dr. Atkins spent
about an hour interviewing Marshall alone. His clinical
impressions from that interview were reported to Zeitz in
written form in February 1986. He reported that Marshall
was "suffering a major depressive episode," and that the
suicide attempt was a "bonafide" attempt of"an extremely
fragile, anxious man who was expressing feelings of
hopelessness, helplessness and futility." PCR Appeal,
Defendant-Appellant Appendix, Vol. 31 at Da4281-82.

Only one of Marshall's siblings, his sister Oakleigh
DeCarlo, testified at trial. As discussed at length above, the

purpose of her testimony was limited. Yet, according to Marshall's representations before us, she and her other siblings were prepared to provide testimony that would have shown Marshall to be a generous and caring father and sibling, but also one who was driven by a need to overcome the poverty and abuse he and his family had experienced when he was a child. He worked from a young age, yet also shared his earnings with his family. App. Br. at 26. As DeCarlo would have testified, Marshall's father was a salesman who was often absent, leaving Marshall to take care of his mother and younger siblings. Id . When he was at home, Marshall's father drank heavily and was often abusive. Id. at 27, 31. When growing up, Marshall's family never owned the homes they lived in; when he had his own family, Marshall wanted his sons to "do better than 'we did.' " Id. at 28. His colleagues-- those who testified at all had testified to his success as a salesman or his reputation for being law-abiding only -- could have testified about his commitment to family, and about his fund-raising and other community activities.

Several witnesses were never even contacted. These included Marshall's other sisters and his brother; his secretary, Nikki Daly; Tom North, who grew up with Marshall; the coach of Marshall's sons' swim team, Michael Conlon; and the high school's former athletic director, Bill Lundy, the latter two of whom would have testified to Marshall's generosity and commitment of both time and money. The Executive Director of the United Way, Kathy Sauer, could have testified about Marshall's fund-raising

101

work, and his accountant, Bruce Bowe, could have testified about his charitable contributions. Id. at 36-37. According to Marshall, none were contacted about their possible testimony.

Additionally, and perhaps more importantly, Marshall has testified that counsel had no discussion with him, and that, not only did Zeitz fail to contact witnesses who were prepared and willing to provide relevant mitigating evidence, but he did no preparation or investigation whatsoever for the penalty phase. We know that counsel produced all his interview notes, spanning the time period from December 1984 to January 1986, and in the almost thirty pages of notes, there is no reference to any discussion of the penalty phase. PCR Appeal, Defendant-Appellant Appendix, Vol. 31 at Da4247-76. And we know that both Marshall and Zeitz stated that the discussion as to what would occur in the penalty phase took place during those few minutes between Marshall's return from the hospital and the commencement of the penalty phase. During that time, according to Zeitz, they discussed the agreement Zeitz had just reached with the judge and the prosecutor, as well as whether -- in light of the State's decision not to argue that the offense was heinous, nor to seek an aggravating factor as to the manner in which the killing took place -- he wanted to call his sons as witnesses

in the penalty phase. Cross-Examination of Glenn A. Zeitz, December 20, 1994, St. Ex. 9PCT at 119. In his testimony at the PCR hearing, Marshall summed up the discussion: "I think he asked me if I wanted to go ahead and I said-- I think that's when I said let's get it over with." Direct Testimony of Robert Marshall, December 20, 1994, St. Ex. 9PCT at 142.

Marshall was adamant that the penalty phase had never been discussed prior to trial:

> We never discussed the penalty phase. We only discussed questions dealing with the trial itself. There was never any discussion about the penalty phase. . . . He certainly made me aware that this was a death penalty trial and that that was a possibility, but we never discussed procedurally or anything beyond the

102

> trial itself. We were all -- all our discussions dealt with the trial portion not the possibility of a penalty phase.

Id. at 142. Zeitz admitted that his notes do not reflect any discussions of the penalty phase with Marshall. Id. at 131. And Zeitz testified that when he referred to having discussed the penalty phase procedure with his client, he was referring to the discussion that occurred between the return of the verdict and the commencing of the penalty phase. Id. at 115.

As we noted above, counsel's duty of inquiry in the death penalty sentencing phase is somewhat unique. First, the preparation and investigation for the penalty phase are different from the guilt phase. The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of evidence to make a case for life. The purpose of investigation is to find witnesses to help humanize the defendant, given that a jury has found him guilty of a capital offense. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. The scope of investigation that may be reasonable "may be determined or substantially influenced by the defendant's own statements or actions," and the reasonableness of investigation in particular "depends critically" on the information or guidance provided by the defendant. Id.

Recently, we confronted the question of whether it was reasonable for an attorney to define the parameters of his investigation based on the defendant's account of the facts and the witnesses he identified. Stevens v. Delaware Corr. Ctr., 295 F.3d 361 (3d Cir. 2002). There we concluded that there was no duty to conduct an investigation that would contradict or undermine the defendant's testimony, relying on the statement in Strickland that "counsel's failure to pursue certain investigations cannot be later challenged as unreasonable when the defendant has given counsel reason

to believe tht a line of investigation should not be pursued."
Id. at 374 (quoting Strickland, 466 U.S. at 691). But even
where a client is recalcitrant, courts have been ambivalent
in whether counsel is relieved of any further duty of
investigation, particularly where the client exhibits signs of

instability. See, e.g., Johnston v. Singletary, 162 F.3d 630,
641-42 (11th Cir. 1998). Here, the only possible limitation
recited by Zeitz is that Marshall was unwilling to have his
sons testify again in the penalty phase, even though Zeitz
suggested the possibility in the brief meeting prior to the
commencement of the penalty phase.

Second, we note that the application of the second prong
of Strickland -- the prejudice prong -- has a somewhat
more subtle application in the penalty phase than in the
guilt phase in a "weighing" state such as New Jersey. Given
the unanimity requirement, the "reasonable probability of a
different outcome" would mean that only one juror need
weigh the factors differently and find that the aggravating
factor did not outweigh the two mitigating factors; even if
the aggravating and mitigating factors were of equal weight,
under New Jersey's sentencing scheme, the sentence would
be life in prison, not death. N.J. Stat. Ann. S 2C:11-3c(3)
provides:

> (a) If the jury or the court finds that any aggravating
> factors exist and that all of the aggravating factors
> outweigh beyond a reasonable doubt all of the
> mitigating factors, the court shall sentence the
> defendant to death.
>
> (b) If the jury or the court finds that no aggravating
> factors exist, or that all of the aggravating factors
> which exist do not outweigh all of the mitigating
> factors, the court shall sentence the defendant
> pursuant to subsection b (which provides for sentences
> from thirty years to life).
>
> (c) If the jury is unable to reach a unanimous verdict,
> the court shall sentence the defendant pursuant to
> subsection b (which provides for sentences from thirty
> years to life).

The New Jersey Supreme Court has explained the impact of
these requirements.

> The jury makes that profound decision [as to life or
> death] through its "determination of the existence of
> aggravating and mitigating factors and the balancing of
> the former against the latter." Our capital

> jurisprudence has recognized that "the jury must . . .
> make the normative judgment whether the aggravating

outweigh the mitigating factors beyond a reasonable doubt. That decision, in effect, determines the appropriateness of the death penalty for the defendant." The importance of the jury's determination cannot be overstated, as "the entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die."

State v. Koskovich, 776 A.2d 144, 192 (N.J. 2001) (internal citations omitted).

While Strickland states the applicable principles, the recent United States Supreme Court ruling in Bell is a useful illustration of Strickland's principles to the penalty phase setting. In Bell, defense counsel made an opening statement calling the jury's attention to the mitigating evidence already before them. He noted defendant's mental disturbance, duress, addiction, and feelings of remorse. He urged the jury that it should preserve his life"if one looked at 'the whole man.' " The Supreme Court noted: "He asked for mercy, calling it a blessing that would raise them above the State to the level of God." Bell, 535 U.S. at ___, 122 S.Ct. at 1848. The prosecution put on one witness, but the defense did not. The government attorney (who was not the lead prosecutor) made a "low key" closing. Defense counsel waived final argument, preventing the lead prosecutor, conceded to be very effective, from arguing in rebuttal.

The Sixth Circuit Court of Appeals held that, by counsel's not asking for mercy after the prosecutor's final argument, counsel did not subject the state's call for the death penalty to "meaningful adversarial testing," and that, under Cronic (decided the same day as Strickland), prejudice should be presumed. Id. at ___, 1849. The United States Supreme Court reversed. It noted that this was not a case in which counsel "entirely" failed to subject the prosecution's case to meaningful adversarial testing -- as in Cronic  -- but only failed to oppose the prosecution "at specific points." Id. at ___, 122 S.Ct. at 1851. Accordingly, the Court addressed each of the claimed failures, employing Strickland. In light

105

of Bell, we recognize that, tempted as we might be to conclude that Zeitz's failure to investigate and prepare, or to take any adversarial position or ask for mercy would, without more, constitute objectively unreasonable performance, we are nonetheless constrained to perform the complete Strickland analysis in this setting and to test whether the New Jersey courts' application of Strickland passes muster under the applicable AEDPA standard. We note further that, although Marshall has contended that we could find the performance to constitute objectively unreasonable performance without more, he has not argued that we should evaluate ineffectiveness using the Cronic standard.

In Bell, the United States Supreme Court then found counsel's rationales for not calling certain witnesses and not making a final argument to be acceptable as statements of strategy:

> While counsel recognized that respondent's mother could have provided further information about respondent's childhood and spoken of her love for him, he concluded that she had not made a good witness at the guilt stage, and he did not wish to subject her to further cross-examination. Respondent advances no argument that would call his attorney's assessment into question.

> In his trial preparations, counsel investigated the possibility of calling other witnesses. He thought respondent's sister, who was closest to him, might make a good witness, but she did not want to testify. And even if she had agreed, putting her on the stand would have allowed the prosecutor to question her about the fact that respondent called her from the Todds' house just after the killings. After consulting with his client, counsel opted not to call respondent himself as a witness. And we think counsel had sound tactical reasons for deciding against it. Respondent said he was very angry with the prosecutor and thought he might lash out if pressed on cross examination, which could have only alienated him in the eyes of the jury. There was also the possibility of calling other witnesses from his childhood or days in

106

> the Army. But counsel feared that the prosecution might elicit information about respondent's criminal history. He further feared that testimony about respondent's normal youth might, in the jury's eyes, cut the other way.

Id. at ___, 122 S.Ct. at 1853.

The Court then concluded:

> Given the choices available to respondent's counsel and the reasons we have identified, we cannot say that the state court's application of Strickland's attorney-performance standard was objectively unreasonable.

Id. at ___, 122 S.Ct. at 1854 (emphasis added).

From Bell, then, the task of the reviewing court is to take each of the claimed failures and measure them against counsel's stated rationale to determine whether the choices were objectively unreasonable.

1. Was Counsel's Representation Objectively Unreasonable?

The United States Supreme Court has counseled that in

order to assess counsel's performance objectively, reviewing courts must resist the temptation of hindsight, instead determining whether, given the specific factual setting, and counsel's perspective at the time, his strategic choices were objectively unreasonable.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Strickland, 466 U.S. at 689 (internal citations omitted).

A reviewing court cannot make such a determination on a clean slate. It is this mandated perspective that dictates that a reviewing court rarely resolve ineffectiveness claims on direct appeal, and that underlies the United States Supreme Court's insistence that a sufficient record is necessary in order to rule on ineffectiveness claims such as this. E.g., Roe v. Flores-Ortega, 528 U.S. 470, 487 (2000) (remanding due to the inadequacy of the record); Kimmelman v. Morrison, 477 U.S. 365, 390-91(1986) (remanding because record was inadequate to determine whether the defendant was prejudiced, even though it was adequate to determine that counsel's performance was constitutionally deficient); see also United States v. Headley, 923 F.2d 1079, 1083 (3d Cir. 1991) (noting that claims of ineffectiveness should be brought through a collateral proceeding to develop the factual basis of the claim, unless the record is sufficient to make the assessment on direct appeal); State v. Morton , 715 A.2d 228, 253 (N.J. 1998) (listing cases) (iterating the general policy against considering ineffectiveness claims on direct appeal, and the Court's refusal to decide such claims when the record is "inadequate to disclose what reasons of tactic and strategy motivated counsel"). As is evident from the United States Supreme Court's analysis in Bell , counsel's explanations for his actions might justify what would facially appear to be substandard performance.

The difficulty we encounter here is that the picture is less than complete. We cannot, and the courts before us did not, evaluate Zeitz's decisions in light of his stated strategy. The Court in Bell was able to determine that counsel's decision to offer a neutral and abbreviated penalty phase and no evidence in mitigation was a strategic move on his part; we cannot reach a similar conclusion on this record. Also unlike Bell, there is no record before us as to what preparation or investigation, if any, was performed by

counsel in anticipation of the penalty phase, nor is there any record of why counsel chose not to undertake investigation that we know he did not -- e.g. , why he chose not even to contact many of Marshall's proffered mitigation witnesses. As noted above, we know that his notes reflect no conversations with Marshall about the penalty phase, and that several prospective witnesses were not contacted

by him. We also know that Zeitz's "usual practice would be to prepare something and put a date or some notation." Direct Testimony of Glenn Zeitz, December 1, 1994, St. Ex. 6PCT at 20. Zeitz also testified, however, that there were some conversations with Marshall that were not recorded in his notes. Id.

But, as was the case with Kimmelman v. Morrison , 477 U.S. at 389, the testimony was provided in response to different questions, at an evidentiary hearing held for a different purpose -- to answer the two limited questions discussed above. Just as the United States Supreme Court refused to infer a lack of prejudice from a judge's comments in Kimmelman, we must decline to infer either a lack of strategy or a strategy from the testimony Zeitz provided as to why he announced in his opening statement that Marshall would testify at trial and why he chose not to seek a continuance between the guilt and sentencing phases.

Aside from those two limited areas of inquiry, there was no opportunity for Marshall to subpoena witnesses, and no opportunity for the court to apprise those witnesses' responses to direct and cross-examination. Further, Zeitz refused to submit any affidavits to the court without a subpoena. The Public Defender submitted an affidavit on Marshall's behalf that stated in relevant part:

> 7. He [Zeitz] advised me that because the court had denied the defendant the right to produce testimony on the remaining claims of ineffective assistance of counsel, he was no longer obliged to provide any information to me, either factually or regarding his thought processes, and would not do so.

> 8. Zeitz indicated that he felt that it would be too time consuming for him to review his files and respond regarding what actions he took in representing Mr. Marshall and why he did so. He acknowledged that, were these claims subject to an evidentiary hearing, he could be subpoenaed to testify and would then be forced to answer defense counsel's questions.

Affidavit of Joan Van Pelt, June 22, 1994, DE-44(3) at 2639a. Because the only testimony from Zeitz was restricted to the two areas discussed above, we have no

evidence from Zeitz himself regarding the scope or strategy of his preparation or investigation, or the choices he made in conducting the penalty phase as he did.

To this date we have no information from counsel, or anyone else for that matter, that addresses the issues Marshall raises and from which we could make an informed assessment as to the reasonableness of counsel's actions -- and, even more important -- as to what counsel's decisions actually were at the time.

Marshall urges that the known facts -- the brief penalty statement and failure to call numerous available witnesses -- requires a finding that counsel's actions were necessarily unreasonable. While it is conceivable that a court could conclude that, even if counsel did act for strategic reasons and know of witnesses, but rejected the idea of using them, such a choice was nonetheless objectively unreasonable, we believe the conclusion would run afoul of Strickland and Bell if it were based on analysis absent facts.

2. Is There a Reasonable Probability That, Absent All of Counsel's Alleged Errors, The Penalty Phase Would Have Ended Differently?

Since we conclude that we cannot resolve the first prong of Strickland on this record, we turn -- as the New Jersey Supreme Court did for the most part -- to the second, "prejudice" prong. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." Strickland, 466 U.S. at 691-92. Because under Strickland either prong can be dispositive, if we can conclude that there is no prejudice -- i.e., that even if counsel had not failed in the ways alleged, there is no reasonable probability that the outcome would be different -- our analysis would be at an end. Id. at 697. But we find we cannot so conclude. That is because, given the strength of the allegations of ineffectiveness before us, the brevity and non-adversarial tone of the penalty phase proceeding itself, and our inability to understand or know what counsel did do, it

is impossible for us to conclude that there is not a reasonable probability that the outcome would have been different had counsel done what Marshall urges he should have done.

In the guilt phase prejudice analysis, the quantity and quality of what was done by counsel and the evidence presented enabled us to determine that the alleged ineffectiveness was not prejudicial. Here, in contrast, Marshall has demonstrated an apparent lack of adversarial effort. The quantity and quality of what was done by counsel is sorely lacking. Plus, Marshall has offered a

significant quantum of apparently relevant mitigating evidence that was never placed before the jury for consideration. If all of Marshall's allegations of ineffectiveness are as he claims, it would be difficult to conclude that the outcome would not have been different had the evidence been offered. This is especially true given, as we have noted, the emphasis on the non-mathematical nature of a jury's "weighing" of aggravating and mitigating circumstances. Indeed, the New Jersey Supreme Court has rejected proportionality review methods that overemphasize quantitative comparisons, precisely because it recognizes that jury deliberations during the penalty phase are "intensely qualitative." State v. Loftin , 724 A.2d 129, 150 (N.J. 1999) (quoting Marshall's proportionality review, State v. Marshall, 613 A. 2d 1059, 1091 (N.J. 1992)).

But even as to the prejudice prong, we are frustrated by the state of the record. For all we know, counsel may have known that the prosecution intended to produce devastating testimony to counter what Marshall now says would have been persuasive. We cannot tell what portion, if any, of the quantum of what counsel did not do should be deemed ineffective rather than strategic. And, if we do not know what "ineffectiveness" goes into the prejudice equation, it is difficult if not impossible to calculate the probable difference it would have made in terms of the outcome. Therefore, as we discuss above, we cannot conclude that Marshall was not prejudiced; further, we cannot conclude that he was, because we have no idea how much of the claimed ineffectiveness was truly ineffective -- if any -- and accordingly cannot opine as to a reasonable

111

probability that the outcome would have been different. Given these unknowns, we would run afoul of both [Terry] Williams and Bell if we were to find prejudice on the state of this record. Under [Terry] Williams, courts are required to "evaluate the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- in reweighing it against the evidence in aggravation." 529 U.S. at 397-98. And Bell  counsels against per se conclusions based on less than complete facts. We know only Marshall's alleged totality of evidence; on remand the District Court will conduct a hearing and will actually know which of counsel's actions and omissions were ineffective under Strickland and should be weighed in the balance. Thus, the District Court will be able to engage in a fully-developed prejudice analysis.

We note that Marshall has consistently raised the lack of an evidentiary hearing as an issue before the New Jersey Supreme Court, the District Court, and before us, contending that he requires an evidentiary hearing to develop the record on his ineffectiveness claims. We agree. But, under AEDPA, the critical question is not whether we disagree with the New Jersey Supreme Court, but whether the New Jersey Supreme Court's determination of the facts or application of the law was unreasonable. We will address

the need for a hearing in that context.

3. The New Jersey Supreme Court's Strickland Analysis

The New Jersey Supreme Court addressed claims of
ineffectiveness on both direct appeal and on appeal from
the denial of post-conviction relief. Both times, the Court
determined that Marshall was not prejudiced by counsel's
alleged failures. In so doing, however, we are constrained to
find that the Court was diverted from the principles we
cited above.

      a. Performance: The Analysis on Direct Appeal

On direct appeal the New Jersey Supreme Court
addressed two aspects of the ineffectiveness claims-- the
additional mitigating evidence that Marshall urges should
have been presented, and the brevity of counsel's penalty
phase appeal to the jury. The Court's approach to both

these issues demonstrates why the claim can only be
decided under Strickland with the benefit of counsel's
insight at an evidentiary hearing. The Court's analysis was
based on surmise as to why counsel might have chosen to
act as he did. The essence of the Court's ruling was that
counsel had his reasons for not presenting mitigating
evidence:

> It is self-evident that in view of the crime of which
> defendant was convicted, the selection of mitigating
> evidence on which to rely was a matter of some
> delicacy, requiring counsel to consider carefully the
> prospect of rebuttal evidence and rebuttal arguments,
> as well as the jury's anticipated reaction to any
> mitigation evidence that was offered. We are unwilling
> to second-guess counsel's strategic decision on this
> issue, particularly in view of the jury's determination
> that both mitigating factors offered had been
> established.

Marshall I, 586 A.2d at 172. This conclusion assumes that
counsel had prepared and investigated, that he knew of and
did "select" mitigating evidence and did "consider carefully"
how to proceed, and that he made a "strategic decision" not
to use the mitigating evidence he had before him. We can
find no evidence to support this assumed basis for
counsel's actions or these factual findings, and they are
therefore not reasonable determinations of the facts.

Then, addressing the brevity of counsel's argument at
sentencing, the Court opined that, because the prosecutor's
response had addressed both mitigating factors relied upon
by defendant:

> [I]t is reasonable to assume that the content of
> defendant's closing argument was formulated in
> anticipation of the State's response.

We also infer from counsel's closing argument a
strategic decision to avoid any emotional appeal to the
jury, in favor of a low-key statement that emphasized
that the life or death decision was the responsibility of
each individual juror. In the context of this record and
the grave offense of which defendant was convicted, a
closing argument that focused each juror's attention on

113

his or her moral responsibility for defendant's life or
death cannot easily be discredited.

Id. at 173 (internal citations omitted). The Court then
referenced the case of Romero v. Lynaugh, 884 F.2d 871
(5th Cir. 1989), as support for the type of "difficult
situation" faced by counsel. It concluded:

We are in accord with the reasoning of the Fifth Circuit
in Romero, supra. What constitutes an effective closing
argument in a capital case depends on the crime, the
evidence, the circumstances -- in short, the entire
record, and there is no general rule requiring counsel
in such cases to appeal specifically to the jury to spare
the defendant's life. The argument that may succeed in
one case can fail in another, and our responsibility is
to insure that competent capital counsel, having an
"expertise regarding the special considerations present
in capital cases," made a reasonable strategic choice
based on adequate investigation. We are unpersuaded
that defendant's highly-experienced and qualified
counsel acted unreasonably in formulating his closing
argument to the jury.

Marshall I, 586 A.2d at 173 (internal citations omitted). The
problem with the Court's reasoning is that, while
referencing specific factors on which counsel's decision
regarding a closing argument can depend, the Court
actually knew nothing regarding whether those factors
played any role at all in Zeitz's decision, but assumed that
a strategic choice was made and was reasonable, merely
because the choice would have been "difficult." In Romero,
the Fifth Circuit Court of Appeals was reviewing the
testimony provided by the attorney to assess the
reasonableness of the strategic choices he had made. Here,
the New Jersey Supreme Court has in essence created a
new standard that would hold any strategy reasonable if
the choices presented to counsel were "difficult." Such
reasoning would eviscerate evidentiary hearings when
ineffectiveness at the sentencing phase in a capital case is
claimed, because, as Marshall notes in his brief, all
strategic choices that counsel must make in asking a jury
who has convicted a defendant of a capital crime not to
impose the death sentence are difficult. But such a

114

standard would be contrary to the principles enunciated in Strickland and applied by the United States Supreme Court in subsequent cases, including [Terry] Williams v. Taylor, 529 U.S. 362, 399 (2000), where the Court held that Williams' counsel was ineffective at the sentencing phase for shortcomings similar to those Marshall has alleged here.

As demonstrated in both [Terry] Williams and Bell, under Strickland the reviewing court must consider whether counsel's performance was substandard by employing a specific inquiry into what counsel did and why, and comparing that to what the appellant urges should have been done; such an inquiry cannot rest on generalized assumptions.

> b. Prejudice: The Analysis on Direct Appeal

In assessing the "prejudice" prong of Strickland, the Court stated in conclusory fashion:

> In any event, we have no doubt that even if counsel's closing argument were deemed to be deficient, there was no reasonable probability that deficiency materially contributed to defendant's death sentence.

Marshall I, 586 A.2d at 174. This is the entire reasoning regarding this issue. The Court sets forth no analysis or explanation, and the standard it states is at best imprecise. Every finding of lack of prejudice under Strickland must be based on certain logic or principles that can be tested. Here there is none. This is perhaps understandable, because a thoughtful analysis under the Strickland prejudice prong -- as urged by Justices O'Connor and Stevens in [Terry] Williams -- must include an understanding as to the omitted matter, that is, what the penalty would have consisted of had counsel been effective, so as to determine whether it would have affected the outcome. The New Jersey Supreme Court on direct appeal did not consider what a lengthier more adversarial presentation with evidence in mitigation might have contained and how that would have impacted the jury's deliberations. We view its determination as unreasonably applying Strickland's second prong as well.

115

> c. The Analysis on Appeal to the New Jersey Supreme
> Court of Denial of Post-Conviction Relief

In addressing Marshall's appeal from the denial of post-conviction relief, the New Jersey Supreme Court was again called upon to address a myriad of ineffectiveness claims asserted by Marshall regarding the penalty phase. Although the New Jersey Supreme Court had before it the testimony adduced at the limited evidentiary hearing, the PCR court had denied an evidentiary hearing as to the remaining ineffectiveness claims, and the New Jersey Supreme Court affirmed that denial. The Court explained the standards for the grant of a hearing.

> Although no PCR rule requires that evidentiary
> hearings be held on PCR petitions, Rule 3:22-10
> recognizes that the PCR court may exercise its
> discretion to conduct evidentiary hearings at which
> oral testimony is taken. Post conviction relief"courts
> ordinarily should grant evidentiary hearings . . . if a
> defendant has presented a prima facie [case] in support
> of post-conviction relief." To establish such a prima
> facie case, the defendant must demonstrate a
> reasonable likelihood that his or her claim will
> ultimately succeed on the merits.

Marshall II, 690 A.2d at 35 (internal citations omitted).46 In
affirming the denial, the Court concluded that Marshall had
not made "the requisite showing suggesting that an
evidentiary hearing would demonstrate a probability that

---

46. The dissent noted in response to the denial of an evidentiary hearing
on Marshall's penalty phase ineffectiveness claims:

> In this case, defendant seeks a hearing to establish that he was
> sentenced to death without the constitutionally-required effective
> assistance of counsel. In order to establish his entitlement to a
> hearing, defendant's petition need only raise a prima facie right to
> relief. Defendant's petition raises an almost open and shut case of
> ineffective assistance of counsel. All that can possibly sustain the
> conviction is a hearing that might somehow lend credibility to
> counsel's choice to present no case at all.

Marshall II, 690 A.2d at 100 (O'Hern, J., concurring in part and
dissenting in part).

116

the production of the omitted evidence would have affected
substantially the jury's penalty-phase deliberations." Id. at
84.

Again, the Court's analysis suffers from a lack of
knowledge that can be attributed to the lack of an
evidentiary hearing. As a result, the Court once again
speculated and made assumptions as to counsel's rationale
and as to the probable impact. It should be noted that by
this time there was some evidence in the record from the
limited evidentiary hearing. However, Zeitz's only testimony
during this limited hearing relevant to his strategy in the
penalty phase was regarding his discussions with Marshall
about the penalty phase during which he acknowledged
that the written notes he had maintained as a
memorialization of his numerous conversations with
defendant did not reflect any penalty-phase discussions.
There were also non-testimonial submissions, two of which
are discussed in greater detail below.

On appeal from the denial of post-conviction relief, the
New Jersey Supreme Court sidestepped the questions of
counsel's performance, often merging the performance and

prejudice analysis. The Court characterized Marshall's "generalized complaints of ineffectiveness" as follows:

> [T]rial counsel's decision to present no penalty-phase witnesses and to advance no forceful argument in summation against the death penalty was not the product of a strategic decision by trial counsel, but simply reflected counsel's utter lack of preparation for a penalty-phase proceeding.

Id. at 79. The Court noted that support for this claim consisted of a certification from Van Pelt, the Public Defender, and an affidavit from Ruffin, a mitigation specialist, who, the Court noted, was a psychologist, not an attorney. Van Pelt certified that she had reviewed Zeitz's files, and they contained

> no materials concerning the penalty phase of the case, no legal research concerning aggravating and mitigating factors or requests to charge in the penalty phase of capital cases, no reports of investigations in preparation for a case in mitigation, no reports of

117

> consultations with experts in the presentation of mitigating evidence, and no notes of interviews with friends or family members in preparation for the presentation of mitigating evidence.

Id. Ruffin, who is hired by attorneys to assist in the preparation and presentation of mitigation evidence in capital cases, submitted an affidavit detailing what a "proper" mitigation investigation should include, and concluded that, from his review of Zeitz's files, Zeitz "failed to conduct a penalty-phase investigation that met the accepted standards of counsel experienced in the conduct of death-penalty trials." Id.

The Court then discussed the Strickland test, and its application in the context of a penalty phase proceeding, and noted its view:

> [A] reviewing court strays from its traditional function if it attempts to predict the probability that a penalty-phase jury would have changed its verdict if counsel had not been deficient. In our view, an adaptation of the Strickland/Fritz prejudice test to capital-case penalty-phase proceedings that more faithfully reflects our appellate function would require courts to determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially.

Id. at 81. These variations from the specific Strickland standard might be, on the one hand, permissible useful distinctions, or, on the other, deviations not in keeping within Supreme Court precedent.[47] However, we will not

challenge the Court's fashioning its own rule, as such,
unless its application actually runs afoul of Strickland.

The Court decried the lack of evidence regarding
information that an adequate investigation would have
revealed, and of other information that would have had a

_____

47. The Court stated it was confident that it was faithful to Strickland:
"We are satisfied that our adaptation of the Strickland prejudice prong to
penalty-phase proceedings is faithful to the core meaning of the standard
announced by the Strickland court." Id. at 82.

118

"substantial effect" on the jury's deliberation in the penalty
phase:

> However, no documentation in the PCR record
> discloses information that an adequate investigation
> would have revealed and that would have been
> reasonably likely to affect substantially the jury's
> deliberations in the penalty phase. Ruffin's
> unsubstantiated allegation that such information
> "exists" is plainly inadequate. Even with the benefit of
> hindsight, PCR counsel does not allege the existence of
> facts, information, or specific evidence possessing a
> reasonable possibility of having had a substantial effect
> on the jury's deliberation in the penalty phase.

Id. at 82. However, two pages later it recounted at length --
in connection with Marshall's argument regarding failure to
present mitigating evidence -- the very types of witnesses
not produced, and investigation not undertaken, by counsel
that should have been considered to be relevant mitigating
evidence:

> Defendant alleges that counsel was ineffective in failing
> to present specific types of mitigating evidence,
> including testimony from defendant's sister, Oakleigh
> DeCarlo, about their relationship and childhood and
> the impact of defendant's execution on her and
> defendant's children; testimony of an unspecified
> nature from a psychologist or other mental health
> professional; testimony from a qualified social scientist
> about defendant's likelihood of recidivism; testimony
> from a qualified mental health professional regarding
> defendant's lack of future dangerousness; testimony
> from Dr. Atkins concerning defendant's depressive
> state and suicidal tendencies on the occasion of
> defendant's alleged suicide attempt at the Best Western
> Motel; evidence consisting of family photographs
> provided to trial counsel by defendant's sister;
> testimony from Henry Tamburin concerning
> defendant's philosophy of gambling; evidence
> consisting of a letter written in July 1985 by the
> victim's father in support of a motion for bail
> reduction; testimony from defendant's son, John,
> concerning defendant's mental state when he spoke to

>John from the Best Western Motel and concerning
>John's relationship with defendant and the likely
>impact of defendant's execution on their family;
>testimony from defendant's religious counselors about
>the appropriateness of sentencing defendant to death;
>and testimony establishing as a specific mitigating
>factor that defendant's execution would cause hardship
>and emotional distress on defendant's family.

Id. at 84. The Court never discusses the impact of the two expert submissions or of this proffered mitigating evidence, but reiterates that it lacked specific information that would have altered the outcome: "That conclusion is buttressed by the inability of PCR counsel to identify specific facts or information concerning defendant that, if offered as mitigating evidence, were likely to have affected substantially the jury's penalty-phase deliberations." Id. at 83. The Court reasoned that, due to the "nature of the crime" and assessing the "entire trial" and the "grave offense" of which defendant was convicted: "After the jury returned a guilty verdict, the conclusion is inescapable that the task of mounting an effective mitigating strategy was formidable indeed."48 Id . at 82-83. The Court then concluded:

>We entertain no doubt that even the most experienced
>capital counsel would have encountered considerable
>difficulty in preparing an effective case in mitigation for
>the penalty-phase of defendant's trial. Acknowledging
>that difficulty, we cannot ascertain on the record before
>us whether or not an evidentiary hearing might
>establish that trial counsel's preparation for the

_____

48. The Court made several assumptions along the way: The nature of the crime of which defendant was convicted diminished the likelihood that the types of mitigation evidence commonly used in capital cases would have had a positive impact on the jury; the claims of ineffective assistance of counsel in the penalty phase can fairly be assessed only in the context of the entire trial record and of the grave offense of which defendant was convicted; because trial counsel was privately retained and well-compensated, the inference was compelling that strategic decisions were not made without consultation with defendant; after the jury returned a guilty verdict, the conclusion was inescapable that the task of mounting an effective mitigation strategy was formidable indeed.

>penalty phase was deficient. Nevertheless, following the
>admonition in Strickland that disposition of the
>prejudice prong of an ineffectiveness claim may obviate
>resolution of whether counsel's performance was
>deficient, we hold that defendant has failed to
>demonstrate any likelihood that an evidentiary hearing
>would produce proof that would show that there is a

reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially. In reaching that conclusion, we reiterate our observation on direct appeal that "the jury found both mitigating factors relied on by defendant . . . [and] that several defense witnesses at trial testified to defendant's good reputation in the community, and defendant testified extensively concerning his background, education, family life, and civic activities." In this case, the contention that proper investigation and preparation would have unearthed new mitigating evidence that probably would have affected substantially the penalty-phase deliberations is simply too speculative to warrant an evidentiary hearing. Accordingly, we reject on the merits defendant's generalized claims of ineffectiveness of counsel in the penalty phase.

Id. at 83 (internal citations omitted). The Court thus disposed of the "generalized" claims of ineffectiveness.

It may be that the New Jersey Supreme Court viewed the prospect of seeking to convince a jury to spare Marshall's life as a hopeless, useless act in light of the heinous crime the jury found he had committed. But that reasoning is not fact-based, and, as a matter of law, disregards the very function of mitigating evidence and the humanization of the defendant that counsel must at least attempt to accomplish in the penalty phase, indeed, the very purpose of characterizing the sentencing proceeding as adversarial. And does not the reasoning that the gravity of the crime itself will inevitably cause the jury to vote for death, mean that the attorney must interpose something between the crime and the juror's minds such that any decision not to do so is at the least a questionable, if not an unreasonable, strategy? Even the attorney in Bell tried to humanize Bell,

121

urging the jury "that there was a good reason for preserving his client's life if one looked at 'the whole man.' " Bell, 535 U.S. at ___, 122 S.Ct. at 1848. Here, counsel did very little in this regard, and we have no knowledge of why he did what he did do.

On appeal from the denial of post-conviction relief, the New Jersey Supreme Court chose not to decide whether counsel's representation was deficient, but decided instead based upon the prejudice prong:

>       [W]e hold that defendant has failed to demonstrate any likelihood that an evidentiary hearing would produce proof that would show that there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially.

Marshall II, 690 A.2d at 83. But, although this "holding" is couched in prejudice terms, it is really not a conclusion

regarding prejudice, because the Court reached its conclusion without ever considering the impact the omitted material might have had on the jury's deliberations. Instead, the Court appears to be justifying its denial of an evidentiary hearing -- the purpose of which would have been to provide the information the court was lacking, namely what counsel did and did not do -- despite the fact that the hearing was the only way the Court could have been informed, through counsel's own testimony after the fact and with the benefit of hindsight, as to what counsel actually did or failed to do, in order that the Court could ascertain whether his acts were substandard and prejudicial. Thus, the Court's somewhat cryptic analysis and conclusions epitomize the basic problem that, as we have noted, is an essential aspect of any Strickland ruling and is lacking here -- a sufficient record to probe the claimed ineffectiveness.

The Court did subsequently refer to what it termed "specific" ineffectiveness claims, i.e. , the failure to present the itemized witnesses to which we referred above. The Court viewed this claim, and other similar ones, to "involve clearly debatable issues of strategy," but then concluded:

> We are unpersuaded that trial counsel's failure to offer evidence of the type described in defendant's specific claims constitutes ineffectiveness of counsel, or that defendant has made the requisite showing suggesting that an evidentiary hearing would demonstrate a probability that the production of the omitted evidence would have affected substantially the jury's penalty-phase deliberations. Each of the specific allegations of ineffectiveness involves evidence that, although possibly beneficial to defendant, posed the clear risk of an adverse jury reaction. In reviewing claims of ineffective assistance of counsel, we reiterate that a defendant must show that "counsel's representation fell below an objective standard of reasonableness," and that "[j]udicial scrutiny of counsel's performance must be highly deferential." None of defendant's claims of ineffectiveness based on the failure to offer specific mitigating evidence in the penalty phase satisfy the Strickland standards.

Id. at 84 (internal citations omitted). Once again, the Court is at once rejecting the notion of an evidentiary hearing and assuming strategic considerations; as a result, the Court gives deference to counsel's decision-making that we find lacking in record support.

We conclude that Strickland requires an analysis based on a complete record. The reviewing court's reasoning under the first prong needs to be made with an understanding of counsel's thought process, as in Bell, so that a conclusion whether counsel was ineffective can be made based on facts of record, rather than on assumptions. Similarly, the prejudice test requires that once the areas

where counsel was found to be ineffective are identified, the redefined presentation must be measured against the reasonably probable outcome in a given case.49 In the penalty phase of a capital case, this involves a delicate weighing process.

---

49. If a court chooses to undertake the prejudice prong first, as Strickland clearly allows, it must make its assessment assuming that defendant's allegations are true.

A proper prejudice determination requires the reviewing court to reweigh the aggravating and mitigating factors with all of the corrections taken into account. See[Terry] Williams v. Taylor, 529 U.S. at 398 (faulting the court for "fail[ing] to evaluate the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- in reweighing it against the evidence in aggravation"). In other words, "the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." Id. at 399. Although the Williams Court cited to Clemons v. Mississippi, 494 U.S. 738 (1990), as its model for reweighing, the reweighing process is set out in Strickland itself.

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account

of the effect of the errors on the remaining findings, a
court making the prejudice inquiry must ask if the
defendant has met the burden of showing that the
decision reached would reasonably likely have been
different absent the errors.

Strickland, 466 U.S. at 695-96. In Clemons, the Court
stressed that reweighing must "give defendants the
individualized treatment that would result from actual
reweighing of the mix of mitigating factors and aggravating
circumstances." 494 U.S. at 752 (emphasis added). There,
the Court was seeking to assess the validity of a sentencing
decision when one of the aggravating factors had been held
to be invalid. But the requirement that the total mix be
reevaluated is no less critical when the claim is as to
counsel's ineffectiveness, as the Court's citation to Clemons
in [Terry] Williams demonstrates.

Here, the New Jersey Supreme Court, and on its heels,
the District Court, did not conduct a re-weighing under the
prejudice prong. In fact, it could not do so, because it had
not fully explored what was to be weighed. It never held an
evidentiary hearing, and the non-testimonial hearing that
the District Court did conduct did not have input from the
critical party -- Zeitz -- because he refused to submit an
affidavit to the Court. The dissenters on the New Jersey
Supreme Court were correct that on these facts, it was
impossible to adjudicate Marshall's claim reasonably
without further factual development. See Marshall II, 690
A.2d at 100-02 (O'Hern, J., concurring in part and
dissenting in part). The New Jersey Supreme Court's
determination was thus an unreasonable application of
Strickland -- based on its unreasonable determination of
the underlying facts.

4. The Remedy

We still must address the question of whether the proper
remedy is to grant the collateral relief that Marshall seeks,
or whether to remand for further proceedings in the District
Court. We have stated that the New Jersey Supreme Court
unreasonably determined the underlying facts. But that
error was not detected by the District Court when it denied
Marshall's habeas petition. The District Court refused to

125

allow Marshall to depose Zeitz to develop his ineffectiveness
claim, reasoning that "[e]ven looking at petitioner's most
disturbing suggestion, that Zeitz failed to sufficiently
investigate and prepare for petitioner's penalty phase,
petitioner has not pointed to specifics or explained precisely
how deposing Mr. Zeitz would allow him to succeed in
proving such a Strickland violation." Marshall III, 103 F.
Supp. 2d at 767. The District Court further stated that it
"agrees with the New Jersey Supreme Court that because
Mr. Zeitz consistently consulted with petitioner throughout
the penalty phase and because his request does not specify

what he hopes to find by deposing Mr. Zeitz, this Court is unwilling to second-guess Mr. Zeitz's strategic decisions." Id. The Court treated the request to depose Zeitz as a discovery request, and concluded that the "full evidentiary hearing" sought by Marshall on both the Brady and Strickland claims was not required, because"none of the Townsend factors requiring an evidentiary hearing are applicable here, and all of petitioner's claims were fully and fairly developed during the state court proceedings." Id. at 772.

At the end of the day, our ruling is that the District Court erred in concluding that the State's application of Strickland was reasonable. We conclude that the District Court could not make that determination without conducting an evidentiary hearing to explore the claimed ineffectiveness of counsel. We note the possibility that after the District Court holds the evidentiary hearing it may conclude that under Strickland counsel was not ineffective or Marshall was not prejudiced such that the New Jersey Supreme Court's ruling would stand. If, on the other hand, the hearing reveals facts to suggest the conclusion that the two prong Strickland test has been satisfied, the writ should thereupon issue, conditioned on a new sentencing phase. Therefore, it is not only appropriate for the District Court to hold the evidentiary hearing on remand, it is essential to its proper consideration of the New Jersey Supreme Court ruling under Strickland. We note that our sister courts of appeals have likewise remanded for further factual development when the record has been inadequate to make a proper legal determination of a claim raised on habeas appeal post-AEDPA, in some instances expressly requiring

126

an evidentiary hearing, and in others merely noting its availability as a tool for the district court to use in its development of the record. See, e.g., Newell v. Hanks, 283 F.3d 827, 838 (7th Cir. 2002); Greer v. Mitchell , 264 F.3d 663, 669 (6th Cir. 2001); United States v. Johnson, 256 F.3d 895, 898 (9th Cir. 2001) (en banc); Valverde v. Stinson, 224 F.3d 129, 135 (2d Cir. 2000). We conclude that a District Court hearing is essential, and remand for a new ruling by the District Court as to Strickland based upon a complete record.

Conclusion

For all the reasons recited above, the decision of the District Court as to the claim of ineffectiveness of counsel in the sentencing phase will be REVERSED and REMANDED for further proceedings consistent with this opinion. The Certificate of Appealability granted on March 28, 2001, with respect to claims 4 and 5 of appellant's application therefor, will be DISMISSED as improvidently granted. As to all other claims, the decision of the District Court will be AFFIRMED.

A True Copy:

Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

127